UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JOSEPH Di MARTINO and EUGENE B. SHANKS, Jr.,

                               Petitioners,           Civ. 2008

            - against -

MARGARET DOOLEY,

                              Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## NOTICE OF REMOVAL

        MARGARET DOOLEY ("Margaret"), by her attorney, Guy R. Fairstein, for her

notice of removal, states:

           1.       Margaret removes to this Court a special proceeding under CPLR Article

75 commenced against her in the Supreme Court of the State of New York, County of New York

(Index No. 601436/2008) (the "NYS Proceeding"), by Joseph Di Martino ("DiMartino") and

Eugene B. Shanks, Jr. ("Shanks"), as petitioners.  In the NYS Proceeding, Di Martino and

Shanks seek an order staying an arbitration commenced by Margaret, whose demand for

arbitration was filed with the American Arbitration Association (the "AAA") on April 28, 2008.

By an order to show cause, dated May 13, 2008, the petition of Di Martino and Shanks was made

returnable in the Supreme Court, New York County, on May 21, 2008.  The order to show cause,

the petition, and the supporting papers of Di Martino and Shanks are under this notice of

removal.  A copy of Margaret's demand for arbitration, without the exhibits thereto as filed with

the AAA, is Exhibit B to the supporting affirmation of Howard J. Rubin.

        2.     Removal is effected pursuant to 28 U.S.C. § 1441(b) and 9 U.S.C. § 205, on the ground that the subject matter of the NYS Proceeding relates to an arbitration agreement falling under The Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "New York Convention").

        3.     Under 9 U.S.C. § 203, the NYS Proceeding is deemed to arise under the laws and treaties of the United States, and this Court has original jurisdiction over it.

        4.     Under 9 U.S.C. § 204, venue is proper in New York County, the place designated in the arbitration agreement as the place of arbitration.

        5.     Under 9 U.S.C. § 202, the arbitration agreement falls under the New York Convention because: it arises out of a legal relationship considered as commercial; it is not entirely between citizens of the United States; it envisages both performance and enforcement abroad; and it has some other reasonable relation with one or more foreign states which are signatories to the Convention.

        A.     The arbitration agreement is contained in an employer-promulgated long-term incentive plan, the Performance Unit Plan (the "LTIP") for CDC North America Inc. and its subsidiaries (now Natixis Capital Markets, Inc.), adopted by the CDC Advisory Board on September 1, 1997, and restated at least once thereafter. Margaret demanded arbitration under the LTIP Document and the New York Convention (Rubin Affirmation, Exhibit B):

>         1.     Margaret demands the arbitration, in New York,
> New York, of her claims under: (a) an employer-promulgated plan, the
> Performance Unit Plan (the "LTIP") for CDC North America Inc. and its
> subsidiaries, adopted by the CDC Advisory Board on September 1, 1997,
> for "Performance Periods" beginning on or after January 1, 1997, and

effective as to all Performance Periods begun prior to January 1, 2006; and (b) 9 U.S.C. §§ 201, et seq., the enabling legislation for the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention").

The purposes of the LTIP are set forth in the LTIP Document (Exhibit B to the supporting affidavit of Joseph Di Martino):

> 1.    **Purposes**.    The purposes of this Performance Unit Plan (the "Plan") are to assist CDC North America Inc. and its subsidiaries (collectively referred to herein as the "Company") in attracting, retaining, motivating and rewarding employees and whose performance can impact the long term success of the Company by providing competitive compensation opportunities that reward outstanding performance.

The LTIP is a legal relationship considered as commercial, within 9 U.S.C. § 202.

    B.    The LTIP is not entirely between citizens of the United States.

Margaret is a citizen of the United Kingdom(demand for arbitration, at ¶ 3).  Other participants in the LTIP are citizens of countries other than the United States, including at least : Philippe Kieffer, a citizen of France residing in the United Kingdom; Kristine Jensen, a citizen of Denmark residing in the United Kingdom; and others who are, upon information and belief, citizens of France residing in the United States (id., at ¶ 10).  One of the members of the LTIP Advisory Board is required to be a representative of Natixis's parent company in France, and is designated the "French Representative" (see Exhibit A to the supporting affidavit of Joseph DiMartino, at ¶ 2), the position filled by Arbitration-Respondent Anthony Orsatelli, who is, upon information and belief, a citizen and resident of France (demand for arbitration., at ¶¶ 5.A, 10).

    C.    The LTIP envisages performance and enforcement abroad, as its participants include employees of Natixis residing outside the United States, and as an arbitration

award against Arbitration-Respondent Anthony Orsatelli would be enforced in France.

        D.     The United States, Denmark, France and The United Kingdom are parties to the New York Convention (id., at ¶ 12) . See:

http://www.uncitral.org/uncitral/en/uncitral_texts/arbitration/NYConvention_status.html

      6.     Pursuant to 28 U.S.C. 1441(b), Margaret submits these papers filed in the Supreme Court of the State of New York, County of New York: (a) order to show cause, dated May 13, 2008; (b) petition, dated May 13, 2008; (c) affirmation of Howard J. Rubin, dated May 13, 2008, and Exhibits A and B thereto; (d) affidavit of Eugene B. Shanks, Jr., sworn to on May 12, 2008; (e) affidavit of Joseph Di Martino, sworn to on May 13, 2008, and Exhibits A, B and C thereto; and (f) memorandum of law, dated May 13, 2008.

      7.     Margaret intends to move to compel arbitration.

Dated: May 19, 2008

                                    Guy R. Fairstein - GF-1721

                                    15 Stewart Place - No. 11-J
                                    White Plains, NY 10603
                                    914-328-0923

To:

Davis & Gilbert LLP
Attorneys for the Petitioners
1740 Broadway
New York, NY 10019

The Clerk
Supreme Court, New York County
Supreme Court Building
60 Centre Street
New York, NY 10007

4

**Papers filed in the
Supreme Court of the State of New York,
County of New York,
on behalf of Joseph Di Martino
and Eugene B. Shanks, Jr.,
under Index No. 601436/2008**

**Order to Show Cause, dated May 13, 2008**

**ORIGINAL**

At an ~~Term~~ IAS Part of the Supreme Court of the State of New York, in and for the County of New York, at the Courthouse thereof, 60 Centre Street, New York, New York on the 17 day of May, 2008

Present: Hon. _____ J.S.C.

---

JOSEPH Di MARTINO AND EUGENE B. SHANKS, Jr.,

                    Petitioners,

    -against-

MARGARET DOOLEY,

                    Respondent.

---

MOTION SEQUENCE # 001

Index No: 601436/08

**ORDER TO SHOW CAUSE**

---

Upon the accompanying Petition, the Affirmation of Howard J. Rubin, Esq. and the exhibits annexed thereto, the Affidavit of Joseph Di Martino, and the exhibits annexed thereto, the Affidavit of Eugene B. Shanks, Jr. and the accompanying Memorandum of Law submitted herewith, and good cause having been alleged, it is hereby:

**ORDERED,** that Respondent Margaret Dooley ("Dooley") show cause before the New York County Supreme Court, IAS Part 36, Room 248 at 60 Centre Street, New York, New York on the 21st day of May 2008, at 9:30 a.m. or as soon thereafter as counsel can be heard, why an order should not be made and entered, pursuant to Article 75 of the CPLR staying the arbitration commenced by Dooley against Joseph Di Martino and Eugene B. Shanks, Jr. ("Petitioners"); and

**IT IS FURTHER ORDERED**, that a copy of this Order and the papers upon which it is granted shall be <u>served</u> personally or by overnight delivery, upon Dooley's attorney, Guy R. Fairstein, Esq., at his office address, 15 Stewart Place, No. 11-J, White Plains, New York on or before May 14, 2008, and that such service shall be deemed good service; and

**IT IS FURTHER ORDERED**, that Dooley shall serve any papers in opposition to this motion by hand upon Davis & Gilbert LLP, 1740 Broadway, New York, New York, attention: Howard J. Rubin, Esq., on or before on May 2$0^{th}$, 2008; and

~~IT IS FURTHER ORDERED, that that Petitioners will serve reply papers, if any, by hand upon Dooley's attorney, Guy R. Fairstein, Esq. at his office address, 15 Stewart Place, No. 11-J, White Plains, New York on or before on _____, 2008.~~

ENTER:

_____
J.S.C.

ORAL ARGUMENT
DIRECTED

_____
J.S.C.

2

# Petition and Application
## for Stay of Arbitration Proceedings,
## dated May 13, 2008

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| JOSEPH Di MARTINO AND EUGENE B. SHANKS, Jr., <br><br>                 Petitioners, <br><br>    -against- <br><br> MARGARET DOOLEY, <br><br>                Respondent. | Special Proceeding <br><br> Index No: <br><br> **PETITION AND APPLICATION FOR STAY OF ARBITRATION PROCEEDINGS** <br><br> NEW YORK COUNTY CLERK'S OFFICE <br><br> MAY 1 3 2008 <br><br> NOT COMPARED WITH COPY FILE |

      Petitioners Joseph Di Martino ("Di Martino") and Eugene B. Shanks, Jr. ("Shanks") (together "Petitioners"), by their attorneys, Davis & Gilbert LLP, for their Petition against Margaret Dooley ("Dooley" or "Respondent") allege as follows:

## NATURE OF ACTION

      1.     Petitioners bring this special proceeding to obtain a stay of the arbitration (the "Arbitration") commenced by Dooley with the American Arbitration Association ("AAA"), pursuant to Civil Practice Law and Rules ("CPLR") § 7503(b), on the grounds that: (1) a valid agreement to arbitrate was not made between Petitioners and Dooley; and (2) even if there was a valid agreement to arbitrate, Dooley did not comply with it.

      2.     Dooley commenced the Arbitration against Petitioners notwithstanding the fact that Petitioners are not parties to the agreement containing the relevant arbitration provision and thus, are not bound by that provision. Shanks never

signed the agreement on which Dooley bases her demand (the "Demand") for Arbitration. Although Di Martino signed at the bottom of this document, he did not sign as a party to it (which is clear from the document itself and the structure and intent behind it), but only as a member of an advisory board to the company that is a party to the agreement and solely to indicate the advisory board's adoption of such document. Neither Di Martino nor Shanks has ever evinced an intent to be bound in their individual capacities by any arbitration agreement with Dooley. Neither receives any direct benefit from the agreement containing the arbitration provision and neither has any personal obligation pursuant to such agreement.

3.     Dooley also failed to satisfy a condition precedent to the commencement of the Arbitration against Petitioners as she failed to first commence a mediation against them.

## **PARTIES**

4.     Petitioner Shanks is an individual residing in Connecticut. He serves on an advisory board to the company that is the party to the agreement to arbitrate and has its principal place of business in New York.

5.     Petitioner Di Martino is an individual residing in New Jersey. He serves on and advisory board to the company that is the party to the agreement to arbitrate and has its principal place of business in New York.

6.     Upon information and belief, Respondent Dooley is a citizen of the

United Kingdom, residing in Connecticut. She worked for the company that is the party to the agreement to arbitrate at its primary place of business at 9 West 57th Street, New York, New York.

## VENUE

7.    Venue is proper in this Court pursuant to CPLR 7502(a)(i) because this special proceeding is brought in the county specified in the arbitration agreement.

## FACTUAL ALLEGATIONS

### Natixis' Long-Term Incentive Plan and the LTIP Document

8.    Petitioners are currently members of the Advisory Board (the "Advisory Board") of Natixis North America Inc. and its subsidiaries, including Natixis Capital Markets, Inc. (hereinafter, "Natixis"), an international banking, brokerage, and asset management firm. Petitioners are not officers of Natixis.

9.    The Advisory Board was assembled primarily to create and administer compensation, including the Long-Term Incentive Plan (the "LTIP") of Natixis' predecessor, CDC North America Inc. and now, Natixis.

10.    In 1997, the 1997 Advisory Board adopted a Performance Unit Plan agreement ("LTIP Document") to govern the terms of LTIP awards made by the "Company" (defined in the LTIP Document as Natixis' predecessor, CDC North America Inc. and its subsidiaries) to LTIP participants.    Only officers of Natixis are eligible to

participate in the LTIP.

11.    The LTIP Document has a governing law clause at paragraph 6(f) expressly providing that the LTIP and "all related documents, [including the LTIP Document], shall be governed by, and construed in accordance with, the laws of the State of New York."

12.    The LTIP Document contains an arbitration clause at paragraph 6(h) (the "Arbitration Clause").  The Arbitration Clause expressly provides:

> In the event there is any claim or dispute arising out of relating to this Plan, or breach thereof, and the **Company** [defined as CDC North America Inc. and its subsidiaries and now, Natixis] and the **Plan participants** shall not have resolved such claim or dispute within 90 days after written notice from one party to the other setting forth the nature of such claim or dispute, then such claim or dispute shall attempt to be settled by mediation through a mediator agreed upon by the parties for nonbinding, confidential mediation.  If this is not successful, the dispute will be submitted to binding **arbitration in New York, New York**, in accordance with the Commercial Arbitration Rules of the American Arbitration Association by an arbitrator(s) selected according to such Rules.    Judgment upon the award rendered by such arbitrator(s) shall be entered in any Court having jurisdiction thereof upon the application of either party.   (Emphasis supplied).

## Dooley's Employment and LTIP Awards

13.    Dooley is the former Managing Director of Natixis' Structured Transaction Group.  During her employment, Natixis awarded Dooley LTIP units as part of her compensation.   Dooley contends that all of the LTIP units she received are administered under the LTIP Document.

14.     Dooley was terminated from Natixis on May 17, 2007.

**The Mediation**

15.     On or about September 28, 2007, Dooley filed a request for mediation with the AAA (the "Mediation"). Dooley's Mediation Request named Natixis as the *only* responding party. She did not name Petitioners or any other Advisory Board member as a respondent in the Mediation. The Mediation was held on November 15, 2007 and continued via telephone and email correspondence until attempts to settle through mediation ultimately failed on or around February 29, 2008.

**The Arbitration**

16.     On or about April 23, 2008, Dooley, relying solely on the Arbitration Clause in the LTIP Document, filed a Demand for Arbitration with the AAA. Dooley named Natixis as a respondent in the Arbitration. She also named Petitioners individually and Orsatelli, another Advisory Board member who lives in France[1] as respondents in the Arbitration despite the fact that she did *not* name any of them as respondents in the Mediation. In addition, she brought claims against Petitioners and Orsatelli in the Demand, *none* of which she asserted at the Mediation. Dooley's claim in the Arbitration against Petitioners is for breach of fiduciary duty.

17.     Petitioners have not moved for or been served with an application to

---

[1] Respondent failed to properly serve Orsatelli with the Demand. However, should the Court deem Orsatelli properly served with the Demand, Orsatelli would have the same arguments as Petitioners for seeking a stay of the Arbitration as against him.

compel the Arbitration, and they have not participated in the Arbitration to date.

18.    CPLR 7503(b) provides that a party "may apply to stay arbitration on the ground that a valid agreement was not made or has not been complied with."

**The Arbitration Should be Stayed Pursuant to CPLR 7503(b) Because Petitioners are not Parties to the LTIP Document and are not Bound by the Arbitration Provision**

19.    Dooley, as an LTIP participant, and the Company (Natixis) are parties to the LTIP Document.

20.    The Advisory Board members, including Petitioners, are not parties to the LTIP Document. The LTIP Document's Arbitration Clause provides clear evidence that Natixis and its officers participating in the LTIP are the only parties to the LTIP Document and its Arbitration Clause.    The Arbitration Clause only provides an agreement to arbitrate between "the Company" and the "Plan participants."    The "Company" is defined in the LTIP Document as "CDC North America Inc. and its subsidiaries" (now Natixis).  Participant is defined in the LTIP Document as "an eligible employee who has been designated by the Committee to receive Units for a specified Performance Period which have not yet been settled."    The preamble to the LTIP Document states that Natixis officers are eligible to participate in the LTIP.    The Advisory Board does not fall into either the LTIP Document's definition of "Company" or "Participant." Instead, the Advisory Board is provided with its own defined term, "Board."

6

21.    Similarly, the face of the LTIP Document clearly demonstrates that it is an agreement solely between Natixis and the LTIP participants, not any Advisory Board member, including Petitioners. At the outset of the LTIP Document is a statement regarding its purpose – namely to assist Natixis in "attracting, retaining, motivating and rewarding employees." Thus, the LTIP Document is meant to benefit Natixis on the one hand, and employees eligible to participate in the LTIP on the other. The preamble to the LTIP Document states that all "officers" of Natixis are eligible to participate in the LTIP. The preamble does not state that Advisory Board members are eligible participants. Moreover, since the LTIP Document provides that the Advisory Board's purpose is to administer, construe and interpret the LTIP, it would be a clear conflict of interest if Advisory Board members could receive direct benefits from the LTIP Document. The Advisory Board members, including Di Martino and Shanks, do not receive any such benefits.

22.    Notably, Shanks did not sign the LTIP Document. Indeed, Shanks did not even become an Advisory Board member until June 1, 1998, nine months *after* the LTIP Document was adopted by the Advisory Board on September 1, 1997.

23.    Although Di Martino did sign the LTIP Document, he did so *solely* in his representative capacity as an Advisory Board member, *not* in his individual capacity. Di Martino and the other 1997 Advisory Board members signed the end of the LTIP Document under the sentence "As adopted by the Board on September 1, 1997," clearly indicating their intention to sign on behalf of the Advisory Board only, not in their

7

individual capacities.

24.     At no time did either Shanks or Di Martino manifest an intent to be personally bound by any provision in the LTIP Document, including the arbitration provision, which expressly indicates that it governs disputes only between the Company (Natixis) and LTIP participants.

25.     Neither Shanks nor Di Martino has ever knowingly exploited the LTIP Document resulting in any direct benefit to them.

26.     Petitioners therefore seek to stay the Arbitration started by Dooley with respect to them, pursuant to CPLR § 7503(b), on the ground that a valid agreement to arbitrate was not made.

**The Arbitration Should be Stayed Pursuant to CPLR 7503(b) Because Dooley Failed to Comply with the Arbitration Agreement**

27.     Respondent failed to first commence a mediation against Petitioners and therefore, failed to satisfy a condition precedent to the Arbitration.

28.     Petitioners therefore seek to stay the Arbitration started by Dooley with respect to them, pursuant to CPLR § 7503(b) on the ground that Dooley did not comply with the arbitration agreement, to the extent the Court deems one to exist between Petitioners and Dooley.

**WHEREFORE**, Petitioners request this Court:

A.    For an order pursuant to CPLR 7503(b), permanently staying the Arbitration started by Dooley before the AAA as against Petitioners;

B.    For interest, costs and disbursements of this proceeding, including Petitioners' reasonable attorneys' fees; and

C.    For such other and further relief as may be just and proper.

Dated: May 13, 2008            DAVIS & GILBERT, LLP

By:                     
                    Howard J. Rubin
                    Jennifer Tafet Klausner
                    Heath J. Rosenthal
                1740 Broadway
                New York, New York 10019
                (212) 468-4800

INDEX NO.

CaSe 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

JOSEPH D. MARTINO AND EUGENE B. SHANKS, Jr.,

Petitioners,

-against-

MARGARET DOOLEY,

Respondent.

ORDER TO SHOW CAUSE AND SUPPORTING DOCUMENTS

Signature (Rule 130-1.1-a)

Print name beneath

Attorneys for  PETITIONERS
DAVIS & GILBERT LLP
*Office and Post Office Address, Telephone*
1740 Broadway
NEW YORK, N.Y. 10019
Area Code (212) 468-4800

To

Attorney(s) for

Service of a copy of the within is hereby admitted.
Dated

Attorney(s) for

---

NOTICE OF ENTRY

PLEASE take notice that the within is a (*certified*) true copy of a
duly entered in the office of the clerk of the within named court on

Dated,

Yours, etc.

DAVIS & GILBERT LLP
*Office and Post Office Address*
1740 Broadway
NEW YORK, N.Y. 10019

To

Attorney(s) for

NOTICE OF SETTLEMENT

PLEASE take notice that an order
of which the within is a true copy will be presented
for settlement to the Hon.
one of the judges of the within named Court, at
on
at                    M.
Dated,

Yours, etc.

DAVIS & GILBERT LLP
*Office and Post Office Address*
1740 Broadway
NEW YORK, N.Y. 10019

*Attorneys for*

To

Attorney(s) for

**Affirmation of Howard J. Rubin,
dated May 13, 2008,
in Support of Petitioners'
Motion for a Stay of Arbitration**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

JOSEPH Di MARTINO AND EUGENE B.
SHANKS, Jr.,

                              Petitioners,

          -against-

MARGARET DOOLEY,

                              Respondent.

Index No. _____

**AFFIRMATION OF
HOWARD J. RUBIN, ESQ.
IN SUPPORT OF
PETITIONERS' MOTION
FOR A STAY OF
ARBITRATION**

HOWARD J. RUBIN, an attorney at law, duly admitted to practice in the State of New York, affirms, under penalty of perjury, that the following is true and correct:

1.      I am a member of Davis & Gilbert LLP, counsel for Petitioners' Joseph Di Martino ("Di Martino") and Eugene B. Shanks, Jr. ("Shanks") (collectively, "Petitioners") in the above-captioned matter.

2.      I submit this affirmation in support of Petitioners' motion, pursuant to CPLR 7503(b), to stay the arbitration (the "Arbitration") brought against them by Respondent Margaret Dooley ("Dooley").

3.      I represented Natixis Capital Markets, Inc. ("Natixis") in the mediation (the "Mediation") that occurred between Natixis and Dooley on November 15, 2007. Dooley had previously filed a request for mediation (the "Mediation Request") with the American Arbitration Association ("AAA") on or about September 28, 2007. Dooley's Mediation Request named Natixis as the *only* responding party. She did not name Di Martino, Shanks or any other Natixis Advisory Board member as a respondent in the Mediation. After November 15, 2007, the Mediation continued via telephone and email correspondence until attempts to settle through mediation ultimately failed on or around February 29, 2008. (Attached hereto as Exhibit A is a

1

true and accurate copy of a letter from AAA Case Manager Linda S. Hendrickson to Guy R. Fairstein, Esq. and Howard J. Rubin, Esq., dated March 4, 2008.)

       4.     On or about April 23, 2008, Dooley filed a demand (the "Demand") for the Arbitration with the AAA. (Attached hereto as Exhibit B a true and accurate copy of the Demand for Arbitration, without exhibits.)  Dooley named Di Martino, Shanks and Anthony Orsatelli ("Orsatelli") as respondents in the Demand despite the fact that she did *not* name any of them as respondents in the Mediation.  In addition, she alleged claims against Di Martino, Shanks, and Orsatelli in the Demand, *none* of which she asserted at the Mediation.

       5.     No prior application for the relief requested herein has been made in this court or any other court.

Dated: New York, New York
      May 13, 2008

                              HOWARD J. RUBIN

**Exhibit A to the
Affirmation of Howard J. Rubin,
dated May 13, 2008**



**American Arbitration Association**
*Dispute Resolution Services Worldwide*

*Northeast Case Management Center*
Catherine Shanks
Vice President
Christopher Fracassa, Yvonne L. Baglin
Assistant Vice Presidents

950 Warren Avenue, East Providence, RI 02914
telephone: 866-293-4053 facsimile: 401-435-6529
internet: http://www.adr.org/

via email

March 4, 2008

Guy R. Fairstein, Esq.
15 Stewart Place - No. 11-J
White Plains, NY  10603

Howard J. Rubin, Esq.
Davis & Gilbert LLP
1740 Broadway
New York, NY  10019

Re: 13 164 02071 07
    Margaret Dooley
    and
    Natixis Capital Markets, Inc.

Dear Parties:

This is confirm mediation in this matter was held on November 15, 2007 and remained open pending settlement discussions.

This is to confirm receipt of an email from Mr. Fairstein dated February 29, 2008 advising the matter cannot be settled and has requested the mediation be concluded   We note a copy has been forwarded to opposing counsel and to the mediator..   Therefore, this is to advise that as of this date the Association is closing its file.  Please note that the case file will be destroyed six (6) months after the date of this letter.

Final closing statements will be forthcoming.    Please be advised any outstanding balances must be submitted immediately upon receipt and no later than March 10, 2008..

We would like to thank you for utilizing the Association's mediation services, and we look forward to serving you in the future.  If we may ever be of any assistance to you regarding these procedures, please do not hesitate to call or write.

Sincerely,

/s/

Linda S. Hendrickson
Case Manager
401 431 4883
HendricksonL@adr.org

*Supervisor Information: Laura E. VanEtten, 401 431 4787, VanEttenl@adr.org*

Cc  Alfred G. Feliu, Esq.

**Exhibit B to the
Affirmation of Howard J. Rubin,
dated May 13, 2008**

AMERICAN ARBITRATION ASSOCIATION
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MARGARET DOOLEY,

                           Claimant,

              v.                                    No.

NATIXIS CAPITAL MARKETS, INC.,
ANTHONY ORSATELLI,
JOSEPH Di MARTINO and
EUGENE B. SHANKS, Jr.,

                     Respondents.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## DEMAND FOR ARBITRATION
## OF THE CLAIMANT, MARGARET DOOLEY


                              GUY R. FAIRSTEIN
                              Attorney for the Claimant
                              15 Stewart Place - No. 11-J
                              White Plains, NY 10603
                              914-328-0923

AMERICAN ARBITRATION ASSOCIATION
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MARGARET DOOLEY,

Claimant,

v.                                  No.

NATIXIS CAPITAL MARKETS, INC.,
ANTHONY ORSATELLI,
JOSEPH Di MARTINO and
EUGENE B. SHANKS, Jr.,

Respondents.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEMAND FOR ARBITRATION

Margaret Dooley ("Margaret"), the Claimant, for her demand for arbitration,

states:

1.      Margaret demands the arbitration, in New York, New York, of her claims

under: (a) an employer-promulgated plan, the Performance Unit Plan (the "LTIP") for CDC

North America Inc. and its subsidiaries, adopted by the CDC Advisory Board on September 1,

1997, for "Performance Periods" beginning on or after January 1, 1997, and effective as to all

Performance Periods begun prior to January 1, 2006; and (b)  9 U.S.C. §§ 201, et seq., the

enabling legislation for the Convention on the Recognition and Enforcement of Foreign Arbitral

Awards (the "New York Convention").  This arbitration concerns LTIP units granted to Margaret

for two Performance Periods under the LTIP, the first from June 1, 2004, to December 31, 2004,

and the second from January 1, 2005, to December 31, 2005.

The Arbitration Clause

> 2.    The arbitration clause is contained in the LTIP (Exhibit A, ¶ 6(h)):

**6.    General Provisions.**

\*    \*    \*

> (h)    Arbitration Clause.    In the event there is any claim or dispute arising out of or relating to this Plan, or the breach thereof, and the Company and the Plan participants shall not have resolved such claim or dispute within 90 days after written notice from one party to the other setting forth the nature of such claim or dispute, then such claim or dispute shall attempt to be settled by mediation through a mediator agreed upon by the parties for nonbinding, confidential mediation.  If this is not successful, the dispute will be submitted to binding arbitration in New York, New York, in accordance with the Commercial Arbitration Rules of the American Arbitration Association by an arbitrator(s) selected according to such Rules.  Judgment upon the award rendered by such arbitrator(s) shall be entered in any Court having jurisdiction thereof upon the application of either party.

The predicate to arbitration has been satisfied, as mediation was held but was not successful.

The Parties

> 3.    Margaret is a citizen of the United Kingdom residing in Greenwich,

Connecticut.  Margaret's contact information is:

> Margaret Dooley
> 66 Sherwood Avenue
> Greenwich, CT 06831
> margaret_dooley1@yahoo.com
> 203-532-4068

> 4.    Upon information and belief, respondent Natixis Capital Markets, Inc., is

the successor by change of name to CDC IXIS Capital Markets North America, Inc. (both of

which entities are hereafter collectively referred to as "Natixis"), and is a Delaware corporation

2

with its principal place of business in New York, New York. Natixis's contact information is:

> Natixis Capital Markets, Inc.
> 9 West 57th Street - 36th Floor
> New York, NY 10019-2701
> (212) 891-6100

5.  Upon information and belief:

A.  Respondent Anthony Orsatelli ("Orsatelli") is a citizen of France.

Margaret does not know Orsatelli's residence address, but believes mail will be forwarded to him

if sent to:

> Anthony Orsatelli
> in care of Natixis
> Attention: Christian Lehir
> 30, Avenue Pierre Mendes-France
> Paris 75013 France

B.  Respondent Joseph Di Martino ("Di Martino") is a citizen of the

United States. Margaret does not know Di Martino's residence address, but believes mail will be

forwarded to him if sent to:

> Joseph Di Martino
> in care of Natixis Capital Markets, Inc.
> Attention: Albert P. Zakes
> 9 West 57th Street - 36th Floor
> New York, NY 10019-2701

C.  Respondent Eugene B. Shanks, Jr. ("Shanks") is a citizen of the

United States residing in Greenwich, Connecticut. Margaret believes Shanks's contact

information is:

> Eugene B. Shanks, Jr.
> 30 Hope Farm Road
> Greenwich, CT 06830-3331
> 203-622-8275

3

6.      Upon information and belief: respondents Orsatelli and Di Martino were members of the Advisory Board for the LTIP, and fiduciaries of the LTIP, at all relevant times from September 21, 1997, until at least February 21, 2008; and respondent Shanks was a member of the Advisory Board for the LTIP, and a fiduciary of the LTIP, at all relevant times from a date after September 21, 1997, until at least February 21, 2008.

The Commercial Relationships

7.      The purposes of the LTIP are stated in its paragraph 1 (Exhibit A, ¶ 1):

1.      **Purposes**.     The purposes of this Performance Unit Plan (the "Plan") are to assist CDC North America Inc. and its subsidiaries (collectively referred to herein as the "Company") in attracting, retaining, motivating and rewarding employees and whose performance can impact the long term success of the Company by providing competitive compensation opportunities that reward outstanding performance.

8.      Margaret was employed pursuant to a written agreement with CDC IXIS Capital Markets North America Inc., dated May 5, 2003 (Exhibit B).  The terms of Margaret's employment included her participation in the LTIP (Exhibit B, ¶ 3):

... You will be eligible to participate in the CDC IXIS annual and long-term incentive programs on a discretionary basis according to your performance as well as the performance of your department and the company ....

... and at Exhibit A thereto:

Individuals initially hired in the Structured Transactions Group ... will participate in a Variable Compensation Pool from May 1, 2003 to May 31, 2004 (The Performance Period).

*       *       *

A portion of the Variable Compensation Pool will be paid in cash bonuses and another portion, not to exceed 20% of the variable

4

compensation will be paid in Long Tern Incentive Plan Units
(LTIP) ....

9.      Natixis employed Margaret as an officer of the company, with the position

of Head of Natixis's Structured Transaction Group (later renamed by Natixis the Structured

Capital Products Group) and with the "officer title of Managing Director" (Exhibit B, at p. 1).

10.      During the period of Margaret's employment by Natixis, that is, between

May 5, 2003, and May 17, 2007, the employees whose performance was rewarded by grants

of LTIP units included: at least one citizen of the United Kingdom resident in the United States

(Margaret); at least one citizen of France resident in the United Kingdom (Philippe Kieffer); at

least one citizen of Denmark resident in the United Kingdom (Kristine Jensen); and citizens of

the United States and France resident in the United States.  Performance under the LTIP thus

occurred in countries which included the United States and the United Kingdom.  As is alleged in

paragraphs 5 and 6 above, at all relevant times the fiduciaries of the LTIP were citizens of France

and the United States.

11.      It was the intention and expectation of Margaret and Natixis that Margaret

and the other Natixis employees in the Structured Transaction Group would negotiate, document

and close structured tax arbitrage transactions between affiliates of Natixis and counterparties

located in countries outside the United States.  In negotiating, documenting and closing such

transactions, Margaret worked with other Natixis employees based in New York City and in the

United Kingdom.  Before such transactions were permitted to be closed, they were approved by

executives of Natixis's parent company in France.  Margaret and other Natixis employees in the

Structured Transaction Group negotiated, documented and closed structured tax arbitrage

5

transactions with counterparties located in Australia, Luxembourg and the United Kingdom.

        12.     The United States, the United Kingdom, France, Denmark, Australia and Luxembourg are, and at all relevant times were, signatories to the New York Convention.

        13.     Both the LTIP and the May 2003 Agreement are commercial relationships under the New York Convention and 9 U.S.C §§ 201, <u>et seq</u>.

<u>Summary of Margaret's Claims for Damages</u>

        14.     Margaret seeks to recover damages as follows:

        A.     As against Natixis: damages for Natixis's breach of the LTIP, which damages are measured by (i) the value, determined in accordance with the terms of the LTIP, of the vested LTIP units granted to Margaret (upon information and belief, a value which exceeds $1,250,000.00), less (ii) the amount of the partial distribution made to Margaret on February 21, 2008 (the net amount, after withholdings, of a gross payment under the LTIP in the amount of $571,215.97); and

        B.     As against the individual respondents: (i) damages for the individual respondents' breach of their fiduciary duties owed to Margaret, as a beneficiary under the LTIP, measured as in subparagraph 14(A) immediately above; and (ii) punitive damages, in an amount to be determined by the Arbitrator by reason of the individual respondents' actions: (a) by determining or interpreting the LTIP and the value of the LTIP units granted to Margaret other than in good faith; and, (b) by having sought, through their or their delegatee's attorney, to render a financial benefit to Natixis at Margaret's expense by seeking to condition the payment to Margaret of an additional settlement amount to which Natixis and Margaret had agreed in principle in mediation, upon Margaret's agreement that the value of her vested LTIP units, as

they had erroneously determined and understated that value, would "unvest" and become subject

to forfeiture in the event of Margaret's breach of the proposed settlement agreement, without

regard to the amount of damages, if any, Natixis might suffer as a result of any such breach.

FIRST CLAIM<br>(for Natixis's breach of the LTIP)

15.     Margaret's employment by Natixis as "Head of the Structured Transaction

Group" and with the "officer title of Managing Director" commenced in May 2003.

16.     Effective May 17, 2007, Natixis terminated Margaret's employment,

without cause.

17.     Between May 2003 and May 2007, Margaret and the Structured

Transaction Group closed transactions based upon which it was anticipated that Natixis would

book pre-tax profits of approximately $244,000,000.00 over the lives of the transactions.

18.     Under the terms of the LTIP:

A.     The Advisory Board (as defined in Exhibit A, at ¶ 2(b)) had the

authority, among other things, to "administer the ]LTIP] in accordance with its terms;" the "full

power and authority to construe and interpret the [LTIP];" the authority "to make all other

determinations necessary or advisable or the administration of the [LTIP]" (Exhibit A, at ¶ 3(a));

and the authority "to delegate any functions of the [LTIP]to a designated officer of the Company

..." (Exhibit A, at ¶ 3(b)).

B.     Notwithstanding the authority granted to it under the LTIP to

delegate certain functions of the Plan, the Advisory Board had the exclusive authority "to grant

Units to, or to take actions with respect to Units then held by, officers of the Company ..."

7

(Exhibit A, at ¶ 3 (b)).

        C.     The Advisory Board and any delegatee "shall not be personally liable for any action, determination, or interpretation taken or made in good faith with respect to the [LTIP] ..." (Exhibit A, at ¶ 3(c)).

        D.     The Advisory Board had the authority to "select eligible employees to whom [LTIP] Units shall be granted, specify the number of Units to be granted to each such eligible employee, and specify the Performance Period to which such Units relate" (Exhibit A, at ¶ 5(a)).

        E.     The term "Performance Period" means, **"unless otherwise determined by the Committee at or after grant,** the period of three consecutive fiscal years over which the value of a Unit shall be measured ..." (Exhibit A, at ¶ 2(h), emphasis added).

        F.     "The value of each Unit awarded for a Performance Period will be determined as of the last day of each calendar year during the Performance Period ..." (Exhibit A, at ¶ 5(b)).

        G.     Except when a Participant dies or becomes disabled prior to the end of a Performance Period, a circumstance not applicable here, "the value of a Participant's vested Units shall be determined and paid as soon as reasonably practicable after the end of the Performance Period to which such Units relate ..." (Exhibit A, at ¶ 5(d)(1)).

        19.     From the inception of her employment with Natixis, and continuing into at least August 2006, Margaret was compensated on a special contractual basis. Rouhani acknowledged this in an e-mail, dated August 3, 2006, addressed to Eric Raiten, another Natixis executive, in which Rouhani wrote:

8

The Structured Capital Product group's compensation heretofore was contractual and based on a formula linking their total compensation to the present value of their transactions. It has been a policy of IXIS to provide contractual compensation in new businesses for a limited period of time (typically two years), beyond which employees compensation is determined through our normal end of the year process ....

The SCP should be treated like other businesses. The team is no longer a "new" team within IXIS and it will be compensated at market levels which will reflect its P&L and its overall performance. It is now important for the team to concentrate on generating new transactions.

20.    By the terms of the May 2003 Agreement (Exhibit B), Margaret became entitled to compensation as follows:

a.    a base salary payable at an annual rate of $200,000.00, and participation in an annual Variable Compensation Pool in the manner described in Exhibit A annexed to and incorporated in the May 2003 Agreement; and

b.    participation in Natixis's "annual and long-term incentive programs on a discretionary basis according to ... [her] performance as well as the performance of ... [her] department and the company."

21.    Exhibit A annexed to and incorporated in the May 2003 Agreement sets forth the formula for Margaret's participation in the Variable Compensation Pool:

Individuals initially hired in the Structured Transaction Group (the "Group") will participate in a Variable Compensation Pool from May 1, 2003 to May 31, 2004 (The Performance Period). The Performance Period will be divided into two segments, one running from the beginning of the Performance Period to December 31, 2003, and the second running from January 1, 2004 to the end of the performance period.

The Variable Compensation Pool to be distributed to the

9

> Pool Participants will be an amount equal to 20% of Net Income of
> the Group before tax up to a maximum Net Income for the Group
> of $5.5 million during the Performance Period.  If Net Income
> before tax exceeds $5.5 million during that period, CDC IXIS
> CMNA management shall determine additional payments greater
> than the total Variable Compensation Pool stipulated above ....

Further, a portion of the incentive compensation payable to Margaret would be payable in cash

and another portion in awards under the LTIP:

> A portion of the Variable Compensation Pool will be paid
> in cash bonuses and another portion, not to exceed 20% of the
> variable compensation will be paid in Long Term Incentive Plan
> Units (LTIP) ....

22.    Exhibit A annexed to and incorporated in the May 2003 Agreement

expressly contemplated the payment by Natixis of variable compensation for Performance

Periods beyond that ended May 31, 2004:

> ... The formula set forth above pertains only to
> compensation for the Performance Period.  Variable compensation
> beyond The Performance Period will be completely discretionary
> by CDC IXIS CMNA Management.

23.    In the exercise of discretion, the Advisory Board granting LTIP units to

Margaret, and Natixis's senior management awarded to Margaret LTIP units and other incentive

compensation, for the Performance Periods June 1, 2004, to December 31, 2004, and January 1,

2005, to December 31, 2005 (see ¶¶ 31-34).  The grant of these LTIP units and other incentive

compensation payable to Margaret was confirmed by Natixis and accepted by Margaret in two

"Supplemental Incentive Compensation Agreements."  The first of these (the "First Incentive

Agreement," Exhibit C) related to the Performance Period  June 1, 2004, to December 31, 2004.

The second (the "Second Incentive Agreement," Exhibit D) related to the Performance Period

10

January 1, 2005, to December 31, 2005. As stated (see ¶ 1 above), the LTIP units granted to Margaret for the Performance Periods June 1, 2004, to December 31, 2004, and January 1, 2005, to December 31, 2005, are the subject of this arbitration.

24.    Among the special contractual compensation arrangements (see ¶ 19 above) granted to Margaret were successive Performance Periods under the LTIP having a duration shorter than the period of three years defined in Exhibit A, at ¶ 2(h), a shortening authorized in Exhibit A, at ¶ 2(h), as follows:

A.    The Performance Period under the May 2003 Agreement was the period May 1, 2003, to May 31, 2004.

B.    The Performance Period to which the grant of units confirmed by the First Supplemental Agreement related was the Performance Period June 1, 2004, to December 31, 2004; and

C.    The Performance Period to which the grant of units confirmed by the Second Supplemental Agreement related was the Performance Period January 1, 2005, through December 31, 2005.

25.    Philippe Kieffer ("Kieffer"), another Natixis employee in the Structured Transaction Group who worked in London, England, and Margaret, had long been professional colleagues, working together, prior to their having been employed by Natixis. It was the intent of Natixis, Margaret and Kieffer to provide substantially identical compensation to Margaret and to Kieffer, with the small differences in their compensation taking account of Margaret's position as Head of the Structured Transaction Group and Kieffer's higher cost of living in London.

26.    Between approximately June 2004 and May 2005, Rouhani negotiated

11

with Margaret and Kieffer the terms of a proposed agreement in writing which addressed, among

other things, the terms of the "Structured Capital Products Variable Compensation Pool" (the

"Pool") for the Performance Periods June 1, 2004, to December 31, 2004, and January 1, 2005,

to December 31, 2005 (that is, for the Performance Periods which immediately followed that of

May 1, 2003, to May 31, 2004, covered by Exhibit A to the May 2003 Agreement).

      27.     Successive drafts of the proposed agreement in writing defined the

Performance Periods covered thereby in a manner to which both Natixis and Margaret had

agreed. One of these successive drafts (Exhibit E), which bears handwritten comments by

Margaret and Kieffer, defined the two Performance Periods to which the succession of drafts

related as May 31, 2004, to December 31, 2004, and January 1, 2005, to December 31, 2005:

> The SCP Pool will be in effect for the period from May
> 31st, 2004 to December 31st, 2005 (the "SCP Pool Period"). **The
> SCP Pool Period will be divided into two periods, one running
> from May 31st, 2004 to December 31st 2004 (the "First
> Performance Period"), and the second running from January
> 1st, 2005 to December 31st, 2005 (the "Second Performance
> Period").** Each of the First Performance Period and the Second
> Performance Period will be referred to herein as a "Performance
> Period". (emphasis added)

That definition of the Performance Periods remained unchanged through the successive drafts.

      28.     For reasons unrelated to the definition of the two Performance Periods

covered thereby, Natixis and Margaret did not sign an agreement in writing applicable to these

two Performance Periods. However, Margaret and Natixis fully performed their non-written

agreement covering the Performance Periods June 1, 2004, to December 31, 2004, and January 1,

2005, to December 31, 2005. Margaret performed the duties of her office and her job during

those Performance Periods, and continuing beyond December 31, 2005, as she negotiated,

documented and closed or prepared for the later closing of structured tax arbitrage transactions;

and the Advisory Board granted and Natixis agreed to and did award to Margaret LTIP units, and

Natixis agreed to and did pay to Margaret other incentive compensation under the Pool, which

related to these Performance Periods.

        29.     As required by the laws of the United Kingdom, Natixis (by Rouhani) and

Kieffer signed an undated agreement (the "First Kieffer Agreement"), Exhibit A to which defined

Performance Periods identical with those defined in Exhibit E hereto:

> The SCP Pool will be in effect for the period from May 31st, 2004 to December 31st, 2005 (the "SCP Pool Period"). **The SCP Pool Period will be divided into two performance periods, one running from May 31st, 2004 to December 31st 2004 (the "First Performance Period"), and the second running from January 1st, 2005 to December 31st, 2005 (the "Second Performance Period").** Each of the First Performance Period and the Second Performance Period will be referred to herein as a "Performance Period". (emphasis added)

A copy of Exhibit A to the First Kieffer Agreement is Exhibit F. Margaret does not know the

legal status of the First Kieffer Agreement.

        30.     Natixis thereafter submitted to Kieffer a revised agreement, which had

been signed by Rouhani on May 23, 2005 (the "Proposed Second Kieffer Agreement"). Upon

information and belief, Kieffer did not sign the Proposed Second Kieffer Agreement because of

mistakes therein unrelated to the definition of the Performance Periods covered thereby, most

particularly because the compensation provisions therein were not those of Kieffer but rather the

substantially lesser compensation provisions applicable to Kristine Jensen. Exhibit A to the

Proposed Second Kieffer Agreement defined the performance periods covered thereby in a

manner identical with their definition in Exhibit E hereto:

The SCP Pool will be in effect for the period from May 31st, 2004 to December 31st, 2005 (the "SCP Pool Period"). **The SCP Pool Period will be divided into two performance periods, one running from May 31st, 2004 to December 31st 2004 (the "First Performance Period"), and the second running from January 1st, 2005 to December 31st, 2005 (the "Second Performance Period").** Each of the First Performance Period and the Second Performance Period will be referred to herein as a "Performance Period". (emphasis added)

A copy of Exhibit A to the Proposed Second Kieffer Agreement is Exhibit G. Margaret does not know the legal status of the Proposed Second Kieffer Agreement.

    31.    The Advisory Board granted to Margaret and Natixis award to Margaret, and Margaret accepted the grant and award of, LTIP units relating to the Performance Periods June 1, 2004, to December 31, 2004, and January 1, 2005, to December 31, 2005.

    A.    In the exercise of discretion, the Advisory Board granted to Margaret LTIP units, and by the First Incentive Agreement (Exhibit C) Natixis awarded to Margaret, and Margaret accepted the grant and award of, "performance incentive compensation" for the Performance Period June 1, 2004, to December 31, 2004, consisting of: (i) LTIP units in the face amount of $635,000.00; and (ii) cash in the amount of $2,385,000.00.

    B    In the exercise of discretion, the Advisory Board granted to Margaret LTIP units, and by the Second Incentive Agreement (Exhibit D) Natixis awarded to Margaret, and Margaret accepted the grant and award of, "performance incentive compensation" for the Performance Period January 1, 2005, to December 31, 2005, consisting of: (i) LTIP units in the face amount of $490,000.00; (ii) cash in the amount of $1,960,000.00; and (iii) Margaret's proportionate share of an accounting reserve of $4,100,000.00 said to have been taken in respect of the St. George Bank and Macquary Bank transactions.

14

32.    The First Incentive Agreement states:

> The company will pay performance unit compensation to ...
> [Margaret] on [sic.] of ... USD 135,000 in LTIPS on March 15,
> 2005 and ... USD 473,860 in LTIPS on July 1st 2005 in respect of
> the BGL transaction. The payments on July 1st, 2005 could
> increase by up to a further USD 130,000 depending on the final pre
> tax equivalent net present value of the BGL transaction. ...
> [Margaret] agrees that the BGL transaction will not be taken into
> account when determining incentive compensation for the calendar
> year 2005.

The parties thus agreed, "at or after grant," per Exhibit A, ¶ 2(h), that the LTIP units granted to

Margaret in 2005 related to the Performance Period ended December 31, 2004. These LTIP units

had a face value of $635,000.00 (see ¶ 34 below and Exhibit H).

33.    The Second Incentive Agreement states:

> [Margaret], an employee of IXIS Capital Arranger, Inc.
> (The "Company") has previously entered into a Compensation
> Agreement (the "Agreement") concerning 2005 governing, among
> other things, the payment of certain performance incentive
> compensation based, in part, on certain 2005 structured capital
> transactions, as contemplated in the Agreement.

> Notwithstanding the fact that no eligible transactions were
> closed in 2005, resulting in no performance compensation
> obligation pursuant to the Agreement, the Company in its
> discretion, will pay performance incentive compensation to
> [Margaret] of ... USD 490,000 in LTIPS on May 5, 2006 in respect
> of the St. George Bank and Macquary Bank transactions.

> *          *          *

> [Margaret] agrees that there is no further payment due from
> the St. George Bank and Macquary Bank transactions other then
> what is stipulated in this agreement and that the Company has no
> further obligation under the agreement.

The parties thus agreed, "at or after grant," per Exhibit A, ¶ 2(h), that the LTIP units granted to

15

Margaret in 2006 related to the Performance Period ended December 31, 2005. These LTIP units

had a face value of $490,000.00 (see ¶ 34 below and Exhibit H).

   34.  The report (Exhibit H) of Brown Bridgman & Company, the administrator

of the Plan, shows that: (a) the LTIP units granted to Margaret in 2005 for the Performance

Period ended December 31, 2004, had a face value of $635,000.00; (b) the LTIP units granted to

Margaret in 2006 for the Performance Period ended December 31, 2005, had a face value of

$490,000.00; and (c) these granted LTIP units had, at the date of the report in the third quarter of

2006 (that is, at a date after the LTIP units granted to Margaret had vested and should have been

valued and paid to her, according to the terms of the LTIP), a total time value in excess of

$1,250,000.00. The basis upon which this aggregate time value in excess of $1,250,000.00 was

determined is not known to Margaret, but, upon information and belief, included the use of an

incorrect valuation date, by reason of which the aggregate time value of Margaret's units could

have been greater had a correct valuation date been used.

   35.  The LTIP units granted to Margaret for the Performance Periods ended

December 31, 2004, and December 31, 2005, became fully vested on, and Margaret was entitled

to have had them valued at, December 31, 2004, and December 31, 2005, respectively. Further,

Margaret was entitled to have received payment of these LTIP units as soon as was reasonably

practicable after December 31, 2004, and December 31, 2005, respectively (Exhibit A, at ¶ 5(d)):

   (d)  Settlement

     (1)  Except as provided in paragraph (2) below
[which is inapplicable here as Margaret did not incur a Termination
of Employment, as defined in the Plan prior to the end of the
performance periods ended December 31, 2004, and December 31,
2005], **the value of a Participant's vested Units shall be determined**

16

**and paid as soon as reasonably practicable after the end of the Performance Period to which such Units relate ....** In the case of a Participant who does not incur a Termination of Employment prior to the end of the Performance Period, such value shall be determined, in accordance with paragraph (b) above, as of the last day of such Performance Period. (emphasis added)

36.    On February 22, 2008, Margaret received from Natixis, on account of the value of her vested LTIP units, two checks, each dated February 6, 2008, in the total amount of $371,820.97, that being the net amount, after withholdings, of a gross payment under the LTIP in the amount of $571,215.97.

37.    Natixis breached the LTIP:

A.    With respect to the LTIP units granted to Margaret for the Performance Period June 1, 2004, to December 31, 2004: (i) by deeming only two-thirds of the units granted to her, rather than all of them, to have vested; (ii) by paying to her the value of only two-thirds of her vested units, rather than the value of all of the units granted to her, to which she was entitled because all of the units granted to her had vested at December 31, 2004; (iii) by valuing two-thirds of the units granted to her, those which it deemed to have vested, as of a date in early 2008, by which date the financial performance of Natixis, a component of the valuation formula, had deteriorated substantially, instead of valuing all of the units granted to her as of December 31, 2004, a date prior to such financial performance deterioration; and (iv) by paying to her the erroneously determined value of two-thirds of her vested units in February 2008, instead of having paid to her the correctly determined value of all of her vested units at the earliest practicable date in 2005; and

B.    With respect to the LTIP units granted to Margaret for the

17

Performance Period January 1, 2005, to December 31, 2005: (i) by deeming only one-third of the units granted to her, rather than all of them, to have vested; (ii) by paying to her the value of only one-third of her vested units, rather than the value of all of the units granted to her, to which she was entitled because all of the units granted to her had vested at December 31, 2005; (iii) by valuing one-third of the units granted to her, those which it deemed to have vested, as of a date in early 2008, by which date the financial performance of Natixis, a component of the valuation formula, had deteriorated substantially, instead of valuing all of the units granted to her as of December 31, 2005, a date prior to such financial performance deterioration; and (iv) by paying to her the erroneously determined value of one-third of her vested units in February 2008, instead of having paid to her the correctly determined value of all of her vested units at the earliest practicable date in 2006.

      38.    By reason thereof, Margaret is entitled to an interim award as follows:

      A.    For the LTIP units having a face value of $635,000.00 granted for the Performance Period June 1, 2004, through December 31, 2004, determining: (i) that all units thus granted vested in full at December 31, 2004; (ii) that Margaret was entitled under the LTIP to have the value of all such units determined at December 31, 2004, and paid to her as soon after December 31, 2004, as was practicable; and (iii) that Natixis breached the LTIP by its failure to have valued at December 31, 2004, all of the units thus granted, all of which units had vested at December 31, 2004, and to have paid to Margaret as soon after December 31, 2004, as was practicable the value of all such units, as determined under the LTIP; and

      B.    For the LTIP units having a face value of $490,000.00 granted for the Performance Period January 1, 2005, through December 31, 2005, determining: (i) that all

units thus granted vested in full at December 31, 2005; (ii) that Margaret was entitled under the

LTIP to have the value of all such units determined at December 31, 2005, and paid to her as

soon after December 31, 2005, as was practicable; and (iii) that Natixis breached the LTIP by its

failure to have valued at December 31, 2005, all of the units thus granted, all of which units had

vested at December 31, 2005, and to have paid to Margaret as soon after December 31, 2004, as

was practicable the value of all such units, as determined under the LTIP; and

        C.      Awarding Margaret interest from the date as of which each award

should have been paid to the date of payment; and

        D.      Directing Natixis to cause the LTIP's administrator, Brown

Bridgman & Company, to value the LTIPs awarded under both grants according to the terms of

the interim award and the LTIP and to provide to Margaret all particulars of and all documents

used in its calculation of the value of both LTIP awards; and

        E.      Awarding Margaret the expenses of this arbitration and a

reasonable attorney's fee; and

        F.      Directing that further proceedings be held for the purpose of

making a final award.

SECOND CLAIM
(for breach of fiduciary duty)

      39.     Margaret repeats the allegations of paragraphs 15 through 37.

      40.     As required by ¶ 6(h) of the LTIP, Margaret filed a request for mediation,

dated September 27, 2007, with the American Arbitration Association (the "AAA"). Upon

information and belief, the individual respondents, or their delegatee, engaged Attorney Howard

19

J. Rubin ("Rubin"), a member of Davis & Gilbert LLP, as counsel in the mediation, and Rubin

caused a response to Margaret's request for mediation to be filed.

       41.    The AAA appointed a mediator. Margaret (accompanied by her attorney),

and Natixis (represented by Albert P. Zakes, its Managing Director and General Counsel, and

Laurence Laier, its Managing Director, Human Resources, and accompanied by Rubin and one of

his associates), attended a mediation session on November 15, 2007. Mediation continued

thereafter, by telephone and e-mail. On or about January 31, 2008, agreement in principle was

reached as to the settlement of Margaret's claims, subject to documentation. On February 29,

2008, Margaret's attorney advised the AAA that mediation had not been successful.

       42.    A.    On or about February 24, 2008, Natixis breached the

confidentiality of the mediation. On or about that date its lawyers in London, Lewis Silkin,

addressed a letter to Kieffer's lawyers in London, in which Lewis Silkin wrote, in part:

> Your client may be aware that his former colleague, Margaret
> Dooley, has reached a settlement agreement in principle with the
> company the US. Subject to final terms being agreed, the company
> will pay to Margaret Dooley $327,000 by way of a full and final
> settlement.

           B.    In an e-mail dated February 26, 2008, addressed to Rubin (Exhibit

I), Margaret's lawyer asserted that Natixis, by the Lewis Silkin disclosure, had waived the

confidentiality of the mediation and that Margaret would not be bound by a unilateral obligation

of confidentiality:

> As a consequence of this disclosure having been made by the
> Natixis side, in disregard of the reference in its Plan to
> "confidential mediation," I see no reason why unilaterality should
> apply and Margaret should be considered bound by an obligation of
> confidentiality which Natixis has waived.

C.    Rubin did not refute or in any other way respond to Margaret's

attorney regarding this assertion as to Natixis's waiver of the confidentiality of the mediation.

43.    A.    On February 1, 2008, Rubin had transmitted to Margaret's

attorney an initial draft of a proposed settlement agreement, which had been prepared by

attorneys in Davis & Gilbert LLP and which provided in part:

> 1.    (a)    Natixis agrees to pay Dooley $571,216.00,
> less applicable withholding taxes and deductions, which represents
> payment of the vested portion of Dooley's Long Term Incentive
> Plan units (the "LTIP Payment"). The LTIP Payment shall be paid
> by check made payable to Dooley. Natixis further agrees to pay
> Dooley $327,784.00 (the "Special Payment"). Of the Special
> Payment, the [amount of _____], less applicable withholding taxes
> and deductions, shall be paid by check made payable to Dooley,
> and the [amount of _____] shall be paid by check made payable
> to Guy R. Fairstein, Esq. ("Fairstein"), Dooley's counsel.
>
> *        *        *
>
> 10.    ... Dooley understands and agrees that if she
> breaches any provisions of this Agreement, including but not
> limited to commencing, joining in or in any other manner
> attempting to assert any claim released herein, in addition to
> any other legal or equitable remedy Natixis may have, Natixis
> shall be entitled to cease making any payments to her or on
> her behalf under paragraph 1, recover any payments made to
> her or on her behalf under paragraph 1, and she shall reimburse
> Natixis for all of its reasonable attorneys' fees and costs
> incurred by it arising out of any such breach. Any such action
> permitted to Natixis by the foregoing, however, shall not affect
> or impair any of Dooley's obligations under this Agreement,
> including without limitation, the release of claims in paragraph
> 2 hereof. Dooley further agrees that nothing in this Agreement
> shall preclude Natixis from recovering attorneys' fees, costs or
> any other remedies specifically authorized under applicable law.

B.    Margaret's attorney commented upon the initial draft in a letter

dated February 5, 2008, which he transmitted to Rubin by e-mail attachment, and in which he

21

wrote, in part:

        1.      A.      ... "Special Payment" should be replaced with "Additional Payment," here and throughout.

                        *       *       *

        10.     ... The "cease making payments" language in the second sentence is mere surplusage and unnecessary given the single-payment settlement contemplated.

             Mrs. Dooley will not agree to your proposal that, in the event of any breach on her part, Natixis will be entitled to recover any payments made by it under paragraph 1; nor will she agree to fee-shifting (except on a mutual basis as to released claims, as set forth above). As to non-released claims, Natixis will have to prove its actual damages, and bear its own legal fees and expenses in doing so. It is utterly ridiculous for Natixis to suggest that Mrs. Dooley surrender back all payments made, without her claims being reinstated with a tolling agreement in place, at the whim of Natixis, and that she also bear all expense, on both sides, of Natixis's pursuit of such a whim.

        C.      On February 13, 2008, Rubin transmitted to Margaret's attorney, by e-mail attachment, a revision of the proposed settlement agreement, which provided in part:

        1.     (a) Natixis agrees to pay Dooley $571,216.00, less applicable withholding taxes and deductions, which represents payment of the vested portion of Dooley's Long Term Incentive Plan units (the "LTIP Payment"). The LTIP Payment shall be paid by check made payable to Dooley. Natixis further agrees to pay Dooley $327,784.00 (the Additional Payment"). Of the Additional Payment, the **[amount of _____]**, less applicable withholding taxes and deductions, shall be paid by check made payable to Dooley, and the **[amount of _____]** shall be paid by check made payable to Guy R. Fairstein, Esq. ("Fairstein"), Dooley's counsel.

                        *       *       *

        10.     ... Dooley understands and agrees that if she

22

breaches any provisions of this Agreement, including but
not limited to commencing, joining in or in any other manner
attempting to assert any claim released herein, in addition to
any other legal or equitable remedy Natixis may have, Natixis
shall be entitled to recover any payments made to her or on her
behalf under paragraph 1.  Any such action permitted to
Natixis by the foregoing, however, shall not affect or impair
any of Dooley's obligations under this Agreement, including
without limitation, the release of claims in paragraph 2 hereof.
Dooley further agrees that nothing in this Agreement shall
preclude ... the Parties from recovering attorneys' fees, costs
or any other remedies specifically authorized under applicable
law.

      D.     In a letter, dated February 21, 2008, addressed to Rubin, and

transmitted to him by e-mail attachment, Margaret's attorney again rejected the attempt of the

individual respondents, for the financial benefit of Natixis, to "unvest" Margaret's vested LTIP

benefit of $571,215.97, as erroneously calculated by the individual respondents, by converting it

into a conditional payment subject to forfeiture at the whim of Natixis:

      **Second potential deal-breaker.**  There cannot under any
circumstances be any forfeiture of the settlement amount.

               *       *       *

      I repeat that Mrs. Dooley will not agree to your proposal that, in
the event of any breach on her part, Natixis will be entitled to
recover any payments made by it under paragraph 1, (not even the
reduced amount to be paid given the "ordinary course" LTIP
distribution currently to be made independent of this settlement
agreement) ....

      44.    A.     Meanwhile, on February 6, 2008, Natixis had drawn to Margaret's

order, and on or about that date had delivered to Rubin, the two checks referred to in paragraph

36 above, in the amount of $571,216.97, in payment of the supposed value of her vested LTIP

units as incorrectly determined by the individual respondents.

B.      By the close of business on February 20, 2008, Rubin had not disclosed to Margaret's attorney: (i) that the individual respondents had determined to accelerate the payment of LTIP distributions otherwise to have been made in June 2008 and June 2009; or (ii) that the two checks had already been drawn and delivered to him; or (iii) that other employees and/or former employees of Natixis had already been paid of the value of their vested LTIP units.

C.      During the evening of February 20/21, 2008, Margaret received an e-mail from a former Natixis employee in which he wrote that he had received the distribution of the value of his vested LTIP units.

45.      By an e-mail dated February 21, 2008, addressed to Rubin, Margaret's attorney wrote:

> Mrs. Dooley has learned that present and former Natixis employees received last week LTIP payments based upon LTIP units awarded in 2005 and 2006.
>
> Demand is hereby made that Mrs. Dooley receive her payment tomorrow, by overnight courier, its amount to be credited against any settlement figure agreed to or any arbitration award made in her favor.
>
> The failure on the part of Natixis and you to have disclosed these payments is not a confidence builder, but rather a display of a remarkable degree of bad faith. I expect that you will cause the payment to be made immediately; let that be a first step in getting this back on track.

46.      Respondents Orsatelli, Di Martino and Shanks breached the fiduciary duty they owed Margaret by:

A.      Having determined Margaret's rights under the LTIP in a manner calculated to provide the greatest financial benefit to Natixis, at Margaret's expense, by

minimizing the amount to be paid to Margaret, as follows:

    i.  With respect to the LTIP units granted to Margaret for the Performance Period June 1, 2004, to December 31, 2004: (a) by determining that only two-thirds of the units granted to her, rather than all of them, had vested; (b) by causing her to be paid the value of only two-thirds of her vested units, rather than the value of all of the units granted to her, to which she was entitled because all of the units granted to her had vested at December 31, 2004; (c) by causing only two-thirds of the units granted to her, those which it deemed to have vested, to have been valued as of a date in early 2008, by which date the financial performance of Natixis, a component of the valuation formula, had deteriorated substantially, instead of having caused all of the units granted to her to have been valued as of December 31, 2004, a date prior to such financial performance deterioration; and (d) by having caused her to be paid the erroneously determined value of two-thirds of her vested units in February 2008, instead of having caused her to be paid to her the correctly determined value of all of her vested units at the earliest practicable date in 2005; and

    ii.  With respect to the LTIP units granted to Margaret for the Performance Period January 1, 2005, to December 31, 2005: (a) by determining that only one-third of the units granted to her, rather than all of them, had vested; (b) by causing her to be paid the value of only one-third of her vested units, rather than the value of all of the units granted to her, to which she was entitled because all of the units granted to her had vested at December 31, 2005; (c) by causing only one-third of the units granted to her, those which it deemed to have vested, to have been valued as of a date in early 2008, by which date the financial performance of Natixis, a component of the valuation formula, had deteriorated

substantially, instead of having caused all of the units granted to her to have been valued as of December 31, 2005, a date prior to such financial performance deterioration; and (d) by having caused her to be paid the erroneously determined value of only one-third of her vested units in February 2008, instead of having caused her to be paid to her the correctly determined value of all of her vested units at the earliest practicable date in 2005.

        B.      Having attempted, during the parties' mediation, through the attorneys whom they or their delegatee engaged, to provide a basis for Natixis to realize a further financial benefit at Margaret's expense, which they did by:

           i.      Having failed to disclose information material to Margaret's and her attorney's knowledgeable participation in the effort to document the terms of settlement agreed to in principle in the mediation; and

           ii.      Having sought to condition the payment to Margaret of the additional settlement amount agreed to in principle upon Margaret's agreement that her vested LTIP settlement benefit in the sum of $571,215.97 would "unvest" and become subject to forfeiture in the event of her breach of the proposed settlement agreement, without regard to the amount of damages, if any, Natixis might suffer as a result of any such breach.

        47.      By reason of the foregoing, the individual respondents' purported determination or interpretation of the LTIP was not made good faith and the individual respondents are not exempt from personal liability under ¶ 3(c) of the LTIP.

        48.      By reason thereof, Margaret is entitled to an interim award as follows:

        A.      For the LTIP units having a face value of $635,000.00 granted for the Performance Period June 1, 2004, through December 31, 2004, determining: (i) that all units

thus granted vested in full at December 31, 2004; (ii) that Margaret was entitled under the LTIP to have the value of all such units determined at December 31, 2004, and paid to her as soon after December 31, 2004, as was practicable; and (iii) that the individual respondents breached the fiduciary duty they owed to Margaret by their failure to have caused all such units to have been valued at December 31, 2004, as all of such units had vested at December 31, 2004, and to have caused Margaret to have been paid as soon after December 31, 2004, as was practicable the value of all such units, as determined under the LTIP; and

B.    For the LTIP units having a face value of $490,000.00 granted for the Performance Period January 1, 2005, through December 31, 2005, determining: (i) that all units thus granted vested in full at December 31, 2005; (ii) that Margaret was entitled under the LTIP to have the value of all such units determined at December 31, 2005, and paid to her as soon after December 31, 2005, as was practicable; and (iii) that the individual respondents breached the fiduciary duty they owed to Margaret by their failure to have caused all such units to have been valued at December 31, 2005, as all of such units had vested at December 31, 2005, and to have caused Margaret to have been paid as soon after December 31, 2005, as was practicable the value of all such units, as determined under the LTIP; and

C.    Awarding Margaret interest from the date as of which each award should have been paid to the date of payment; and

D.    Directing the individual respondents to cause the LTIP's administrator, Brown Bridgman & Company, to value the LTIPs awarded under both grants according to the terms of the interim award and the LTIP and to provide to Margaret all particulars of and all documents used in its calculation of the value of both LTIP awards; and

27

        E.      Awarding Margaret the expenses of this arbitration and a reasonable attorney's fee; and

        F.      Directing that further proceedings be held for the purpose of making a final award.

Dated: April 23, 2008

                                    Margaret Dooley

                                      Guy R. Fairstein
                                      **Attorney for Margaret Dooley**
                                      15 Stewart Place - No. 11-J
                                      White Plains, NY 10603
                                      914-328-0923

To:

Howard J. Rubin, Esquire
Davis & Gilbert LLP
Attorneys for Natixis Capital Markets, Inc.
1740 Broadway
New York, New York 10019

Anthony Orsatelli
in care of Natixis
Attention: Christian Lehir
30, Avenue Pierre Mendes-France
Paris 75013 France

Joseph Di Martino
in care of Natixis Capital Markets, Inc.
Attention: Albert P. Zakes
9 West 57th Street - 36th Floor
New York, NY 10019-2701

Eugene B. Shanks, Jr.
30 Hope Farm Road
Greenwich, CT 06830-3331

**Affidavit of Eugene B. Shanks, Jr.,
sworn to on May 12, 2008,
in Support of Petitioners'
Motion to Stay Arbitration**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

JOSEPH Di MARTINO AND EUGENE B.
SHANKS, Jr.,

                 Petitioners,

     -against-

MARGARET DOOLEY,

                 Respondent.

Index No. _____

**AFFIDAVIT OF**
**EUGENE B. SHANKS, JR.**
**IN SUPPORT OF**
**PETITIONERS' MOTION**
**TO STAY ARBITRATION**

STATE OF NEW YORK      )
                             ) ss:
COUNTY OF NEW YORK   )

        Eugene B. Shanks, Jr., being duly sworn, deposes and states:

        1.      I am currently a member of the Advisory Board (the "Advisory Board") of Natixis North America Inc. and its subsidiaries, including Natixis Capital Markets, Inc. (together, "Natixis").[1] I am not currently, nor have I ever been, an officer of Natixis. I submit this affidavit in support of my motion, joined by Joseph Di Martino ("Di Martino"), for a stay of the arbitration proceeding (the "Arbitration") commenced against me by Margaret Dooley ("Dooley") with the American Arbitration Association ("AAA"). I understand that Dooley also commenced the Arbitration against two other Advisory Board members, Anthony Orsatelli ("Orsatelli") and Di Martino, as well as Natixis Capital Markets, Inc.

        2.      Natixis first offered me a position as a member of the Advisory Board on May 26, 1998 for the period of April 1, 1998 through June 30, 1999. I accepted this offer on June 1, 1998. I have been a member of the Advisory Board from that time until the present.

---

[1] CDC North America Inc., a predecessor Natixis company, will also be referred to as "Natixis" for purposes of this affidavit.

3. The Advisory Board was assembled primarily to objectively interpret and administer Natixis' compensation, including its Long-Term Incentive Plan (the "LTIP").

4. On September 1, 1997, the 1997 Advisory Board adopted a Performance Unit Plan agreement ("LTIP Document") to govern the terms of LTIP awards made by Natixis to LTIP participants. I was not on the Advisory Board at that time and thus had no role with respect to the implementation of the LTIP Document.

5. Dooley brings the Arbitration pursuant to the LTIP Document and its arbitration clause ("Arbitration Clause").

6. I did not sign the LTIP Document, and even if I did, such signature would not make me a party to the LTIP Document because it would have been made in my capacity as a member of the Advisory Board and not individually. The LTIP Document is an agreement only between Natixis and LTIP participants, including Dooley.

7. Neither I nor the other Advisory Board members are parties to the LTIP Document, receive any direct benefits by virtue of the terms of the LTIP Document, or assume any personal obligation pursuant to the LTIP Document.

8 Notably, the Arbitration Clause in the LTIP Document expressly provides that it applies to claims or disputes arising out of or relating to the LTIP only between LTIP participants and Natixis. The preamble to the LTIP Document states that officers of Natixis are eligible to participate in the LTIP. I am not, nor have I ever been, a Natixis officer.

9. Moreover, the Arbitration Clause requires that Natixis and LTIP participants attempt to resolve a claim or dispute arising out of or relating to the LTIP Document by non-binding, confidential mediation as a prerequisite to commencing an arbitration. Dooley, however, never commenced a mediation proceeding against me.

10.    I have not moved for or been served with an application to compel the Arbitration, and I have not participated in the Arbitration to date.

Eugene B. Shanks, Jr.

Sworn to before me this
12 day of May ___ 2008.

ELIZABETH M. RYAN
Notary Public, State of New York
No. 01RY6166578
Qualified in Nassau County
Commission Expires May 21, 2011

3

**Affidavit of Joseph Di Martino,
sworn to on May 13, 2008,
in Support of Petitioners'
Motion to Stay Arbitration**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

JOSEPH Di MARTINO AND EUGENE B.
SHANKS, Jr.,

                 Petitioners,

  -against-

MARGARET DOOLEY,

                 Respondent.

Index No. _____

**AFFIDAVIT OF
JOSEPH Di MARTINO
IN SUPPORT OF
PETITIONERS' MOTION
TO STAY ARBITRATION**

STATE OF NEW YORK     )
                     ) ss:
COUNTY OF NEW YORK  )

Joseph Di Martino, being duly sworn, deposes and states:

1.    I am currently a member of the Advisory Board (the "Advisory Board") of Natixis North America Inc. and its subsidiaries, including Natixis Capital Markets, Inc. (together, "Natixis").[1] I am not currently, nor have I ever been, an officer of Natixis. I submit this affidavit in support of my motion, joined by Eugene B. Shanks, Jr. ("Shanks"), to stay the arbitration proceeding (the "Arbitration") commenced against me by Margaret Dooley ("Dooley") with the American Arbitration Association ("AAA"). I understand that Dooley also commenced the Arbitration against two other Advisory Board members, Anthony Orsatelli ("Orsatelli") and Shanks, as well as Natixis Capital Markets, Inc.

2.    Natixis first offered me a position as a member of the Advisory Board on December 5, 1995 for the period of December 1, 1995 through June 30, 1996. I accepted this

---

[1] CDC North America Inc., a predecessor Natixis company, will also be referred to as "Natixis" for purposes of this affidavit.

offer on December 8, 1995. I have been a member of the Advisory Board from that time until the present.

    3.    The Advisory Board was assembled primarily to objectively interpret and administer Natixis' compensation, including its Long-Term Incentive Plan (the "LTIP"). (See attached as Exhibit A the Natixis Advisory Board Charter.)

    4.    On September 1, 1997, the Advisory Board adopted a Performance Unit Plan agreement ("LTIP Document") to govern the terms of LTIP awards made by Natixis to LTIP p articipants. Dooley brings the Arbitration pursuant to this LTIP Document and its arbitration clause ("Arbitration Clause"). (See attached as Exhibit B the LTIP Document.)

    5.    I was on the Advisory Board at the time the LTIP Document was adopted. I signed the bottom of the LTIP Document, along with the other three Advisory Board members at that time, Orsatelli, Gerard Barbot and Ken Dowd. (Shanks was not an Advisory Board member at the time.) I signed the LTIP Document in my capacity as a member of the Advisory Board. I did not sign it in my individual capacity. The signature lines at the end of the LTIP Document were included merely to evidence the adoption of the LTIP Document by the Company (Natixis). Indeed, immediately above the signature lines, the LTIP Document states: "As adopted by the Board on September 1, 1997."

    6.    The LTIP Document is an agreement only between Natixis and LTIP participants, including Dooley. Neither I nor the other Advisory Board members are parties to the LTIP Document, receive any direct benefits by virtue of the terms of the LTIP Document, or assume any personal obligation pursuant to the LTIP Document.

    7.    Moreover, and more specifically, I never agreed to be bound by the Arbitration Clause. That provision expressly provides that it applies to claims or disputes arising

out of relating to the LTIP between LTIP participants and Natixis. The preamble to the LTIP Document states that officers of Natixis are eligible to participate in the LTIP. (See attached as Exhibit C the Preamble to the LTIP Document.) I am not, nor have I ever been, a Natixis officer.

8.    The Arbitration Clause requires that Natixis and LTIP participants attempt to resolve a claim or dispute arising out of or relating to the LTIP Document by non-binding, confidential mediation as a prerequisite to commencing an arbitration. Dooley never commenced a mediation proceeding against me.

9.    I have not moved for or been served with an application to compel the Arbitration, and I have not participated in the Arbitration to date.

_____
Joseph Di Martino

Sworn to before me this
_13 day of May ___ 2008.

_____
NOTARY PUBLIC

TALIA C. DELGADO
Notary Public, State of New York
No. 01DE6176274
Qualified in Bronx County
Commission Expires November 26, 2011

**Exhibit A to the**
**Affidavit of Joseph Di Martino,**
**sworn to on May 13, 2008**

January 3, 1997

## CDC NORTH AMERICA

## ADVISORY BOARD CHARTER

1.    **Composition**

The CDC North America Advisory Board (the Board) will consist of at least three members: at least one representative of Caisse des Dépôts et Consignations (the French Representative) and at least two representatives, with proven expertise in the US financial industry, (the North American Representatives), selected from time to time by the French Representative, subject to the reasonable approval of the Chief Executive Officer of CDC North America Inc. (the CEO). If one of the North American Representative seats becomes vacant for any reason, the French Representative(s) shall select a replacement whose appointment shall be subject to the reasonable approval of the CEO.

While the Member(s) representing Caisse des Dépôts et Consignations will make the final choice,    it is understood that they will not be empowered to make arbitrary changes in the constitution of the Advisory Board so as to destroy or undo the purposes of the Board described herein.    CDC North America will be responsible for the renewal of the Board Members contracts.

The Board may elect to enlist the assistance of non-members to assist in the performance of its tasks.

2.    **Purpose**

a)    With the concurrence of the senior management of the Caisse des Dépôts et Consignations, the Advisory Board has been assembled primarily to create and administer the Long-Term Incentive Plan of CDC North America and its affiliates. In this capacity, the Board is charged with reviewing the overall compensation of the participants in the plan and ascertaining that it is within the parameters of established competitive practices in the United States. The Board's function is to provide objective judgment regarding the compensation practices of CDC North America and to provide transparency in the compensation process to the Caisse des Dépôts et Consignations. In addition, the Board's function is to provide objectivity to the participants in the plan, and to ensure that the nature of the plan is not arbitrarily discontinued or altered so as not to damage its credibility.

2.

b)     The Board is also responsible for assisting the senior management of the CDC Group in
general business management issues, long term strategic planning, business
development, or any other management issue as requested by the CDC Group. In this
capacity, the Board members will have the opportunity to work on specific issues and
research projects from time to time.

3.     **Long-Term Incentive Plan**

The purpose of the Long-Term Incentive Plan is to compensate and retain those individuals who
are critical to the development of the CDC North America businesses.

The plan is geared to reward participants for their efforts in the long-term development of the
businesses. The Board is, however, expected to balance these objectives against the needs of the
Caisse des Dépôts et Consignations to ensure that its interests are also protected.

The Board will meet not less than once every quarter according to a schedule that will be
approved by the Board Members the prior year. The Board will review the operating results of
the New York-based business for purposes of compensation planning and determine appropriate
long-term incentive levels for the business results achieved. The Board will review the
recommendations of local management and decide on appropriate levels of individual awards.

Since the North American Representatives will be selected based on their knowledge of US
capital markets and expertise in diversified US financial institutions, the North American
Representatives shall have initial responsibility for recommending compensation initiatives and
evaluating compensation recommendations presented to the Board. All compensation proposals
must thereafter be adopted by the Board as a whole. If the French Representative objects to any
compensation proposal or recommendation made by the North American Representatives, the
North American Representatives must provide objective analysis and criteria demonstrating that
these proposals or recommendations are consistent with North American financial industry
compensation practices. The French Representative must weigh such objective analysis and
criteria in reviewing the compensation recommendations made by the North American
Representatives.

## 4.    Commencement and Term of Board Members

Board Members' employment begins on July 1 and continues through June 30 of the following year unless a multi-year term is agreed upon between CDC and the Board Members.

## 5.    Renewal and Termination

The employment agreement with the individual members of the Board will be from July 1 for a period of one year unless otherwise agreed to between CDC and the Board Members. This agreement will be renewed voluntarily by both parties upon expiration of the term. It is expected that both sides will commence discussions on the composition of the Board at that outset of the year in which the term expires. Individual discussions will occur during May of that year, with an agreement reached by the end of that month. At that point, and with no less than 30 days notice, either side may provide formal notice of their intention not to renew the agreement. Alternatively, the CDC Group will issue a formal letter confirming the specific agreements for the coming term at the outset of June of that year.

A Board Member may not be relieved of his post before the expiration of this term except for cause or conflict of interest. "For cause" is defined to include, but not limited to, gross negligence or willful misconduct in the performance of specified duties under this Agreement, the perpetration of a fraud, crime or other act of serious misconduct, willful misrepresentation of information or willful act detrimental to the CDC Group.

## 6.    Confidentiality

The Board Members will be routinely asked to review highly confidential business matters on behalf of the CDC Group. It is expected that these matters will be treated as such, and that all such information will remain the property of the CDC Group and that any disclosure of such items will be considered a breach of contract. The North American Representatives may be asked to enter into confidentiality agreements in connection with their consulting contracts.

Adopted January 7, 1997

Gérard Barbot          Anthony Orsatelli          Joseph Di Martino          Kenneth Dowd

**Exhibit B to the
Affidavit of Joseph Di Martino,
sworn to on May 13, 2008**

CDC NORTH AMERICA INC.

PERFORMANCE UNIT PLAN

**1.    Purposes.**  The purposes of this Performance Unit Plan (the "Plan") are to assist CDC North America Inc. and its subsidiaries (collectively referred to herein as the "Company") in attracting, retaining, motivating and rewarding employees and whose performance can impact the long term success of the Company by providing competitive compensation opportunities that reward outstanding performance.

**2.    Definitions.**  In addition to the terms defined in Section 1 hereof, the following terms used in the Plan shall have the meanings set forth below:

(a)    "Beneficiary" means any person (which may include trusts and is not limited to one person) who has been designated by the Participant in his or her most recent written beneficiary designation filed with the Company to receive the benefits specified under the Plan in the event of the Participant's death.  If no Beneficiary has been designated who survives the Participant's death, then Beneficiary means any person(s) entitled by will or the laws of descent and distribution to receive such benefits.

(b)    "Board" means the CDC Advisory Board as constituted both of non-CDC employees and representatives of CDC as selected by the Company.

(c)    "Cause" means (i) a Participant's willful failure to perform his or her duties (other than as a result of total or partial incapacity due to physical or mental illness, and excluding any action taken and any decision not to act if such action is taken or such decision is made in the good faith belief that it is in the furtherance of the business of the Company); (ii) gross negligence or gross malfeasance in the performance of the Participant's duties; (iii) a final finding by a court or other governmental body with proper jurisdiction that an act or acts by the Participant constitutes (A) a felony under the laws of the United States or other state thereof, or (B) a violation of Federal or state securities law if, as a result of such finding under clause (A) or (B) of this clause (iii), the Board determines, in good faith, that the continued employment of the Participant by the Company or any subsidiary or affiliated company would be seriously detrimental to the Company and its business; or (iv) in the absence of any final finding by a court or other governmental body with proper jurisdiction, a determination in good faith by the Board that an act or acts constituted a felony violation of Federal or state securities law and that, by reason of such act or acts, the continued employment of the Participant by the Company or any subsidiary or affiliated company would be seriously detrimental to the Company and its business.

(d)    "CDC" means Caisse des Dépôts Group, the sole shareholder of the Company

(e)    "Disability" means that because of injury or sickness a Participant cannot perform each of the material duties of his or her position, as determined by the President of the Company and with the agreement of the Board.

(f)    "Income Before Taxes" means, for each fiscal year, or other period determined by the Board, the consolidated earnings or losses of the Company before income taxes, as determined in the sole discretion of the Board whose determination shall be final, conclusive and binding on all interested parties, including participants and beneficiaries of the Plan.

(g)    "Participant" means an eligible employee who has been designated by the Committee to receive Units for a specified Performance Period which have not yet been settled.

(h)    "Performance Period" means, unless otherwise determined by the Committee at or after grant, the period of three consecutive fiscal years over which the value of a Unit shall be measured (except that a period shorter than the full Performance Period may be used for such measurement in certain cases involving the Participant's Termination of Employment, as specified in Section 5(d).

(i)    "Prohibited Actions" means that without the prior written consent of the Company the Participant will not

(i)    directly or indirectly engage in, own, manage, operate, control or otherwise participate in or be connected with, any investment management, structured product or other competing business, whether as principal, sole proprietor, agent, employee, employer, consultant, advisor, independent contractor, stockholder, director, officer, partner, joint venturer or in any other individual or representative capacity whatsoever during the Performance Period, provided, however, that the mere ownership by the Participant of not more than one percent (1%) of the equity securities of any competitor or similar business entity, the securities of which are registered pursuant to the Securities and Exchange Act of 1934 as amended, shall not be deemed to be a violation of this covenant so long as the Participant does not actively participate in the business or management of such corporation or entity in any manner whatsoever;

(ii)    employ, solicit for employment, or advise or recommend to any other person that they employ or solicit for employment, any person who is or was an employee of the Company  during the Performance Period;

(iii)    disclose, furnish or make accessible to any person or entity, or make use of for the benefit of himself or others, any confidential information obtained or developed by him or her while in the employ of the Company or any subsidiary or affiliated company.  Prior to the termination of his or her employment with the Company or any subsidiary or affiliated company the Participant shall return to the Company all such information in written or other physical or recorded form or which has been reduced to written or other physical or recorded form, and all copies thereof, in his possession, custody or control.  The foregoing covenant shall not apply to (i) any confidential information that becomes generally known or available to the public other than as a result of  disclosure or other breach of the terms hereof by Participant and (ii) any disclosure of confidential information by the Participant that is expressly required by judicial or administrative order; provided, however, that the Participant shall have (x) notified the Company as promptly as practicable of the existence, terms and circumstances of any notice, subpoena or other process or order issued by a court or administrative authority that may require him or her to disclose any confidential information and (y) cooperated with the Company at its request, in taking legally available steps to resist or narrow such process or order and to obtain an order or other reliable assurance that confidential treatment will be given to such confidential information as is required to be disclosed.

(j)    "Retirement" means an event by which the Participant, at or after age 65, or such earlier age as deemed by the Board, ceases to be an employee of the Company or a subsidiary or affiliated company and immediately after such event the Participant is not employed by the Company or any subsidiary or affiliated company.

(k)    "Termination of Employment" means any event by which the Participant ceases to be an employee of the Company or a subsidiary or affiliated company and immediately after such event the Participant is not employed by the Company or any subsidiary or affiliated company.

(l)    "Unit" means a right, granted by a Participant under the Plan, to receive payout of an amount equal to .0001% of the Income Before Taxes measured over a Performance Period (or shorter period specified in Section 5(d)), subject to the terms and conditions of the Plan.  Units are arbitrary accounting measures created and used solely for purposes of administering the Plan.  Units do not

represent ownership rights in the Company or any assets of the Company, are not transferable and otherwise carry no value outside the context of the Plan.

3.    **Administration**.

(a)    Board Authority.  Unless otherwise determined by the senior management of CDC, the Board shall administer the Plan in accordance with its terms, and shall have full power and authority to construe and interpret the Plan, to prescribe, amend and rescind rules and regulations, agreements, terms and notices hereunder, and to make all other determinations necessary or advisable for the administration of the Plan.  Any actions of the Board within their operating charter with respect to the Plan shall be conclusive and binding upon all persons interested in the Plan.

(b)    Delegation.  The Board may delegate any functions of the Plan to a designated officer of the Company, in which case references to the Board shall be deemed to include such delegatee or delegates.  The foregoing notwithstanding, only the Board, and no other delegatee, shall have authority (i) to grant Units to, or take actions with respect to Units then held by, officers of the Company or (ii) to make determinations relating to the measurement of Income Before Taxes under the Plan.

(c)    Limitation of Liability.  In the exercise of authority under the Plan, each member of the Board, and any person acting as a delegatee of the Board hereunder, shall be entitled to, in good faith, rely or act upon any report or other information furnished to him or her by any officer or other employee of the Company or any subsidiary, the Company's independent certified public accountants, or any executive compensation consultant, legal counsel, or other professional retained by the Company to assist in the administration of the Plan.  Neither a member of the Board nor any person acting as a delegatee of the Board hereunder shall be personally liable for any action, determination, or interpretation taken or made in good faith with respect to the Plan, and each such person shall, to the extent permitted by law, be fully indemnified and protected by the Company with respect to any such action, determination, or interpretation.

4.    **Eligibility**.  Units may be granted only to employees whose performance can impact the long term success of the Company, as designated and approved by the Board.

5.    **Grants and Payouts of Units**.

(a)    Grant of Units.  Subject to the terms and conditions of the Plan, the Board may select eligible employees to whom Units shall be granted, specify the number of Units to be granted to each such eligible employee, and specify the Performance Period to which such Units relate.  With the exception of the 1997 grant, such grants shall be made not later than 120 days after the beginning of a specified Performance Period.  Whether a given employee who meets the eligibility requirements of Section 4 will be granted Units for any Performance Period, and the number of Units that may be granted to any eligible employee for any Performance Period, shall be within the sole discretion of the Board.  The Board may consider an employee's past performance, current or future responsibility level, individual ability to impact the future success of the Company, or any other circumstance deemed relevant in making such determination.  Such grants and the circumstances considered by the Board in making such determinations need not be the same or consistent for all or any identifiable group of employees, within a given Performance Period or otherwise.

(b)    Determination of Unit Value.  The value of each Unit awarded for a Performance Period will be determined as of the last day of each calendar year during the Performance Period.  The value of each Unit as of each such date shall be equal to .0001% of the cumulative Income Before Taxes of the Company for the period beginning on the first day of the Performance Period and ending on such date of determination.  Unless circumstances require otherwise, such annual determinations of Unit value shall be made within 45 days after the completion of the year-end audit by the Company's independent certified public accountants.

Notwithstanding anything contained herein to the contrary, the Board may adjust the value of Units at any time in the event that CDC materially impacts the financial performance of the Company during the Performance Period through an action(s) that was precipitated for reasons other than the business or investment performance of the Company. It is intended that such events would, by their nature, be rare and that any such adjustment would only be made after careful consideration of the fairness of such action to both CDC and the Participant in view of the objectives of the Plan.

(c)    Vesting and Forfeiture. Units granted to a Participant which have not vested, in accordance with this Section 5(c), at or before such Participant's Termination of Employment shall be forfeited at the time of such Termination of Employment. One-third of a Participant's Units granted for any Performance Period will vest at the close of business on the final day of each year of such Performance Period (which vesting shall include fractional Units), provided that, (i) in the event of a Participant's Termination of Employment due to death or disability, or as otherwise determined by the Board, all of the Participant's Units granted for any Performance Period then in progress shall vest at the time of such Termination, or (ii) in the event of a Participant's Termination of Employment due to Retirement, all of the Participant's Units granted for any Performance Period then in progress shall continue to vest one-third per year provided the Participant does not engage in any Prohibited Actions.

(d)    Settlement.

(1)    Except as provided in paragraph (2) below, the value of a Participant's vested Units shall be determined and paid as soon as reasonably practicable after the end of the Performance Period to which such Units relate. In the case of a Participant whose Termination of Employment occurs prior to the end of a Performance Period, such value will be equal to the lower of (i) the value of such vested Units determined, in accordance with paragraph (b) above, as of the last day of the Performance Period, or (ii) the value of such vested Units determined, in accordance with paragraph (b) above, as of the last day of the calendar year coincident with or immediately preceding such date of Termination of Employment. In the case of a Participant who does not incur a Termination of Employment prior to the end of the Performance Period, such value shall be determined, in accordance with paragraph (b) above, as of the last day of such Performance Period.

(2)    In the case of a Participant whose Termination of Employment occurs prior to the end of a Performance Period as a result of death or disability, the value of his Units determined as of the last day of the fiscal quarter coincident with or immediately preceding such date of Termination of Employment shall be paid to the Participant, or in the event of his death to his beneficiary, as soon as reasonably practicable after such value is determined.

(3)    Notwithstanding anything contained herein to the contrary, in the event that Units are held by a Participant who is an expatriate who is being transferred to a CDC affiliate outside the United States, such Participant may elect, within 30 days following such transfer, to be treated for purposes of the Plan as though he had incurred a Termination of Employment as of the date of such transfer or to continue to be treated as a Participant following such transfer. If such Participant elects to continue to be treated as Participant following such transfer, his service with the non-United States CDC affiliate shall be treated as service under the Plan for vesting purposes.

(e)    Deferral. Notwithstanding paragraph (d) above, a Participant may, no later than the June 30th preceding the end of each Performance Period, irrevocably elect to defer payment of all or any portion of the amount otherwise payable under paragraph (d) with respect to Units granted for such Performance Period; provided, however, that no such election shall be effective if the Participant's Termination of Employment occurs prior to the end of such Performance Period. Any such deferral election shall be made in accordance with the terms and conditions of the CDC Capital, Inc. Deferred Compensation Plan. Any amount so deferred shall be credited to the Participant's Deferred Compensation Account under such Plan and otherwise be subject to all of the terms and conditions thereof.

6.    **General Provisions.**

(a)    No Rights to Participate or Receive Grants or Payouts; No Rights as Stockholder. Until the Board has determined to grant Units to an eligible employee, no employee shall have any right to participate or receive a grant of Units hereunder, and the granting of Units hereunder shall not be construed as a commitment that any payout shall be made with respect to such Award except in accordance with the terms of the Plan. No Participant shall have any rights of a stockholder of the Company or any subsidiary as a result of the grant of Units or otherwise under the Plan.

(b)    No Rights to Employment. Nothing contained in the Plan or in any documents related to the Plan, and no grant of Units, shall (i) confer upon any employee or Participant any right to continue as a Participant or in the employ of the Company or a subsidiary, (ii) constitute any contract or agreement of employment, or (iii) interfere in any way with the right of the Company or a subsidiary to reduce such person's compensation, to change the position held by such person or to terminate the employment of such employee or Participant, with or without cause.

(c)    Non-Transferability. Units and other rights under the Plan shall not be transferable by a Participant except upon a Participant's death by will or the laws of descent and distribution or to a Beneficiary, and shall not otherwise be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, or charge, and any such attempted action shall be void.

(d)    Unfunded Plan. The Plan is intended to constitute an "unfunded" plan for incentive and deferred compensation. With respect to any amount payable to a Participant under the Plan, nothing contained in the Plan (or in any agreement or other documents related thereto), nor the creation or adoption of the Plan, the grant of any Award, or the taking of any other action pursuant to the provisions of the Plan shall give any such Participant any rights that are greater than those of a general creditor of the Company; provided, however, that the Board may authorize the creation of trusts or make other arrangements to meet the Company's obligations under the Plan, which trusts or other arrangements shall be consistent with the "unfunded" status of the Plan unless the Board otherwise determines with the consent of each affected Participant.

(e)    Tax Withholding. The Company and any subsidiary shall have the right to deduct from any cash amount deliverable hereunder an amount equal to any federal, state, local, or foreign taxes required to be withheld with respect to such payout.

(f)    Governing Law. The Plan and all related documents shall be governed by, and construed in accordance with, the laws of the State of New York. If any provision hereof shall be held by a court of competent jurisdiction to be invalid and unenforceable, the remaining provisions of the Plan shall continue to be fully effective.

(g)    Amendment and Termination. The Board may, at any time, terminate or, from time to time, amend, modify, or suspend the Plan and agreements under the Plan, provided that no such action shall materially and adversely affect the rights of a Participant with respect to previously granted Units without the consent of such affected Participant. If the Plan is terminated with respect to future appreciation on outstanding Units, the Units will be fully vested and their current value based on the prior fiscal quarter paid out immediately. Unless earlier terminated hereunder, the Plan will terminate when the Company has no further obligations under the Plan.

(h)    Arbitration Clause. In the event there is any claim or dispute arising out of or relating to this Plan, or the breach thereof, and the Company and the Plan participants shall not have resolved such claim or dispute within 90 days after written notice from one party to the other setting forth the nature of such claim or dispute, then such claim or dispute shall attempt to be settled by mediation through a mediator agreed upon by the parties for nonbinding, confidential mediation. If this is not successful, the dispute will be submitted to binding arbitration in New York, New York, in accordance with

the Commercial Arbitration Rules of the American Arbitration Association by an arbitrator(s) selected according to such Rules. Judgment upon the award rendered by such arbitrator(s) shall be entered in any Court having jurisdiction thereof upon the application of either party.

(i)    Effective Date.  The Plan shall become effective as of January 1, 1997, for Performance Periods beginning on or after January 1, 1997.

As adopted by the Board on September 1, 1997.

G. Barbot              Date            J. Di Martino            Date

K. Dowd              Date            A. Orsatelli            Date

**Exhibit C to the
Affidavit of Joseph Di Martino,
sworn to on May 13, 2008**

# CDC IXIS North America's Long Term Incentive Plan

CDC IXIS North America's Long Term Incentive Plan was created to give officers direct participation in the financial success of the companies. By giving officers a direct stake in our longer term financial results, it aligns their personal financial interest directly with the development of the CDC IXIS North America companies and rewards officers for their remarkable efforts in creating value in all our activities.

## What does the plan do?

The Long Term Incentive Plan (LTIP) grants units to CDC Officers representing a share in the cumulative 3 year pre-tax profitability of CDC IXIS Capital Markets North America.

These Units are equal to 1/1,000,000 (.0001%) of the three-year cumulative income before taxes of CDC IXIS Capital Inc.  The Unit Value is paid at the end of a Performance Period following verification of performance results by outside auditors and reviewed by CDC Compensation Advisory Board.

## Who is eligible?

All Officers of CDC IXIS North America and CDC IXIS Capital Markets North America are eligible to receive units of the company in which they work.

## How are units awarded?

When managers make their compensation decisions on an annual basis, they make recommendations on LTIP units in the same way they make recommendations regarding bonuses and base salaries.  These recommendations, like all compensation elements, are reviewed by senior management and the compensation Advisory Board[2].  Final approval comes from CDC IXIS Management in Paris.

## How are the initial awards valued?

The Award Value is based on an average of the pre-tax profitability of the previous three years plus a hurdle rate of 5% added to each year.  The result is a "hypothetical" 3-year cumulative profitability.  Each "Performance Unit"[1] is worth 1/1,000,000 (.0001%) of this projection.

When managers recommend LTIP awards, they assign a dollar amount, a face value to the award.  The units are calculated from face value by the following:

(1) adding a "time value" (three-year blended treasury rate for years 2 and 3), to the face amount to get an adjusted face value.
(2) by dividing the individual target value by the unit value as described above.

---

[2] Subject to review and adjustment by CDC Advisory Board in the event of unanticipated action taken by CDC for reason not related to investment or other performance that impacts profitability and results in the hardship or windfall to participants. Participation and grant level is at the sole discretion of CDC IXIS NA, please refer to the Plan Document for further information. The plan and actions taken thereunder are subject to final approval by CDC IXIS NA as set forth in the Charter of the Advisory Board
[1] These Units do not represent ownership rights in the Company or Group of any assets of the Company or Group, and are not transferable and otherwise carry no value outside the context of the plan

# CDC IXIS North America's Long Term Incentive Plan    2

<u>How are units paid?</u>

After the three-year cycle runs its course, the audited pre-tax financial results from the three years are totaled and divided by 1 million. This creates the final unit value. It can be greater or less than the initial value. Individual awards are calculated by multiplying the initial unit value by the number of units an employee was awarded. The result is a cash amount that is paid out just like a bonus.

<u>How do they vest?</u>

Participants will receive full vesting if they are employed with the Company for a full-three year period, or by retiring from CDC IXIS. One-third of the participant's units granted for any Performance Period will vest at the close of business on the final day of each year. At the end of the three-year cycle, units are fully vested and are paid out as soon as possible after the financial audit is completed.

<u>What happens if an employee terminates?</u>

If the termination is due to death or disability, the outstanding Units will fully vest. When termination is due to retirement, the Units will continue to vest as long as the participant gives one month notice, does not engage in any activities that are competitive with or damaging to the company.

Units granted to a participant who has not vested at or before termination are forfeited at the time of termination. A partially vested participant whose termination occurs prior to the end of a Performance Period will receive a partial payout, provided the officer has provided one month's notice to the company prior to departure.

All vested and partially vested LTIP units will be paid out at the end of the three-year Performance Period cycle at the same time that active employees are paid.

<u>Summary</u>

The plan gives Officers at CDC IXIS a financial interest in the development of the business over time. It also affords them the opportunity to reap the rewards of a job well done. The more prosperous the company is, the more profitable it is for each participant.

For further information as to the Definitions as well as Administration of the plan please refer to the Plan Document or contact your Human Resources Department.

# Memorandum of Law, dated May 13, 2008, in Support of Petitioners' Motion to Stay Arbitration

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

JOSEPH Di MARTINO AND EUGENE B.
SHANKS, Jr.,

                    Petitioners,

        -against-

MARGARET DOOLEY,

                    Respondent.

Index No. 60146 3/08

## MEMORANDUM OF LAW IN SUPPORT OF PETITIONERS' MOTION TO STAY ARBITRATION

DAVIS & GILBERT LLP

*Attorneys for Petitioners Joseph Di Martino and Eugene B. Shanks, Jr.*
Howard J. Rubin
Jennifer Tafet Klausner
Heath J. Rosenthal
1740 Broadway
New York, NY 10019
(212) 468-4800

# TABLE OF CONTENTS

<u>Page</u>

PRELIMINARY STATEMENT.................................................................................1

STATEMENT OF FACTS ....................................................................................4

ARGUMENT.......................................................................................................7

    I.    DOOLEY DOES NOT HAVE A VALID ARBITRATION AGREEMENT WITH EITHER DI MARTINO OR SHANKS AND THEREFORE, THE COURT SHOULD STAY THE ARBITRATION AS AGAINST THEM..................................................7

    II.    DOOLEY HAS NOT COMPLIED WITH THE LTIP DOCUMENT'S CLEAR CONDITION PRECEDENT FOR INITIATING THE ARBITRATION AGAINST DI MARTINO OR SHANKS AND THEREFORE, THE COURT SHOULD STAY THE ARBITRATION AS AGAINST THEM ................................................14

CONCLUSION....................................................................................................16

# TABLE OF AUTHORITIES

## CASES

*AT&T Techs., Inc. v. Commc'ns Workers of Am.,*
475 U.S. 643 (1986) ........................................................................7

*Cement & Concrete Workers Dist. Council Welfare Fund v. Lollo,*
35 F3d 29 (2d Cir. 1994) ............................................................11

*D.P. Promotions Ltd v. SelectTV of Amer., Ltd.,*
99 A.D.2d 717, 472 N.Y.S.2d 323 (1st Dep't 1984) ...................13

*Gulf Underwriters Ins. Co. v. Verizon Commc'ns , Inc.,*
32 A.D.3d 709, 710, 822 N.Y.S.2d 8 (1st Dep't 2006) .................8

*In the Matter of 3202 Owners Corp. v. Billy Contractors, Inc.,*
25 A.D.3d 715, 716, 811 N.Y.S.2d 727 (2d Dep't 2006)..............15

*In the Matter of the Arb. between Asphalt Green, Inc. and Herbert Constr. Co.,*
*Inc.*, 210 A.D.2d 21, 618 N.Y.S.2d 810 (1st Dep't 1994) ............16

*In the Matter of Arthur Miller,*
40 A.D.3d 861, 862, 835 N.Y.S.2d 728 (2d Dep't 2007).........7, 8

*In the Matter of Wausau Ins. Co. v. Bartz,*
197 A.D.2d 627, 604 N.Y.S.2d 760 (2d Dep't 1993)..................16

*Johnston v. Silverman,*
167 A.D.2d 284, 561 N.Y.S.2d 788 (1st Dep't 1990).............12, 13

*Lerner v. Amalgamated Clothing and Textile Workers,*
938 F.2d 2 (2d Cir. 1991).............................................................10, 11

*Mason Tenders Dist. Council Welfare Fund v. Thomsen Constr. Co.,*
301 F.3d 50 (2d Cir. 2002)............................................................11, 12

*Mencher v. Weiss,*
306 N.Y.1, 114 N.E.2d177 (1953) ...............................................10

*Salzman Sign Co., Inc. v. Beck,*
10 N.Y.2d 63, 217 N.Y.S.2d55 (1961) .........................................11, 12

*TNS Holdings, Inc. v. MKI Secs. Corp.,*
92 N.Y.2d 335, 680 N.Y.S.2d 891 (1998) ...................................7

## STATE STATUTES

CPLR § 7503 (b) .......................................................................................... *passim*

CPLR § 7503 (c) ................................................................................................3

## MISCELLANEOUS

AAA, Commercial Arbitration Rules and Mediation, Rule R.39 (2007)
www.adr.org ...............................................................................................3

Petitioners Joseph Di Martino ("Di Martino") and Eugene B. Shanks, Jr. ("Shanks") (together, "Petitioners") respectfully submit this memorandum of law in support of their motion pursuant to CPLR § 7503(b) to stay the arbitration proceeding (the "Arbitration") that Respondent Margaret Dooley ("Dooley" or "Respondent") commenced against them by a Demand for Arbitration (the "Demand") with the American Arbitration Association ("AAA").

## PRELIMINARY STATEMENT

Dooley purported to commence an AAA Arbitration against Di Martino and Shanks[1] under the authority of the Long-Term Incentive Plan ("LTIP") of her former employer Natixis[2], as administered pursuant to a Performance Unit Plan Agreement adopted in 1997 (the "LTIP Document") that contains an arbitration clause (the "Arbitration Clause"). Natixis' principal place of business is New York, and Dooley worked for Natixis in New York. The LTIP Document contains a New York choice of law provision and calls for the Arbitration to take place in New York.

---

[1] Dooley also commenced the Arbitration against Natixis Capital Markets, Inc. ("Natixis"). Natixis is not seeking to stay the Arbitration as to it and, notably, it has sufficient assets to satisfy a judgment should one be entered in Dooley's favor in the Arbitration. Dooley also named Anthony Orsatelli ("Orsatelli") in the Demand for Arbitration; however, Dooley failed to properly serve the Demand for Arbitration on Orsatelli, who lives in France. Therefore, the instant application seeks only to stay the Arbitration with respect to Di Martino and Shanks.

[2] For the purpose of simplicity, all the below-referenced Natixis entities will be referred to as "Natixis" in this Memorandum of Law. Natixis was formed in 2006, when two French companies in the banking and finance sector, Ixis and Natexis, merged certain of their subsidiaries to create Natixis. Ixis Corporate & Investment Bank ("Ixis CIB") was one of the subsidiaries that Ixis contributed to the new Natixis entity.

The US operations of Ixis CIB, before and after the Natixis merger, were conducted along the following format: There was (and now is) a US parent holding company, senior to another holding company, which in turn owns the various operating companies. Prior to the merger, the senior US holding company for Ixis CIB was Ixis North America Inc., and the holding company it owned was Ixis Capital Markets. Ixis Capital Markets owned the operating companies. Following the merger, these companies and this structure continued in place, the only change being to their names. The name of Ixis North America Inc. was changed to Natixis North America Inc., and the name of Ixis Capital Markets was changed to Natixis Capital Markets. Natixis Capital Markets owns the operating companies. CDC North America Inc. was a predecessor company to Ixis North America Inc.

Petitioners bring this special proceeding to stay the Arbitration because Dooley cannot require either Di Martino or Shanks to arbitrate any claims she may have against them because they are not parties to the LTIP Document, and therefore are not subject to the Arbitration Clause. The *only* parties to the LTIP Document are the Company (Natixis) and the LTIP participants as evidenced by the plain language of the LTIP Document.

Only officers of Natixis are eligible to participate in the LTIP. Di Martino and Shanks were *never* officers of Natixis and therefore never participated in the LTIP and are not parties to the LTIP Document. Rather, Di Martino and Shanks are members of an Advisory Board (the "Advisory Board"), the purpose of which is to objectively interpret and administer compensation, including the LTIP, on behalf of both Natixis and the LTIP participants. Neither Di Martino nor Shanks received any direct benefit from the LTIP Document and they never intended to be bound by the terms of its Arbitration Clause. Notably, Shanks was not even on the Advisory Board when the LTIP Document was signed by the members at that time. There is no signature line for him and he did not sign it. Although Di Martino did sign the LTIP Document, he did so solely in his representative capacity as an Advisory Board member, not in his individual capacity. Under CPLR § 7503(b), "a party . . . may apply to stay arbitration on the ground that a valid agreement was not made. . . ." Because Petitioners are not parties to the LTIP Document and therefore never agreed to be bound by the Arbitration Clause, their application to stay the Arbitration should be granted.

CPLR § 7503(b) also states that a party may apply to stay an arbitration on the ground that the arbitration agreement "has not been complied with." Thus, even if the Court finds that Di Martino and Shanks are parties to the LTIP Document – which they are not – the Arbitration should nevertheless be stayed with respect to them because Dooley failed to comply with the

LTIP Document's requirement that she first attempt to settle any dispute arising out of or relating to the LTIP Document through non-binding mediation *prior* to making a demand for arbitration. Although Dooley brought an AAA mediation (the "Mediation") against *Natixis* prior to filing her the Demand, she did *not* name Di Martino, Shanks, or any other Advisory Board member as a respondent in the Mediation. Similarly, Dooley only asserted claims against *Natixis* at the Mediation. She did not assert at the Mediation any of the claims she now makes against Di Martino and Shanks in the Demand. The fact that Dooley purposefully did not include Di Martino or Shanks in the Mediation evidences her knowledge that they are *not* parties to the LTIP Document or subject to its Arbitration Clause. Moreover, her inclusion of Di Martino and Shanks as respondents in the Arbitration, the Demand for which was only made for the first time approximately five months after the Mediation occurred, is blatant bad faith on her part. Therefore, Dooley failed to comply with the LTIP Document's necessary prerequisite for proceeding with the Arbitration against Di Martino and Shanks.

For all the above-stated reasons, this Court should stay the Arbitration with respect to Di Martino and Shanks.[3]

---

[3] Dooley claims in the Demand that she served the Demand on Orsatelli by sending it to Natixis' Paris Office. (Demand ¶ 5A.) CPLR § 7503(c) states that service of the demand for arbitration shall be served "in the same manner as a summons or by registered or certified mail, return receipt requested." AAA Rule R-39 states that "[a]ny papers, notices or process necessary or proper for the initiation … of an arbitration under these rules … may be served on a party by mail addressed to the party, or its representative at the last known address or by personal service, in or outside the state where the arbitration is to be held, provided that reasonable opportunity to be heard with regard to the dispute is or has been granted to the party." Orsatelli is no longer affiliated with Natixis. Thus, Dooley's sending of the Demand to Natixis' Paris Office does not constitute proper service on Orsatelli under the CPLR or the AAA Rules. However, should the Court deem Orsatelli properly served with the Demand, Petitioners respectfully request that the Court also stay the Arbitration as against Orsatelli for the same reasons that such relief is being requested on Petitioners' behalf, as discussed more fully below.

## STATEMENT OF FACTS

Natixis hired Dooley on May 5, 2003, as the Head of its Structured Transaction Group. (*See* Affirmation of Howard J. Rubin, Esq., dated May 13, 2008 ("Rubin Affirm."), Ex. B (Demand for Arbitration ("Demand")), ¶ 15.) Dooley was terminated on May 17, 2007. (*Id.* ¶ 16.) During her employment, Natixis awarded Dooley LTIP units as part of her compensation. (*Id.* ¶ 23.) Dooley alleges that all of the LTIP units she received are administered under the LTIP Document. (*Id.* ¶¶ 1, 8, 10, 23, 35.)

Natixis and the LTIP participants are the *only* parties to the LTIP Document. (Affidavit of Joseph D. Martino, sworn to May 13, 2008 ("Di Martino Aff."), ¶ 6 & Ex. B (LTIP Document); Affidavit of Eugene B. Shanks, Jr., sworn to May 12, 2008 ("Shanks Aff.") ¶ 6.) Only officers of Natixis are eligible to receive long-term incentive compensation from Natixis or to participate in the LTIP. (Di Martino Aff. ¶ 7 & Ex. C (LTIP Document Preamble) at p.1; Shanks Aff. ¶ 8.) The Advisory Board members, including Di Martino and Shanks, are *not* parties to the LTIP Document. (Di Martino Aff. ¶ 6; Shanks Aff. ¶ 7.) In fact, Di Martino and Shanks were *never* Natixis officers, and therefore were never even eligible to participate in the LTIP. (Di Martino Aff. ¶ 7; Shanks Aff. ¶ 8; LTIP Document Preamble at p. 1.) Rather, the role of Di Martino and Shanks, as Advisory Board members, is to objectively interpret and administer compensation, including the LTIP pursuant to the LTIP Document. (Di Martino Aff. ¶ 3 & Ex. A (Natixis Advisory Board Charter) ¶ 2(a); Shanks Aff. ¶ 3.)

Moreover, none of the Advisory Board Members' names, including Di Martino and Shanks, appear anywhere in the body of the LTIP Document. (*See* LTIP Document.) Instead, the four 1997 Advisory Board Members' names, including Di Martino, appear *only* on the last page of the LTIP Document following the sentence, "As adopted by the Board on September 1, 1997."

4

(*Id.*) Di Martino and the other three 1997 Advisory Board members signed above their names at the end of the LTIP Document indicating the 1997 Advisory Board's adoption of the LTIP Document. (*Id.*) Di Martino and the three other 1997 Advisory Board Members signed the LTIP Document *only* in their representative capacities as Advisory Board Members. (Di Martino Aff. ¶ 5. ; Shanks Aff. ¶ 6.) They did not sign the LTIP Document in their individual capacities, and they had no intention of being subject to the Arbitration Clause. (*Id.*) Furthermore, Shanks did not even sign the LTIP Document because he did not become an Advisory Board Member until June 1 1998, approximately nine months *after* the LTIP Document was adopted. (Shanks Aff. ¶¶ 2, 6; LTIP Document.)

The LTIP Document's Arbitration Clause provid es the procedural process by which Natixis and the LTIP participants must resolve claims arising out of or relating to the LTIP Document. (LTIP Document at ¶ 6(h).) Specifically, it provides:

> In the event there is any claim or dispute arising out of or relating to this Plan, or the breach thereof, and the Company and the Plan participants shall not have resolved such claim or dispute within 90 days after written notice from one party to the other setting forth the nature of such claim or dispute, then such claim or dispute shall attempt to be settled by mediation through a mediator agreed upon by the parties for nonbinding, confidential mediation. If this is not successful, the dispute will be submitted to binding arbitration in New York, New York, in accordance with the Commercial Arbitration Association by an arbitrator(s) selected according to such Rules. Judgment upon the award rendered by such arbitrator(s) shall be entered in any Court having jurisdiction thereof upon the application of either party.

(*Id.* (emphasis added).) Notably, the Arbitration Clause states that such claims must first be mediated prior to being brought before an AAA arbitrator. (*Id.*)

On or about September 28, 2007, Dooley filed a request for mediation (the "Mediation Request") with the AAA. (Rubin Affirm. ¶ 3.) Dooley's Mediation Request named Natixis as

the *only* responding party. (*Id.*) She did not name Di Martino, Shanks or any other Advisory Board member as a respondent in the Mediation. (*Id. See also* Di Martino Aff. ¶ 8; Shanks Aff. ¶ 9.) The Mediation was held on November 15, 2007, and continued via telephone and email correspondence until attempts to settle through mediation ultimately failed on or around February 29, 2008. (Rubin Affirm. ¶ 3 & Ex. A (L. Hendrickson Letter dated Mar. 4, 2008).)

On or about April 23, 2008, Dooley filed the Demand with the AAA. (Demand at p. 28.) Dooley named Natixis as a respondent in the Arbitration. (*Id.* at 1.) She also named Di Martino, Shanks and Orsatelli as respondents in the Arbitration despite the fact that she did *not* name any of them as respondents in the Mediation. (*Id.*; Rubin Affirm. ¶ 3; Di Martino Aff. ¶ 8; Shanks Aff. ¶ 9.) In addition, she brought claims against Di Martino, Shanks, and Orsatelli in the Demand, *none* of which she asserted at the Mediation. (Rubin Affirm. ¶ 4.) Nevertheless, Dooley stated in the Demand that "the predicate to arbitration has been satisfied, as mediation was held but was not successful." (Demand ¶ 2.)

Neither Di Martino nor Shanks have moved for or been served with an application to compel the Arbitration, and Di Martino and Shanks have not participated in the Arbitration to date. (Di Martino Aff. ¶ 9; Shanks Aff. ¶ 10.)

## **ARGUMENT**

I.  **DOOLEY DOES NOT HAVE A VALID ARBITRATION AGREEMENT WITH EITHER DI MARTINO OR SHANKS AND THEREFORE, THE COURT SHOULD STAY THE ARBITRATION AS AGAINST THEM**

CPLR § 7503(b) provides that "a party who has not participated in the arbitration and who has not made or been served with an application to compel arbitration, may apply to stay arbitration on the ground that a valid agreement was not made . . . ." Neither Di Martino nor Shanks have moved for or been served with an application to compel the Arbitration, and Di Martino and Shanks have not participated in the Arbitration to date. (Di Martino Aff. ¶ 9; Shanks Aff. ¶ 10.) Therefore, because no valid arbitration agreement exists between Dooley and either Di Martino or Shanks, as discussed below, the Arbitration should be stayed as to both Petitioners.

The United States Supreme Court has made clear that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (internal quotations and citations omitted). New York law also holds that parties must clearly and unequivocally manifest an intention to arbitrate before relinquishing their rights to have their case heard in a court of law. *TNS Holdings, Inc. v. MKI Secs. Corp.*, 92 N.Y.2d 335, 339, 680 N.Y.S.2d 891, 893 (1998) (courts are mindful "to avoid the unintentional waiver of the benefits and safeguards which a court of law may provide in resolving disputes ... unless the parties have subscribed to an arbitration agreement" and shown a "clear indication of intent" to be bound by the agreement); *Matter of Arthur Miller*, 40 A.D.3d 861, 862, 835 N.Y.S.2d 728, 729 (2d Dep't 2007) ("a party will not be compelled to arbitrate and, thereby, to surrender the right to resort to

the courts, absent evidence which affirmatively establishes that the parties expressly agreed to arbitrate their disputes") (internal quotations and citations omitted); *Gulf Underwriters Ins. Co. v. Verizon Commc'ns , Inc.*, 32 A.D.3d 709, 710, 822 N.Y.S.2d 8, 9 (1st Dep't 2006) ("A party cannot be forced to an arbitration to which it has not agreed, and any arbitration agreement must reflect a clear and unequivocal manifestation of an intention to arbitrate.").

Neither Di Martino nor Shanks contractually agreed to arbitrate any disputes that LTIP participants, including Dooley, have relating to the LTIP Document. The face of the LTIP Document clearly demonstrates that it is an agreement solely between Natixis and the LTIP participants, not any Advisory Board member, including Di Martino and Shanks. Moreover, Shanks did not sign the LTIP Document, and the structure of and the intent behind the LTIP Document demonstrates that Di Martino signed it *only* in his representative capacity as an Advisory Board Member, *not* in his individual capacity.

The face of the LTIP Document proves that Dooley does not have a valid agreement to arbitrate with either Di Martino or Shanks. First, the LTIP Document's Arbitration Clause provides clear evidence that Natixis and its officers participating in the LTIP are the only parties to the LTIP Document and its Arbitration Clause. The Arbitration Clause states:

> In the event there is any claim or dispute arising out of or relating to this Plan, or the breach thereof, and **the Company** and the Plan participants shall not have resolved such claim or dispute within 90 days after written notice from one party to the other setting forth the nature of such claim or dispute, then such claim or dispute shall attempt to be settled by mediation through a mediator agreed upon by the parties for nonbinding, confidential mediation. If this is not successful, the dispute will be submitted to binding arbitration in New York, New York, in accordance with the Commercial Arbitration Association by an arbitrator(s) selected according to such Rules. Judgment upon the award rendered by such arbitrator(s) shall be entered in any Court having jurisdiction thereof upon the application of either party.

(LTIP Document ¶ 6(h) (emphasis added).)

The plain language of the Arbitration Clause demonstrates that neither Di Martino nor Shanks agreed to submit to the Arbitration. The Arbitration Clause only provides an agreement to arbitrate between "the Company" and the "Plan participants." The "Company" is defined in the LTIP Document as "CDC North America Inc. and its subsidiaries" (now Natixis North America, Inc., including Natixis). (LTIP Document ¶ 1.) Participant is defined in the LTIP Document as "an eligible employee who has been designated by the Committee to receive Units for a specified Performance Period which have not yet been settled." (*Id.* ¶ 2(g).) As stated above, only officers of Natixis are "eligible employees" for purposes of the LTIP Document. (Preamble at p. 1.) The Advisory Board does not fall into either the LTIP Document's definition of "Company" or "Participant." Instead, the Advisory Board is provided with its own defined term, "Board." Thus, under the well-known maxim "*expressio unius est exclusio alterius,*" the inclusion of the defined terms "Company" and "Participant" in the Arbitration Clause leads to the conclusion that the Advisory Board is not covered by the Arbitration Clause. Further evidence of this point is found in the last sentence of the Arbitration Clause which refers to "either" party – meaning that the Arbitration Clause applies only to two entities – Natixis and the LTIP participants, the only parties to the LTIP Document.

Second, the LTIP Document's plain language evidences that it is an agreement *only* between Natixis and those Natixis employees who participate in the LTIP. At the outset of the LTIP Document is a statement regarding its purpose – namely to assist Natixis in "attracting, retaining, motivating and rewarding employees." (LTIP Document ¶ 1.) Thus, the LTIP Document is meant to benefit Natixis on the one hand, and employees eligible to participate in

the LTIP on the other. The preamble to the LTIP Document states that all "officers" of Natixis are eligible to participate in the LTIP. (LTIP Document Preamble at p. 1.) The preamble does *not* state that Advisory Board members are eligible participants. Moreover, since the LTIP Document provides that the Advisory Board's purpose is to administer, construe and interpret the LTIP, it would be a clear conflict of interest if Advisory Board Members could receive direct benefits from the LTIP Document. (*See* LTIP Document ¶ 3(a).) And, in fact, the Advisory Board Members, including Di Martino and Shanks, do not receive any such benefits.

The structure of the LTIP Document provides further evidence that Di Martino and Shanks did not contract to submit to its Arbitration Clause. Neither Di Martino's nor Shanks's names are mentioned individually in the body of the LTIP Agreement, including the Arbitration Clause. (LTIP Document.) Critically, Shanks did not sign the LTIP Document. (*Id.*) Indeed, Shanks did not even become an Advisory Board Member until June 1, 1998, nine months *after* the LTIP Document was adopted by the Advisory Board on September 1, 1997. (*Id.*; Shanks Aff. ¶ 4.)

Finally, although Di Martino did sign the LTIP Document, he did so *solely* in his representative capacity as an Advisory Board member, *not* in his individual capacity. (Di Martino Aff. ¶ 5.) New York law provides that "an agent who signs an agreement on behalf of a disclosed principal will not be individually bound to the terms of the agreement 'unless there is clear and explicit evidence of the agent's intention to substitute or superadd his personal liability for, or to, that of his principal.'" *Lerner v. Amalgamated Clothing and Textile Workers*, 938 F.2d 2, 6-7 (2d Cir. 1991) (emphasis added) (quoting *Mencher v. Weiss*, 306 N.Y. 1, 4, 114 N.E.2d 177, 179 (1953)). The New York Court of Appeals explained the rational behind this rule as follows:

> In modern times most commercial business is done between corporations, everyone in business knows that an individual stockholder or officer is not liable for his corporation's engagements unless he signs individually, and where individual responsibility is demanded the nearly universal practice is that the officer signs twice – once as an officer and again as an individual. There is great danger in allowing a single sentence in a long contract to bind individually a person who signs only as a corporate officer. In many situations the signing officer holds little or no stock and if the language of the agreement makes him individually liable his estate may be stuck for a very large obligation which he never dreamed of assuming.

*Salzman Sign Co., Inc. v. Beck*, 10 N.Y.2d 63, 67, 217 N.Y.S.2d 55, 57-58 (1961). Therefore, "New York courts have found individual liability only in rare cases," such as those cases where there is "overwhelming evidence" of the signatory's intention to assume *person al* liability. *Lerner*, 938 F.2d at 5. In considering whether there is sufficient evidence of a contract signatory's intent to be individually bound to its provisions, New York courts will consider the following factors: "the contract's length, the location of the liability provision relative to the signature line, the presence of the name of the signatory in the contract itself, the nature of the negotiations leading to the contract, and the signatory's role in the corporation." *Mason Tenders Dist. Council Welfare Fund v. Thomsen Constr. Co.*, 301 F.3d 50, 53 (2d Cir. 2002) (internal quotations omitted) (citing *Cement & Concrete Workers Dist. Council Welfare Fund v. Lollo*, 35 F.3d 29, 35 (2d Cir. 1994)).

The instant case is *not* one of those exceptional circumstances where individual liability should be found. Di Martino and the other 1997 Advisory Board members signed the end of the LTIP Document under the sentence "As adopted by the Board on September 1, 1997," clearly indicating their intention to sign on behalf of the Advisory Board only, not in their individual capacities. Indeed, the LTIP Document contained only one place for the 1997 Board Members to

11

sign, providing additional evidence of the lack of intent on behalf of Di Martino to be personally bound to the LTIP Document.

Moreover, there is no indication anywhere in the body of the LTIP Document of Di Martino's intention to be bound individually to any of its provisions, including the Arbitration Clause. The Second Circuit has stated that the high degree of intention needed to be shown in order to impart personal liability on a signatory to a contract "goes beyond the mere presence of a personal liability clause in the signed agreement." *See Mason Tenders Dist. Council Welfare Fund*, 301 F.3d at 54. Here, the LTIP Agreement does not even have a personal liability clause. To the contrary, the LTIP Document contains an indemnity provision stating that no Advisory Board member "shall be personally liable for any action, determination, or interpretation taken or made in good faith with respect to the [LTIP], and each such person shall, to the extent permitted by law, be fully indemnified and protected by the Company with respect to any such action, determination or interpretation." (LTIP Document ¶ 3(c).) Thus, it is clear beyond cavil that the Advisory Board members were not assuming personal liability for the payment of Natixis' long-term incentive obligations to all of its officers.

In addition, as discussed above, Di Martino's name does not even appear anywhere in the body of the LTIP Document. Therefore, Di Martino did not intend to be personally bound by the Arbitration Clause by signing the LTIP Document on behalf of the Advisory Board. *See Salzman Sign Co., Inc.*, 10 N.Y.2d at 66, 217 N.Y.S.2d at 57 (contract clause purporting to bind officer individually was insufficient where individual "was neither named in the contract as a party thereto nor did he sign as such"); *Johnston v. Silverman*, 167 A.D.2d 284, 285, 561 N.Y.S.2d 788, 789 (1st Dep't 1990) (affirming stay of arbitration as to individuals because they "were not parties to the agreements having signed the same in their representative capacities not their

12

individual capacities"); *D.P. Promotions Ltd v. SelectTV of Amer., Ltd.*, 99 A.D.2d 717, 472 N.Y.S.2d 323 (1st Dep't 1984) (granting permanent stay of arbitration as to individual who signed underlying agreement as authorized representative as company and not as an individual, despite his signature on the addendum to the agreement appearing without any qualification as to his status because the parties were all aware of the agency).

Finally, the intent behind the LTIP Document and the role of the Advisory Board with respect to the LTIP Document provides additional proof that Di Martino and Shanks did not intend to be personally bound by its provisions, including the Arbitration Clause. As stated above, the purpose of the LTIP Document was to set up a compensation scheme for Natixis officers that would enable Natixis to recruit and retain talent. The role of the Advisory Board is to interpret and administer the LTIP Document to ensure that *both* Natixis and the LTIP participants feel satisfied that they are benefiting from the agreement between them. In fact, the Advisory Board Charter states that the Advisory Board's function is "to provide objective judgment regarding the compensation practices of [Natixis]" and "to provide objectivity to the participants in the plan . . . ." (Natixis Advisory Board Charter ¶ 2(a).) Thus, the Advisory Board's role is to ensure that the LTIP is administered objectively with respect to both parties to the LTIP Document – Natixis and the LTIP participants. The Advisory Board members, including Di Martino and Shanks, do not derive direct benefits from the LTIP Document.

For all of the above-stated reasons, neither Di Martino nor Shanks have entered into a valid agreement with Dooley to arbitrate her claims relating to the LTIP Document. Therefore, the Court should stay the Arbitration with respect to Di Martino and Shanks.

## II.  DOOLEY HAS NOT COMPLIED WITH THE LTIP DOCUMENT'S CLEAR CONDITION PRECEDENT FOR INITIATING THE ARBITRATION AGAINST DI MARTINO OR SHANKS AND THEREFORE, THE COURT SHOULD STAY THE ARBITRATION AS AGAINST THEM

In addition to permitting the stay of an arbitration where no valid arbitration agreement exists, CPLR § 7503(b) also provides that "a party who has not participated in the arbitration and who has not made or been served with an application to compel arbitration, may apply to stay arbitration on the ground that a valid agreement . . . has not been complied with."    As stated above, neither Di Martino nor Shanks have made or been served with an application to compel the Arbitration, and Di Martino and Shanks have not participated in the Arbitration. (Di Martino Aff. ¶ 9; Shanks Aff. ¶ 10.)  Therefore, even if the Court holds that a valid arbitration agreement exists between Dooley and Di Martino or Shanks – which it does not – the Court should nevertheless stay the Arbitration as against Di Martino and Shanks because Dooley failed to comply with the Arbitration Clause's clear direction that any of her claims arising out of or relating to the LTIP Document must be submitted to a mediator before such claims can be brought before an AAA arbitrator.  (LTIP Document ¶ 6(h).)

Again, the Arbitration Clause states, in pertinent part:

> In the event there is any claim or dispute arising out of or relating to this Plan, or the breach thereof, and the Company and the Plan participants shall not have resolved such claim or dispute within 90 days after written notice from one party to the other setting forth the nature of such claim or dispute, then such claim or dispute shall attempt to be settled by mediation through a mediator agreed upon by the parties for nonbinding, confidential mediation.  If this is not successful, the dispute will be submitted to binding arbitration in New York, New York, in accordance with the Commercial Arbitration Association by an arbitrator(s) selected according to such Rules.

(*Id.*)

14

On or about September 27, 2007, Dooley filed a request for mediation with the AAA. (Rubin Affirm. ¶ 3.) Dooley's Mediation Request named Natixis as the *only* responding party. (*Id.*) She did not name Di Martino, Shanks, Orsatelli or any other Advisory Board member as a respondent in the Mediation. (*See id.*) The Mediation was held on November 15, 2007 and continued via telephone and email correspondence until attempts to settle through mediation ultimately failed on or around February 29, 2008. (*Id.* at Ex. A.)

On or about April 23, 2008, Dooley filed the Demand with the AAA. (Demand at p. 28.) Dooley named Natixis as a respondent in the Arbitration. (*Id.* at p. 1.) She also named Di Martino, Shanks and Orsatelli as respondents in the Arbitration despite the fact that she did *not* name any of them as respondents in the Mediation. (*Id.*; Rubin Affirm. ¶ 4.) In addition, she brought claims against Di Martino, Shanks, and Orsatelli in the Demand, *none* of which she asserted in the Mediation Request or at the Mediation. (Rubin Affirm. ¶ 4.)

Dooley's contention in the Demand that "the predicate to arbitration has been satisfied, as mediation was held but was not successful," is disingenuous at best and attempts to mislead the AAA. (*See* Demand ¶ 2.) The mere fact that a mediation with *Natixis* occurred does not establish that Dooley met the conditions precedent set forth in the Arbitration Clause for bringing an arbitration against Di Martino or Shanks. Dooley's failure to bring a mediation against Di Martino or Shanks prior to initiating the Arbitration is a breach of the LTIP Document, justifying a stay of the Arbitration with respect to Di Martino and Shanks and the claims Dooley brought against them in the Demand. *See In the Matter of 3202 Owners Corp. v. Billy Contractors, Inc.*, 25 A.D.3d 715, 716, 811 N.Y.S.2d 727, 728 (2d Dep't 2006) (staying arbitration because Respondent's failure to timely meet the condition precedent was an overriding failure under the agreement, and even a belated attempt to correct the error did not

permit arbitration); *In the Matter of the Arb. between Asphalt Green, Inc. and Herbert Constr. Co., Inc.*, 210 A.D.2d 21, 618 N.Y.S.2d 810 (1st Dep't 1994) (granting Petitioner's motion to stay arbitration because Respondent failed to submit the matter to the Project Architect, a condition precedent to a demand for arbitration); *In the Matter of Wausau Ins. Co. v. Bartz*, 197 A.D.2d 627, 604 N.Y.S.2d 760 (2d Dep't 1993) (granting Petitioner's motion to permanently stay arbitration because appellant failed to comply with a condition precedent to arbitration)

## CONCLUSION

For the foregoing reasons, Petitioners Joseph Di Martino and Eugene B. Shanks, Jr. respectfully request that the Court grant their motion to stay the Arbitration as to them and the claims brought against them in the Demand, along with such other and further relief as the Court deems just and proper.

Dated:    May 13, 2008
          New York, New York

DAVIS & GILBERT LLP

By: _____
      Howard J. Rubin
      Jennifer Tafet Klausner
      Heath J. Rosenthal
      1740 Broadway
      New York, NY 10019
      (212) 468-4800

*Attorneys for Petitioners Joseph Di Martino and Eugene B. Shanks, Jr.*