UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JOSEPH Di MARTINO and EUGENE B. SHANKS, Jr.,

                            Petitioners,                  08 Civ. 4606

              - against -                       Judge Chin

MARGARET DOOLEY,

                            Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MOTION OF MARGARET DOOLEY,
## THE RESPONDENT, PURSUANT TO 9 U.S.C. § 206,
## TO COMPEL ARBITRATION, NOTICE THEREOF,
## AND SUPPORTING AFFIDAVITS WITH EXHIBITS

      MARGARET DOOLEY, the Respondent, moves the Court, pursuant to 9 U.S.C.

§ 206, for an order compelling the petitioners, Joseph Di Martino and Eugene B. Shanks, Jr., to

arbitrate the claims asserted in the Demand for Arbitration, dated April 23, 2008, which Mrs.

Dooley has filed with the American Arbitration Association.

      This motion is made based upon: (a) the accompanying affidavits of Margaret

Dooley and Guy R. Fairstein, both sworn to on June 6, 2008, and the exhibits thereto; (b) Mrs.

Dooley's notice of removal to this Court of a special proceeding commenced by Messrs Di

Martino and Shanks in the Supreme court of the State of New York, County of New York; and

(c) the petition and other papers filed by Messrs Di Martino and Shanks in their special

proceeding in the Supreme Court, New York County.

      This motion will be submitted to the Honorable Denny Chin, United States

1

District Judge for the Southern District of New York, at the Daniel Patrick Moynihan United

States Courthouse, 500 Pearl Street, New York, NY 10007, in accordance with the schedule "so

ordered" by Judge Chin on June 5, 2008, upon the letter, dated May 22, 2008, addressed to the

Court by Guy R. Fairstein.

Dated: June 6, 2008

GUY R. FAIRSTEIN (GF - 1721)
Attorney for Margaret Dooley,
    the Respondent
15 Stewart Place - No. 11-J
White Plains, NY 10603
914-328-0923

To:

Howard J. Rubin, Esquire
Davis & Gilbert LLP
Attorneys for the Petitioners
1740 Broadway
New York, NY 10019

2

**Affidavit of Margaret Dooley,
sworn to on June 6, 2008,
in Support of her Motion
to Compel Arbitration and in
Opposition to the Petitioners'
Motion to Stay Arbitration**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JOSEPH Di MARTINO and EUGENE B. SHANKS, Jr.,

                                    Petitioners,                    08 Civ. 4606

                    - against -                                     Judge Chin

MARGARET DOOLEY,

                                    Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**AFFIDAVIT OF MARGARET DOOLEY, THE RESPONDENT,
IN SUPPORT OF HER MOTION TO COMPEL ARBITRATION
AND IN OPPOSITION TO THE PETITION TO STAY ARBITRATION**


STATE OF NEW YORK              )
                               )  ss:
COUNTY OF WESTCHESTER          )

          I, MARGARET DOOLEY, having been sworn, state:

          1.        I am the arbitration-claimant in the underlying arbitration, and the

respondent in this proceeding.  I make this affidavit in support of my motion to compel

arbitration and in opposition to the petition by which Joseph Di Martino and Eugene B. Shanks,

Jr., two of the four arbitration-respondents, seek to stay the arbitration.

          2.        I am a chartered accountant by profession, a citizen of the United

Kingdom, and a resident of Greenwich, Connecticut.   I left the practice of accountancy a

number of years ago and, for more than fifteen years, for several employers, have negotiated,

documented and closed sophisticated international tax arbitrage transactions.

3.    I became employed by CDC IXIS Capital Markets North America Inc. pursuant to a written agreement dated May 5, 2003 (the "May 2003 Agreement," Exhibit A hereto). I had attached a copy of the May 2003 Agreement to my demand for arbitration (the "Demand"). Messrs Di Martino and Shanks omitted that and all other exhibits from the copy of the Demand which they submitted in support of their petition to stay arbitration.

4.    As the result of a merger, in about 2006 my employer became Natixis Capital Markets, Inc. When I refer to "Natixis" in this affidavit, I refer to my employer from May 2003 until May 2007, when my employment was terminated, without cause.

5.    I was employed as Head of the Structured Transactions Group with the officer title of Managing Director (Exhibit A, at p. 1). The terms of my employment included incentive compensation. Among the forms of incentive compensation which I received were units in the Natixis long-term incentive plan or "LTIP" (Exhibit A, ¶ 3):

> ... You will be eligible to participate in the CDC IXIS annual and long-term incentive programs on a discretionary basis according to your performance as well as the performance of your department and the company ....

... and at Exhibit A thereto:

> Individuals initially hired in the Structured Transactions Group ... will participate in a Variable Compensation Pool from May 1, 2003 to May 31, 2004 (The Performance Period).
>
> *    *    *
>
> A portion of the Variable Compensation Pool will be paid in cash bonuses and another portion, not to exceed 20% of the variable compensation will be paid in Long Term Incentive Plan Units (LTIP) ....

2

6.    Other Natixis employees, including several in the Structured Transactions Group, were participants in the LTIP. These included my colleague over the span of many years and with several employers, Philippe Kieffer, and also Kristine Jensen. Philippe is a citizen of France, and Kristine is a citizen of Denmark; both worked for Natixis in, and both reside in, London.

7.    From the inception of my employment with Natixis, and continuing into at least August 2006, I was compensated on a special contractual basis. Ramine Rouhani, a senior Natixis executive, acknowledged this in an e-mail, dated August 3, 2006, addressed to Eric Raiten, another Natixis executive. Rouhani wrote:

> The Structured Capital Product group's compensation heretofore was contractual and based on a formula linking their total compensation to the present value of their transactions. It has been a policy of IXIS to provide contractual compensation in new businesses for a limited period of time (typically two years), beyond which employees compensation is determined through our normal end of the year process ....
>
> The SCP should be treated like other businesses. The team is no longer a "new" team within IXIS and it will be compensated at market levels which will reflect its P&L and its overall performance. It is now important for the team to concentrate on generating new transactions.

8    Exhibit A annexed to and incorporated in the May 2003 Agreement divided my initial incentive compensation as between two Performance Periods:

> Individuals initially hired in the Structured Transaction Group (the "Group") will participate in a Variable Compensation Pool from May 1, 2003 to May 31, 2004 (The Performance Period). The Performance Period will be divided into two segments, one running from the beginning of the Performance Period to December 31, 2003, and the second running from

3

January 1, 2004 to the end of the performance period.

These Performance Periods were shortened, as the LTIP document defines "Performance

Period," in the absence of shortening, as a period of three years. The difference in length of

Performance Periods affects matters under the LTIP, including the vesting and forfeiture of

awarded LTIP units, and contributes to the dispute here regarding the number of my awarded

units which had vested at the date when Natixis terminated my employment, and the value of

my vested units.

        9.     For the performance periods May 1, 2003, to December 31, 2003, and

January 1, 2004, to May 31, 2004, I received incentive compensation but was not awarded any

LTIP units

        10.     I was awarded LTIP units, and received other incentive compensation, for

two later Performance Periods. The incentive compensation which I received for these two later

Performance Periods, including the two awards of LTIP units, were confirmed by Natixis in two

"Supplemental Incentive Compensation Agreements." The first of these (Exhibit B hereto)

related to the performance period June 1, 2004, to December 31, 2004; my LTIP units thereunder

were in the face amount of $635,000.00. The second of these (Exhibit C hereto) related to the

performance period January 1, 2005, to December 31, 2005; my LTIP units thereunder were in

the face amount of $490,000.00. These LTIP units are the subject of the underlying arbitration.

        11.     The report (Exhibit D hereto) of Brown Bridgman & Company, the

administrator of the Plan, shows that at a date in the third quarter of 2006 the LTIP units granted

to me had a total "time value" in excess of $1,250,000.00. I do not know the formula basis upon

which this "time value" was determined.

4

12.    My arbitration claim is based upon an interpretation of the Performance Period, vesting, and date-of-payment provisions in the LTIP plan document.  I assert that: (a) the LTIP units granted to me for the Performance Periods ended December 31, 2004, and December 31, 2005, were subject to one-year vesting, by reason of which they became fully vested on those dates; (b) I became entitled to have had them valued at those dates; and (c) I was entitled to have received payment of their value as soon after those dates as was reasonably practicable.  By contrast, Natixis claims that both awards were subject to three-year vesting, that they had vested only partially at the date it terminated my employment, and that the non-vested portions of both awards were forfeited upon its termination of my employment.

13.    On February 22, 2008, I received from Natixis two checks, each dated February 6, 2008, in the total amount of $371,820.97.  That was the net amount, after withholdings, of a gross LTIP distribution to me of $571,215.97.  I claim in the Demand the balance of the value ($700,000.00 or more) of my vested LTIP units, and punitive damages for the bad faith conduct of the LTIP fiduciaries, the individual arbitration-respondents.

14.    It was a struggle for me even to obtain copies of the LTIP documents.  I was initially given only a plan summary (Exhibit E hereto).  After my many requests for the full plan document, I was finally given a copy of the LTIP document as adopted on September 1, 1997; but the copy given to me did not have the signatures of the Advisory Board members who had adopted it (Exhibit F hereto).  I did not see a signed copy of that LTIP document until I received the stay petition of Messrs Di Martino and Shanks, and their related papers; it was attached as Exhibit B to Mr. Di Martino's affidavit.  I did receive, in late 2006 or early 2007, a signed copy of the LTIP document as it was restated post-merger in 2006 (Exhibit G hereto).

15.    I had understood that Mr. Orsatelli was the chief executive officer of IXIS Corporate and Investment Bank (the French parent company of CDC IXIS Capital Markets North America Inc.), and the board chairman of CDC IXIS Capital Markets North America Inc., and that he continued to hold a senior executive position in the post-merger French parent company. I do not know Mr. Di Martino and Mr. Shanks; I have neither met nor spoken with either of them. I had assumed that they were independent, "outside" Advisory Board members.

16.    I do not know if there were any intermediate versions of the LTIP document; I was not given any such version. I had not been given the Advisory Board Charter before I received the stay petition and related papers. Prior to my receipt of those papers I was unaware of the existence of "consulting contracts" with Messrs Di Martino and Shanks.

17.    I accept that as an LTIP participant I am obliged to arbitrate my claims relating to the LTIP, notwithstanding that I am not a signatory to it. It does seem to me, as a lay person, entirely counterintuitive that the Advisory Board members should consider me, as a non-signatory to the LTIP, bound by its terms, whereas they, who adopted and have operated the LTIP, and who are its only signatories, should consider themselves not bound by its terms.

_____
Margaret Dooley

Sworn to before me

on June 6th 2008

_____
Notary Public

**David Y. Choi**
**NOTARY PUBLIC**
**No. 02CH6178590**
**Valid In the County of Westchester**
**Commission Expires 12/03/2011**

6

**Exhibit A to the
Affidavit of Margaret Dooley,
sworn to on June 6, 2008**

# CDC IXIS

Capital Markets North America Inc.

Ramine Rouhani
Managing Director

May 5, 2003

Margaret Dooley
66 Sherwood Avenue
Greenwich, CT 06831

Dear Margaret:

I am pleased to confirm to you that we are offering you the position of Head of the Structured Transaction Group of CDC IXIS Capital Markets North America Inc., a subsidiary of CDC IXIS North America (CDC IXIS) according to the following terms:

1.  You will report to the Head of Capital Markets or to his designee.  Your officer title will be Managing Director.

2.  During our normal business hours, you will devote your entire time, best professional efforts and skills to develop and manage the structured transaction activity.

3.  For all services rendered by you, you will be paid a base salary at the annual rate of $200,000 payable in equal semi-monthly installments. You will be eligible to participate in the CDC IXIS annual and long-term incentive programs on a discretionary basis according to your performance as well as the performance of your department and the company.  Except as set forth in this agreement, whether you receive an award under either or both of these programs, and the amount of any such award, if any, is at the company's sole discretion. For the period specified in Exhibit A as the Applicable Period, you will participate in a Variable Compensation Pool as described therein.

4.  You will receive all benefits offered by CDC including a major medical and dental plan, life and disability insurance, a pension pursuant to our existing plan and a 401(k) plan.  You will be entitled to four weeks paid vacation time annually, exclusive of holidays when CDC IXIS is closed for business. It is the company's policy that normal work hours and location are determined by what is appropriate to get the job done within the context of a team oriented environment.

5.  Your employment at CDC IXIS will be subject to standard reference checks and will continue as long as we mutually desire. You or CDC IXIS may terminate your employment at any time.  If, during 2003 or 2004, CDC IXIS terminates your employment other than for cause as described below, you will be entitled to  participate in the Variable Compensation Pool as per Exhibit A as if your employment had continued through the performance period, as well as the standard CDC IXIS severance plan.  If you should leave voluntarily, you would forfeit any further right to compensation beyond your termination date unless specified by CDC policy.

6.  In addition, your employment may be terminated immediately by CDC IXIS, without notice, for cause. "For cause" is defined to include, but not limited to gross negligence or willful misconduct in the performance of your duties under this agreement, the perpetration of fraud, crime or other act of serious misconduct, willful misrepresentation of information pertaining to your employment or your willful disobedience to the directives of management.  Any termination for cause will result in no further salary payments being due to you beyond the date of termination and your ineligibility to participate in any bonus scheme described above.

A subsidiary of CDC IXIS
North America

CDC IXIS

7. Your employment will be governed by the rules of confidentiality and professional behavior customary to CDC IXIS. In particular, you may not discuss any matters regarding the CDC IXIS's internal workings, business dealings, proprietary products and tools or clients at any point during or following your employment with CDC IXIS without express approval of the company.

8. Membership on any outside Board, committee memberships or advisory roles with other firms or outside employment that you may wish to accept will require the express approval of CDC IXIS.

9. By accepting employment with CDC IXIS, you represent and warrant that the performance of your duties will not violate any agreement between you and any other person, firm, partnership, corporation or organization. You further understand that before you can be put on the CDC IXIS payroll, you must complete a form I-9 and provide proper documentation as specified by federal law.

10. This letter sets forth all of terms of your employment and supersedes all prior understandings, written or oral between us. The terms our your employment may not be modified unless in writing and signed by both you and a duly authorized representative of CDC IXIS

We believe that you have the qualification to make a substantial contribution to our capital markets activities and look forward to your joining the company.

If you agree to the foregoing terms and conditions of employment, please sign where indicated below and return this letter to me.

Yours truly,


_____        _____
Ramine Rouhani                          Date



Agreed to and accepted by:


_____        _____
Margaret Dooley                         Date

2

## EXHIBIT A
### Structured Transaction Group Variable Compensation Pool

Individuals initially hired in the Structured Transaction Group (the "Group") will participate in a Variable Compensation Pool from May 1, 2003 to May 31, 2004 (The Performance Period). The Performance Period will be divided into two segments, one running from the beginning of The Performance Period to December 31, 2003, and the second running from January 1, 2004 to the end of the performance period.

The Variable Compensation Pool to be distributed to the Pool Participants will be an amount equal to 20% of Net Income of the Group before tax up to a maximum Net Income for the Group of $5.5 million during the Performance Period. If Net Income before tax exceeds $5.5 million during that period, CDC IXIS CMNA management shall determine additional payments greater than the total Variable Compensation Pool stipulated above. The formula set forth above pertains only to compensation for the Performance Period. Variable compensation beyond The Performance Period will be completely discretionary by CDC IXIS CMNA Management.

Net Income before tax shall be defined as the sum of the present values of the cash flows occurring in the twelve months following the settlement of each transaction, less expenses for each segment in the Performance Period. "Expenses" shall mean expenses incurred for salary and benefits for Structured Transaction Group, plus all direct and indirect expenses, all of which shall be as determined and allocated by management in good faith in the customary manner consistent with other businesses of the Company.

A portion of the Variable Compensation Pool will be paid in cash bonuses and another portion, not to exceed 20% of the variable compensation will be paid in Long Term Incentive Plan Units (LTIP). Incentive awards from transactions competed in 2003 will be awarded and paid no later than March 2004. Incentive awards from transactions competed from January 2004 to May 2004 will be awarded and paid no later than September 2004. The final allocation of such total pool payments among the Variable Compensation Pool Participants, subject to the mandatory parameters set forth herein will be subject to the approval the management of the Company, through its Head of Capital Markets.

Upon a termination of the employment of an employee of the Group (1) without Cause by CDC IXIS, including, but not limited to termination for discontinuance of the business, or (2) for Disability or upon death, the LTIP amounts for the Performance Period shall be fully vested. Such terminated employee shall participate in any Net Income subsequently allocated to the Variable Compensation Pool generated during the performance period after termination related to transactions pending at the time of such termination. Such participation shall be by cash bonus on the dates set forth above, in the same proportion as previous variable compensation was paid prior to termination, or, if none was previously paid, in a reasonable proportion commensurate with the position of the employee prior to termination.

---

**Exhibit B to the
Affidavit of Margaret Dooley,
sworn to on June 6, 2008**

## SUPPLEMENTAL INCENTIVE COMPENSATION AGREEMENT

The undersigned, an employee of IXIS Capital Arranger Inc. (the "Company") has previously entered into a compensation agreement (the "Agreement") governing, among other things, the payment of certain performance incentive compensation based, in part, on certain structured capital transactions, as contemplated in the Agreement.

The company will pay performance incentive compensation to the undersigned on of USD 1,665,000 in cash and USD 135,000 in LTIPS on March 15, 2005 and USD 630,439 in cash and USD 473,860 in LTIPS on July 1st, 2005 in respect of the BGL transaction. The payments on July 1st, 2005 could increase by up to a further USD 130,700 depending on the final pre tax equivalent net present value of the BGL transaction. The undersigned agrees that the BGL transaction will not be taken into account when determining incentive compensation for the calendar year 2005.

Name: Margaret Dooley
Title: Managing Director

Name: R. Rouhani
Title: Managing Director
6-20-05

**Exhibit C to the
Affidavit of Margaret Dooley,
sworn to on June 6, 2008**

## SUPPLEMENTAL INCENTIVE COMPENSATION AGREEMENT

The undersigned, an employee of IXIS Capital Arranger, Inc. (The "Company") has previously entered into a Compensation Agreement (the "Agreement") concerning 2005 governing, among other things, the payment of certain performance incentive compensation based, in part, on certain 2005 structured capital transactions, as contemplated in the Agreement.

Notwithstanding the fact that no eligible transactions were closed in 2005, resulting in no performance compensation obligation pursuant to the Agreement, the Company in its discretion, will pay performance incentive compensation to the undersigned of USD 1,960,000 in cash and USD 490,000 in LTIPS on May 5, 2006 in respect of the St. George Bank and Macquary Bank transactions.

The Company further agrees that if the proposed $4,100,000 accounting reserve for the referenced transactions is reduced or withdrawn, then the Company will pay you a *pro rata* amount representing your proportional share of 15% of the amount of such reserve not taken, as part of your compensation for the year during which the reserve is released, so long as you are an employee of the Company at the time that such amount is to be paid.  Up to 20% of the reserve release payment listed above will be allocated in LTI units, with the remaining portion paid in cash.

The undersigned agrees that there is no further payment due from the St. George Bank and Macquary Bank transactions other than what is stipulated in this agreement and that the Company has no further obligation under the Agreement.

Name:  Margaret Dooley
Title:   Managing Director
Dated:  5/11e/ 06

Name: Ramine Rouhani
Title:  Managing Director
Dated:   5/16/06

**Exhibit D to the
Affidavit of Margaret Dooley,
sworn to on June 6, 2008**



**IXIS**
Capital Markets

Administered By: Brown Bridgman & Company

## Determination of 2006 Performance Unit Awards - click on the link to see the calculation for the LTI 2006 initial value

LTI Program:   Margaret Dooley

| Participant | Date of Termination | LTI Cycle | LTI Face Value Award | LTI Value Plus Time Value Units Granted | Initial Unit Value | LTI Cycle End Date | Approx Payout Date |
|---|---|---|---|---|---|---|---|
| Dooley, Margaret | | 2005 | $635,000.00 | $699,433.97 | 1302.59 | 536.96 | 12/31/2007 | 6/2008 |
| Dooley, Margaret | | 2006 | $490,000.00 | $556,638.90 | 825.36 | 674.42 | 12/31/2008 | 6/2009 |

Original Value ▼

2006 Q3 ▼

**Exhibit E to the
Affidavit of Margaret Dooley,
sworn to on June 6, 2008**

# CDC IXIS North America's Long Term Incentive Plan

CDC IXIS North America's Long Term Incentive Plan was created to give officers direct participation in the financial success of the companies. By giving officers a direct stake in our longer term financial results, it aligns their personal financial interest directly with the development of the CDC IXIS North America companies and rewards officers for their remarkable efforts in creating value in all our activities.

## What does the plan do?

The Long Term Incentive Plan (LTIP) grants units to CDC Officers representing a share in the cumulative 3 year pre-tax profitability of CDC IXIS Capital Markets North America.

These Units are equal to 1/1,000,000 (.0001%) of the three-year cumulative income before taxes of CDC IXIS Capital Inc. The Unit Value is paid at the end of a Performance Period following verification of performance results by outside auditors and reviewed by CDC Compensation Advisory Board.

## Who is eligible?

All Officers of CDC IXIS North America and CDC IXIS Capital Markets North America are eligible to receive units of the company in which they work.

## How are units awarded?

When managers make their compensation decisions on an annual basis, they make recommendations on LTIP units in the same way they make recommendations regarding bonuses and base salaries. These recommendations, like all compensation elements, are reviewed by senior management and the compensation Advisory Board[2]. Final approval comes from CDC IXIS Management in Paris.

## How are the initial awards valued?

The Award Value is based on an average of the pre-tax profitability of the previous three years plus a hurdle rate of 5% added to each year. The result is a "hypothetical" 3-year cumulative profitability. Each "Performance Unit[1] is worth 1/1,000,000 (.0001%) of this projection.

When managers recommend LTIP awards, they assign a dollar amount, a face value to the award. The units are calculated from face value by the following:

(1) adding a "time value" (three-year blended treasury rate for years 2 and 3), to the face amount to get an adjusted face value.
(2) by dividing the individual target value by the unit value as described above.

---

[2] Subject to review and adjustment by CDC Advisory Board in the event of unanticipated action taken by CDC for reason not related to investment or other performance that impacts profitability and results in the hardship or windfall to participants. Participation and grant level is at the sole discretion of CDC IXIS NA, please refer to the Plan Document for further information. The plan and actions taken thereunder are subject to final approval by CDC IXIS Advisory Board as set forth in the Charter of the Advisory Board

[1] These Units do not represent ownership rights in the Company or Group of any assets of the Company or Group, and are not transferable and otherwise carry no value outside the context of the plan

# CDC IXIS North America's Long Term Incentive Plan    2

<u>How are units paid?</u>

After the three-year cycle runs its course, the audited pre-tax financial results from the three years are totaled and divided by 1 million. This creates the final unit value. It can be greater or less than the initial value. Individual awards are calculated by multiplying the initial unit value by the number of units an employee was awarded. The result is a cash amount that is paid out just like a bonus.

## How do they vest?

Participants will receive full vesting if they are employed with the Company for a full-three year period, or by retiring from CDC IXIS.  One-third of the participant's units granted for any Performance Period will vest at the close of business on the final day of each year. At the end of the three-year cycle, units are fully vested and are paid out as soon as possible after the financial audit is completed.

<u>What happens if an employee terminates?</u>

If the termination is due to death or disability, the outstanding Units will fully vest. When termination is due to retirement, the Units will continue to vest as long as the participant gives one month notice, does not engage in any activities that are competitive with or damaging to the company.

Units granted to a participant who has not vested at or before termination are forfeited at the time of termination. A partially vested participant whose termination occurs prior to the end of a Performance Period will receive a partial payout, provided the officer has provided one month's notice to the company prior to departure.

All vested and partially vested LTIP units will be paid out at the end of the three-year Performance Period cycle at the same time that active employees are paid.

<u>Summary</u>

The plan gives Officers at CDC IXIS a financial interest in the development of the business over time. It also affords them the opportunity to reap the rewards of a job well done. The more prosperous the company is, the more profitable it is for each participant.

For further information as to the Definitions as well as Administration of the plan please refer to the Plan Document or contact your Human Resources Department.

**Exhibit F to the
Affidavit of Margaret Dooley,
sworn to on June 6, 2008**

CDC NORTH AMERICA INC.

PERFORMANCE UNIT PLAN

1.    **Purposes**.  The purposes of this Performance Unit Plan (the "Plan") are to assist CDC North America Inc. and its subsidiaries (collectively referred to herein as the "Company") in attracting, retaining, motivating and rewarding employees and whose performance can impact the long term success of the Company by providing competitive compensation opportunities that reward outstanding performance.

2.    **Definitions**.  In addition to the terms defined in Section 1 hereof, the following terms used in the Plan shall have the meanings set forth below:

(a)    "Beneficiary" means any person (which may include trusts and is not limited to one person) who has been designated by the Participant in his or her most recent written beneficiary designation filed with the Company to receive the benefits specified under the Plan in the event of the Participant's death.  If no Beneficiary has been designated who survives the Participant's death, then Beneficiary means any person(s) entitled by will or the laws of descent and distribution to receive such benefits.

(b)    "Board" means the CDC Advisory Board as constituted both of non-CDC employees and representatives of CDC as selected by the Company.

(c)    "Cause" means (i) a Participant's willful failure to perform his or her duties (other than as a result of total or partial incapacity due to physical or mental illness, and excluding any action taken and any decision not to act if such action is taken or such decision is made in the good faith belief that it is in the furtherance of the business of the Company); (ii) gross negligence or gross malfeasance in the performance of the Participant's duties; (iii) a final finding by a court or other governmental body with proper jurisdiction that an act or acts by the Participant constitutes (A) a felony under the laws of the United States or other state thereof, or (B) a violation of Federal or state securities law if, as a result of such finding under clause (A) or (B) of this clause (iii), the Board determines, in good faith, that the continued employment of the Participant by the Company or any subsidiary or affiliated company would be seriously detrimental to the Company and its business; or (iv) in the absence of any final finding by a court or other governmental body with proper jurisdiction, a determination in good faith by the Board that an act or acts constituted a felony violation of Federal or state securities law and that, by reason of such act or acts, the continued employment of the Participant by the Company or any subsidiary or affiliated company would be seriously detrimental to the Company and its business.

(d)    "CDC" means Caisse des Dépôts Group, the sole shareholder of the Company

(e)    "Disability" means that because of injury or sickness a Participant cannot perform each of the material duties of his or her position, as determined by the President of the Company and with the agreement of the Board.

(f)    "Income Before Taxes" means, for each fiscal year, or other period determined by the Board, the consolidated earnings or losses of the Company before income taxes, as determined in the sole discretion of the Board whose determination shall be final, conclusive and binding on all interested parties, including participants and beneficiaries of the Plan.

(g)    "Participant" means an eligible employee who has been designated by the Committee to receive Units for a specified Performance Period which have not yet been settled.

(h)    "Performance Period" means, unless otherwise determined by the Committee at or after grant, the period of three consecutive fiscal years over which the value of a Unit shall be measured (except that a period shorter than the full Performance Period may be used for such measurement in certain cases involving the Participant's Termination of Employment, as specified in Section 5(d).

(i)    "Prohibited Actions" means that without the prior written consent of the Company the Participant will not

(i)    directly or indirectly engage in, own, manage, operate, control or otherwise participate in or be connected with, any investment management, structured product or other competing business, whether as principal, sole proprietor, agent, employee, employer, consultant, advisor, independent contractor, stockholder, director, officer, partner, joint venturer or in any other individual or representative capacity whatsoever during the Performance Period, provided, however, that the mere ownership by the Participant of not more than one percent (1%) of the equity securities of any competitor or similar business entity, the securities of which are registered pursuant to the Securities and Exchange Act of 1934 as amended, shall not be deemed to be a violation of this covenant so long as the Participant does not actively participate in the business or management of such corporation or entity in any manner whatsoever;

(ii)    employ, solicit for employment, or advise or recommend to any other person that they employ or solicit for employment, any person who is or was an employee of the Company  during the Performance Period;

(iii)    disclose, furnish or make accessible to any person or entity, or make use of for the benefit of himself or others, any confidential information obtained or developed by him or her while in the employ of the Company or any subsidiary or affiliated company.  Prior to the termination of his or her employment with the Company or any subsidiary or affiliated company the Participant shall return to the Company all such information in written or other physical or recorded form or which has been reduced to written or other physical or recorded form, and all copies thereof, in his possession, custody or control.  The foregoing covenant shall not apply to (i) any confidential information that becomes generally known or available to the public other

than as a result of disclosure or other breach of the terms hereof by Participant and (ii) any disclosure of confidential information by the Participant that is expressly required by judicial or administrative order; provided, however, that the Participant shall have (x) notified the Company as promptly as practicable of the existence, terms and circumstances of any notice, subpoena or other process or order issued by a court or administrative authority that may require him or her to disclose any confidential information and (y) cooperated with the Company at its request, in taking legally available steps to resist or narrow such process or order and to obtain an order or other reliable assurance that confidential treatment will be given to such confidential information as is required to be disclosed.

(j)      "Retirement" means an event by which the Participant, at or after age 65, or such earlier age as deemed by the Board, ceases to be an employee of the Company or a subsidiary or affiliated company and immediately after such event the Participant is not employed by the Company or any subsidiary or affiliated company.

(k)      "Termination of Employment" means any event by which the Participant ceases to be an employee of the Company or a subsidiary or affiliated company and immediately after such event the Participant is not employed by the Company or any subsidiary or affiliated company.

(l)      "Unit" means a right, granted by a Participant under the Plan, to receive payout of an amount equal to .0001% of the Income Before Taxes measured over a Performance Period (or shorter period specified in Section 5(d)), subject to the terms and conditions of the Plan. Units are arbitrary accounting measures created and used solely for purposes of administering the Plan. Units do not represent ownership rights in the Company or any assets of the Company, are not transferable and otherwise carry no value outside the context of the Plan.

3.    **Administration**.

(a)    <u>Board Authority</u>.  Unless otherwise determined by the senior management of CDC, the Board shall administer the Plan in accordance with its terms, and shall have full power and authority to construe and interpret the Plan, to prescribe, amend and rescind rules and regulations, agreements, terms and notices hereunder, and to make all other determinations necessary or advisable for the administration of the Plan. Any actions of the Board within their operating charter with respect to the Plan shall be conclusive and binding upon all persons interested in the Plan.

(b)    <u>Delegation</u>.  The Board may delegate any functions of the Plan to a designated officer of the Company, in which case references to the Board shall be deemed to include such delegatee or delegates. The foregoing notwithstanding, only the Board, and no other delegatee, shall have authority (i) to grant Units to, or take actions with respect to Units then held by, officers of the Company or (ii) to make determinations relating to the measurement of Income Before Taxes under the Plan.

(c)    <u>Limitation of Liability</u>.  In the exercise of authority under the Plan, each member of the Board, and any person acting as a delegatee of the Board

hereunder, shall be entitled to, in good faith, rely or act upon any report or other information furnished to him or her by any officer or other employee of the Company or any subsidiary, the Company's independent certified public accountants, or any executive compensation consultant, legal counsel, or other professional retained by the Company to assist in the administration of the Plan. Neither a member of the Board nor any person acting as a delegatee of the Board hereunder shall be personally liable for any action, determination, or interpretation taken or made in good faith with respect to the Plan, and each such person shall, to the extent permitted by law, be fully indemnified and protected by the Company with respect to any such action, determination, or interpretation.

**4.    Eligibility**. Units may be granted only to employees whose performance can impact the long term success of the Company, as designated and approved by the Board.

**5.    Grants and Payouts of Units**.

(a)    <u>Grant of Units</u>. Subject to the terms and conditions of the Plan, the Board may select eligible employees to whom Units shall be granted, specify the number of Units to be granted to each such eligible employee, and specify the Performance Period to which such Units relate. With the exception of the 1997 grant, such grants shall be made not later than 120 days after the beginning of a specified Performance Period. Whether a given employee who meets the eligibility requirements of Section 4 will be granted Units for any Performance Period, and the number of Units that may be granted to any eligible employee for any Performance Period, shall be within the sole discretion of the Board. The Board may consider an employee's past performance, current or future responsibility level, individual ability to impact the future success of the Company, or any other circumstance deemed relevant in making such determination. Such grants and the circumstances considered by the Board in making such determinations need not be the same or consistent for all or any identifiable group of employees, within a given Performance Period or otherwise.

(b)    <u>Determination of Unit Value</u>. The value of each Unit awarded for a Performance Period will be determined as of the last day of each calendar year during the Performance Period. The value of each Unit as of each such date shall be equal to .0001% of the cumulative Income Before Taxes of the Company for the period beginning on the first day of the Performance Period and ending on such date of determination. Unless circumstances require otherwise, such annual determinations of Unit value shall be made within 45 days after the completion of the year-end audit by the Company's independent certified public accountants.

Notwithstanding anything contained herein to the contrary, the Board may adjust the value of Units at any time in the event that CDC materially impacts the financial performance of the Company during the Performance Period through an action(s) that was precipitated for reasons other than the business or investment performance of the Company. It is intended that such events would, by their nature, be rare and that any such adjustment would only be made after careful

consideration of the fairness of such action to both CDC and the Participant in view of the objectives of the Plan.

(c)     Vesting and Forfeiture.  Units granted to a Participant which have not vested, in accordance with this Section 5(c), at or before such Participant's Termination of Employment shall be forfeited at the time of such Termination of Employment.  One-third of a Participant's Units granted for any Performance Period will vest at the close of business on the final day of each year of such Performance Period (which vesting shall include fractional Units), provided that, (i) in the event of a Participant's Termination of Employment due to death or disability, or as otherwise determined by the Board, all of the Participant's Units granted for any Performance Period then in progress shall vest at the time of such Termination, or (ii) in the event of a Participant's Termination of Employment due to Retirement, all of the Participant's Units granted for any Performance Period then in progress shall continue to vest one-third per year provided the Participant does not engage in any Prohibited Actions.

(d)     Settlement.

(1)     Except as provided in paragraph (2) below, the value of a Participant's vested Units shall be determined and paid as soon as reasonably practicable after the end of the Performance Period to which such Units relate.  In the case of a Participant whose Termination of Employment occurs prior to the end of a Performance Period, such value will be equal to the lower of (i) the value of such vested Units determined, in accordance with paragraph (b) above, as of the last day of the Performance Period, or (ii) the value of such vested Units determined, in accordance with paragraph (b) above, as of the last day of the calendar year coincident with or immediately preceding such date of Termination of Employment.  In the case of a Participant who does not incur a Termination of Employment prior to the end of the Performance Period, such value shall be determined, in accordance with paragraph (b) above, as of the last day of such Performance Period.

(2)     In the case of a Participant whose Termination of Employment occurs prior to the end of a Performance Period as a result of death or disability, the value of his Units determined as of the last day of the fiscal quarter coincident with or immediately preceding such date of Termination of Employment shall be paid to the Participant, or in the event of his death to his beneficiary, as soon as reasonably practicable after such value is determined.

(3)     Notwithstanding anything contained herein to the contrary, in the event that Units are held by a Participant who is an expatriate who is being transferred to a CDC affiliate outside the United States, such Participant may elect, within 30 days following such transfer, to be treated for purposes of the Plan as though he had incurred a Termination of Employment as of the date of such transfer or to continue to be treated as a Participant following such transfer.  If such Participant elects to continue to be treated as Participant following such transfer, his service with the non-United States CDC affiliate shall be treated as service under the Plan for vesting purposes.

(e)    Deferral.  Notwithstanding paragraph (d) above, a Participant may, no later than the June 30th preceding the end of each Performance Period, irrevocably elect to defer payment of all or any portion of the amount otherwise payable under paragraph (d) with respect to Units granted for such Performance Period; provided, however, that no such election shall be effective if the Participant's Termination of Employment occurs prior to the end of such Performance Period.  Any such deferral election shall be made in accordance with the terms and conditions of the CDC Capital, Inc. Deferred Compensation Plan.  Any amount so deferred shall be credited to the Participant's Deferred Compensation Account under such Plan and otherwise be subject to all of the terms and conditions thereof.

## 6.    General Provisions.

(a)    No Rights to Participate or Receive Grants or Payouts; No Rights as Stockholder.  Until the Board has determined to grant Units to an eligible employee, no employee shall have any right to participate or receive a grant of Units hereunder, and the granting of Units hereunder shall not be construed as a commitment that any payout shall be made with respect to such Award except in accordance with the terms of the Plan.  No Participant shall have any rights of a stockholder of the Company or any subsidiary as a result of the grant of Units or otherwise under the Plan.

(b)    No Rights to Employment.  Nothing contained in the Plan or in any documents related to the Plan, and no grant of Units, shall (i) confer upon any employee or Participant any right to continue as a Participant or in the employ of the Company or a subsidiary, (ii) constitute any contract or agreement of employment, or (iii) interfere in any way with the right of the Company or a subsidiary to reduce such person's compensation, to change the position held by such person or to terminate the employment of such employee or Participant, with or without cause.

(c)    Non-Transferability.  Units and other rights under the Plan shall not be transferable by a Participant except upon a Participant's death by will or the laws of descent and distribution or to a Beneficiary, and shall not otherwise be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, or charge, and any such attempted action shall be void.

(d)    Unfunded Plan.  The Plan is intended to constitute an "unfunded" plan for incentive and deferred compensation.  With respect to any amount payable to a Participant under the Plan, nothing contained in the Plan (or in any agreement or other documents related thereto), nor the creation or adoption of the Plan, the grant of any Award, or the taking of any other action pursuant to the provisions of the Plan shall give any such Participant any rights that are greater than those of a general creditor of the Company; provided, however, that the Board may authorize the creation of trusts or make other arrangements to meet the Company's obligations under the Plan, which trusts or other arrangements shall be consistent with the "unfunded" status of the Plan unless the Board otherwise determines with the consent of each affected Participant.

(e)    Tax Withholding.  The Company and any subsidiary shall have the right to deduct from any cash amount deliverable hereunder an amount equal to any

federal, state, local, or foreign taxes required to be withheld with respect to such payout.

(f)    <u>Governing Law</u>.  The Plan and all related documents shall be governed by, and construed in accordance with, the laws of the State of New York.  If any provision hereof shall be held by a court of competent jurisdiction to be invalid and unenforceable, the remaining provisions of the Plan shall continue to be fully effective.

(g)    <u>Amendment and Termination</u>.  The Board may, at any time, terminate or, from time to time, amend, modify, or suspend the Plan and agreements under the Plan, provided that no such action shall materially and adversely affect the rights of a Participant with respect to previously granted Units without the consent of such affected Participant.  If the Plan is terminated with respect to future appreciation on outstanding Units, the Units will be fully vested and their current value based on the prior fiscal quarter paid out immediately.  Unless earlier terminated hereunder, the Plan will terminate when the Company has no further obligations under the Plan.

(h)    <u>Arbitration Clause</u>.  In the event there is any claim or dispute arising out of or relating to this Plan, or the breach thereof, and the Company and the Plan participants shall not have resolved such claim or dispute within 90 days after written notice from one party to the other setting forth the nature of such claim or dispute, then such claim or dispute shall attempt to be settled by mediation through a mediator agreed upon by the parties for nonbinding, confidential mediation.  If this is not successful, the dispute will be submitted to binding arbitration in New York, New York, in accordance with the Commercial Arbitration Rules of the American Arbitration Association by an arbitrator(s) selected according to such Rules. Judgment upon the award rendered by such arbitrator(s) shall be entered in any Court having jurisdiction thereof upon the application of either party.

(i)    <u>Effective Date</u>.  The Plan shall become effective as of January 1, 1997, for Performance Periods beginning on or after January 1, 1997.

As adopted by the Board on September 1, 1997.

_____
G. Barbot                    Date

_____
J. Di Martino                    Date

_____
K. Dowd                    Date

_____
A. Orsatelli                    Date

**Exhibit G to the
Affidavit of Margaret Dooley,
sworn to on June 6, 2008**

IXIS NORTH AMERICA INC.

PERFORMANCE UNIT PLAN

RESTATED EFFECTIVE AS OF JANUARY 1, 2006

1.    **Purposes**. The purposes of this Performance Unit Plan (the "Plan") are to assist IXIS North America Inc. and its subsidiaries or any successor entity(ies) thereto (collectively referred to herein as the "Company") in attracting, retaining, motivating and rewarding employees and whose performance can impact the long term success of the Company by providing competitive compensation opportunities that reward outstanding performance.

2.    **Definitions**. In addition to the terms defined in Section 1 hereof, the following terms used in the Plan shall have the meanings set forth below:

(a)    "Beneficiary" means any person (which may include trusts and is not limited to one person) who has been designated by the Participant in his or her most recent written beneficiary designation filed with the Company to receive the benefits specified under the Plan in the event of the Participant's death. If no Beneficiary has been designated who survives the Participant's death, then Beneficiary means any person(s) entitled by will or the laws of descent and distribution to receive such benefits.

(b)    "Board" means the Compensation Advisory Board of the Company.

(c)    "Cause" means (i) a Participant's willful failure to perform his or her duties (other than as a result of total or partial incapacity due to physical or mental illness, and excluding any action taken and any decision not to act if such action is taken or such decision is made in the good faith belief that it is in the furtherance of the business of the Company); (ii) gross negligence or gross malfeasance in the performance of the Participant's duties; (iii) a final finding by a court or other governmental body with proper jurisdiction that an act or acts by the Participant constitutes (A) a felony under the laws of the United States or other state thereof, or (B) a violation of Federal or state securities law if, as a result of such finding under clause (A) or (B) of this clause (iii), the Board determines, in good faith, that the continued employment of the Participant by the Company or any subsidiary or affiliated company would be seriously detrimental to the Company and its business; or (iv) in the absence of any final finding by a court or other governmental body with proper jurisdiction, a determination in good faith by the Board that an act or acts constituted a felony violation of Federal or state securities law and that, by reason of such act or acts, the continued employment of the Participant by the Company or any subsidiary or affiliated company would be seriously detrimental to the Company and its business.

(d)    "Disability" means that because of injury or sickness a Participant cannot perform each of the material duties of his or her position, as determined by the President of the Company and with the agreement of the Board.

(e)    "Income Before Taxes" means, for each fiscal year, or other period determined by the Board, the consolidated earnings or losses of the Company before income taxes, as determined in the sole discretion of the Board whose determination shall be final, conclusive and binding on all interested parties, including participants and beneficiaries of the Plan.

(f)    "Participant" means an eligible employee who has been designated by the Committee to receive Units for a specified Performance Period which have not yet been settled.

(g)    "Performance Period" means, unless otherwise determined by the Committee at or after grant, the period of three consecutive fiscal years over which the value of a Unit shall be measured (except that a period shorter than the full Performance Period may be used for such measurement in certain cases involving the Participant's Termination of Employment, as specified in Section 5(d).

(h)     "Prohibited Actions" means that without the prior written consent of the Company the Participant will not

(i)     directly or indirectly engage in, own, manage, operate, control or otherwise participate in or be connected with, any investment management, structured product or other competing business, whether as principal, sole proprietor, agent, employee, employer, consultant, advisor, independent contractor, stockholder, director, officer, partner, joint venturer or in any other individual or representative capacity whatsoever during the Performance Period, provided, however, that the mere ownership by the Participant of not more than one percent (1%) of the equity securities of any competitor or similar business entity, the securities of which are registered pursuant to the Securities and Exchange Act of 1934 as amended, shall not be deemed to be a violation of this covenant so long as the Participant does not actively participate in the business or management of such corporation or entity in any manner whatsoever;

(ii)     employ, solicit for employment, or advise or recommend to any other person that they employ or solicit for employment, any person who is or was an employee of the Company  during the Performance Period;

(iii)     disclose, furnish or make accessible to any person or entity, or make use of for the benefit of himself or others, any confidential information obtained or developed by him or her while in the employ of the Company or any subsidiary or affiliated company.  Prior to the termination of his or her employment with the Company or any subsidiary or affiliated company the Participant shall return to the Company all such information in written or other physical or recorded form or which has been reduced to written or other physical or recorded form, and all copies thereof, in his possession, custody or control. The foregoing covenant shall not apply to (i) any confidential information that becomes generally known or available to the public other than as a result of  disclosure or other breach of the terms hereof by Participant and (ii) any disclosure of confidential information by the Participant that is expressly required by judicial or administrative order; provided, however, that the Participant shall have (x) notified the Company as promptly as practicable of the existence, terms and circumstances of any notice, subpoena or other process or order issued by a court or administrative authority that may require him or her to disclose any confidential information and (y) cooperated with the Company at its request, in taking legally available steps to resist or narrow such process or order and to obtain an order or other reliable assurance that confidential treatment will be given to such confidential information as is required to be disclosed.

(i)     "Retirement" means an event by which the Participant, at or after age 65, or such earlier age as deemed by the Board, ceases to be an employee of the Company or a subsidiary or affiliated company and immediately after such event the Participant is not employed by the Company or any subsidiary or affiliated company.

(j)     "Termination of Employment" means any event by which the Participant ceases to be an employee of the Company or a subsidiary or affiliated company and immediately after such event the Participant is not employed by the Company or any subsidiary or affiliated company.

(k)     "Unit" means a right, granted by a Participant under the Plan, to receive payout of an amount equal to .0001% of the Income Before Taxes measured over a Performance Period (or shorter period specified in Section 5(d)), subject to the terms and conditions of the Plan.  Units are arbitrary accounting measures created and used solely for purposes of administering the Plan.  Units do not represent ownership rights in the Company or any assets of the Company, are not transferable and otherwise carry no value outside the context of the Plan.

3.     **Administration**.

(a)     Board Authority.  Unless otherwise determined by the senior management of the Company, the Board shall administer the Plan in accordance with its terms, and shall have full power and

authority to construe and interpret the Plan, to prescribe, amend and rescind rules and regulations, agreements, terms and notices hereunder, and to make all other determinations necessary or advisable for the administration of the Plan. Any actions of the Board within their operating charter with respect to the Plan shall be conclusive and binding upon all persons interested in the Plan.

(b)    Delegation. The Board may delegate any functions of the Plan to a designated officer of the Company, in which case references to the Board shall be deemed to include such delegatee or delegates. The foregoing notwithstanding, only the Board, and no other delegatee, shall have authority (i) to grant Units to, or take actions with respect to Units then held by, officers of the Company or (ii) to make determinations relating to the measurement of Income Before Taxes under the Plan.

(c)    Limitation of Liability. In the exercise of authority under the Plan, each member of the Board, and any person acting as a delegatee of the Board hereunder, shall be entitled to, in good faith, rely or act upon any report or other information furnished to him or her by any officer or other employee of the Company or any subsidiary, the Company's independent certified public accountants, or any executive compensation consultant, legal counsel, or other professional retained by the Company to assist in the administration of the Plan. Neither a member of the Board nor any person acting as a delegatee of the Board hereunder shall be personally liable for any action, determination, or interpretation taken or made in good faith with respect to the Plan, and each such person shall, to the extent permitted by law, be fully indemnified and protected by the Company with respect to any such action, determination, or interpretation.

**4.    Eligibility.** Units may be granted only to employees whose performance can impact the long term success of the Company, as designated and approved by the Board.

**5.    Grants and Payouts of Units.**

(a)    Grant of Units. Subject to the terms and conditions of the Plan, the Board may select eligible employees to whom Units shall be granted, specify the number of Units to be granted to each such eligible employee, and specify the Performance Period to which such Units relate. Such grants shall be made not later than 120 days after the beginning of a specified Performance Period. Whether a given employee who meets the eligibility requirements of Section 4 will be granted Units for any Performance Period, and the number of Units that may be granted to any eligible employee for any Performance Period, shall be within the sole discretion of the Board. The Board may consider an employee's past performance, current or future responsibility level, individual ability to impact the future success of the Company, or any other circumstance deemed relevant in making such determination. Such grants and the circumstances considered by the Board in making such determinations need not be the same or consistent for all or any identifiable group of employees, within a given Performance Period or otherwise.

(b)    Determination of Unit Value. The value of each Unit awarded for a Performance Period will be determined as of the last day of each calendar year during the Performance Period. The value of each Unit as of each such date shall be equal to .0001% of the cumulative Income Before Taxes of the Company for the period beginning on the first day of the Performance Period and ending on such date of determination. Unless circumstances require otherwise, such annual determinations of Unit value shall be made within 45 days after the completion of the year-end audit by the Company's independent certified public accountants.

Notwithstanding anything contained herein to the contrary, the Board may adjust the value of Units at any time due to an extraordinary event outside the Company's normal business operations that materially impacts the financial performance of the Company during the Performance Period. It is intended that such events would, by their nature, be rare and that any such adjustment would only be made after careful consideration of the fairness of such action to both the Company and the Participant in view of the objectives of the Plan.

(c)    Vesting and Forfeiture. Units granted to a Participant which have not vested, in accordance with this Section 5(c), at or before such Participant's Termination of Employment shall be forfeited at the time of such Termination of Employment. One-third of a Participant's Units granted for any

Performance Period will vest at the close of business on the final day of each year of such Performance Period (which vesting shall include fractional Units), provided that, (i) in the event of a Participant's Termination of Employment due to death or disability, or as otherwise determined by the Board, all of the Participant's Units granted for any Performance Period then in progress shall vest at the time of such Termination (ii) in the event of a Participant's Termination of Employment due to Retirement, all of the Participant's Units granted for any Performance Period then in progress shall continue to vest one-third per year provided the Participant does not engage in any Prohibited Actions, or (iii) in the event of a senior staff Participant's voluntary Termination of Employment, such Participant shall forfeit the Units excluding units from any fully vested cycle at the time of termination that vested during the calendar year prior to the year of such Termination of Employment, unless such Participant provides the Company with 30-days advance written notice of such Termination of Employment. The Company, in its sole discretion, may waive the requirement contained in clause (iii) of this Section 5(c).

     (d)    <u>Settlement</u>.

       (1)    Except as provided in paragraph (2) below, the value of a Participant's vested Units shall be determined and paid as soon as reasonably practicable after the end of the Performance Period to which such Units relate. In the case of a Participant whose Termination of Employment occurs prior to the end of a Performance Period, such value will be equal to the lower of (i) the value of such vested Units determined, in accordance with paragraph (b) above, as of the last day of the Performance Period, or (ii) the value of such vested Units determined, in accordance with paragraph (b) above, as of the last day of the calendar year coincident with or immediately preceding such date of Termination of Employment. In the case of a Participant who does not incur a Termination of Employment prior to the end of the Performance Period, such value shall be determined, in accordance with paragraph (b) above, as of the last day of such Performance Period.

       (2)    In the case of a Participant whose Termination of Employment occurs prior to the end of a Performance Period as a result of death or disability, the value of his Units determined as of the last day of the fiscal quarter coincident with or immediately preceding such date of Termination of Employment shall be paid to the Participant, or in the event of his death to his beneficiary, as soon as reasonably practicable after such value is determined.

       (3)    Notwithstanding anything contained herein to the contrary, in the event that Units are held by a Participant who is an expatriate who is being transferred to a Company affiliate outside the United States, such Participant may elect, within 30 days following such transfer, to be treated for purposes of the Plan as though he had incurred a Termination of Employment as of the date of such transfer or to continue to be treated as a Participant following such transfer. If such Participant elects to continue to be treated as Participant following such transfer, his service with the non-United States Company affiliate shall be treated as service under the Plan for vesting purposes.

     (e)    <u>Deferral</u>. Notwithstanding paragraph (d) above, a Participant may, no later than the December 31 of the year preceding the year in which the services giving rise to the grant of Units are performed, irrevocably elect to defer payment of all or any portion of the amount otherwise payable under paragraph (d) with respect to Units granted for such year; provided, however, that no such election shall be effective if the Participant's Termination of Employment occurs prior to the end of the applicable Performance Period. [For example, with regard to payments scheduled to be made in 2010 for the performance period 2007-2009, the portion of the payments attributable to services performed in 2007, 2008 and 2009 can be deferred by an election made by December 31, 2006 (or such an election can be made to apply only to the 2007 portion, with additional elections made by December 31, 2007 applying to the 2008 portion and by December 31, 2008 for the 2009 portion).] Any such deferral election shall be made in accordance with the terms and conditions of the IXIS North America Inc. Deferred Compensation Plan. Any amount so deferred shall be credited to the Participant's Deferred Compensation Account under such Plan and otherwise be subject to all of the terms and conditions thereof.

6.        **General Provisions**.

        (a)        No Rights to Participate or Receive Grants or Payouts; No Rights as Stockholder.  Until the Board has determined to grant Units to an eligible employee, no employee shall have any right to participate or receive a grant of Units hereunder, and the granting of Units hereunder shall not be construed as a commitment that any payout shall be made with respect to such Award except in accordance with the terms of the Plan.  No Participant shall have any rights of a stockholder of the Company or any subsidiary as a result of the grant of Units or otherwise under the Plan.

        (b)        No Rights to Employment.  Nothing contained in the Plan or in any documents related to the Plan, and no grant of Units, shall (i) confer upon any employee or Participant any right to continue as a Participant or in the employ of the Company or a subsidiary, (ii) constitute any contract or agreement of employment, or (iii) interfere in any way with the right of the Company or a subsidiary to reduce such person's compensation, to change the position held by such person or to terminate the employment of such employee or Participant, with or without cause.

        (c)        Non-Transferability.  Units and other rights under the Plan shall not be transferable by a Participant except upon a Participant's death by will or the laws of descent and distribution or to a Beneficiary, and shall not otherwise be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, or charge, and any such attempted action shall be void.

        (d)        Unfunded Plan.  The Plan is intended to constitute an "unfunded" plan for incentive and deferred compensation.  With respect to any amount payable to a Participant under the Plan, nothing contained in the Plan (or in any agreement or other documents related thereto), nor the creation or adoption of the Plan, the grant of any Award, or the taking of any other action pursuant to the provisions of the Plan shall give any such Participant any rights that are greater than those of a general creditor of the Company; provided, however, that the Board may authorize the creation of trusts or make other arrangements to meet the Company's obligations under the Plan, which trusts or other arrangements shall be consistent with the "unfunded" status of the Plan unless the Board otherwise determines with the consent of each affected Participant.

        (e)        Tax Withholding.  The Company and any subsidiary shall have the right to deduct from any cash amount deliverable hereunder an amount equal to any federal, state, local, or foreign taxes required to be withheld with respect to such payout.

        (f)        Governing Law.  The Plan and all related documents shall be governed by, and construed in accordance with, the laws of the State of New York.  If any provision hereof shall be held by a court of competent jurisdiction to be invalid and unenforceable, the remaining provisions of the Plan shall continue to be fully effective.

        (g)        Amendment and Termination.  The Board may, at any time, terminate or, from time to time, amend, modify, or suspend the Plan and agreements under the Plan, provided that no such action shall materially and adversely affect the rights of a Participant with respect to previously granted Units without the consent of such affected Participant.  If the Plan is terminated with respect to future appreciation on outstanding Units, the Units will be fully vested and their current value based on the prior fiscal quarter paid out immediately.  Unless earlier terminated hereunder, the Plan will terminate when the Company has no further obligations under the Plan.

        (h)        Arbitration Clause.  In the event there is any claim or dispute arising out of or relating to this Plan, or the breach thereof, and the Company and the Plan participants shall not have resolved such claim or dispute within 90 days after written notice from one party to the other setting forth the nature of such claim or dispute, then such claim or dispute shall attempt to be settled by mediation through a mediator agreed upon by the parties for nonbinding, confidential mediation.  If this is not successful, the dispute will be submitted to binding arbitration in New York, New York, in accordance with the Commercial Arbitration Rules of the American Arbitration Association by an arbitrator(s) selected according to such Rules. Judgment upon the award rendered by such arbitrator(s) shall be entered in any Court having jurisdiction thereof upon the application of either party.

(i) _Effective Date_. The restated Plan shall become effective as of January 1, 2006, for Performance Periods beginning on or after January 1, 2006.

As adopted on _30 OCT_ , 2006.

_____      _____
Anthony Orsatelli                                     Date

_____      _____
Joseph Di Martino                                     Date

_____      _____
Eugene Shanks, Jr.                                     Date

1056356v.5 05033-0001-000

**Affidavit of Guy R. Fairstein, sworn to on June 6, 2008, in Support of the Motion of the Respondent, Margaret Dooley, to Compel Arbitration and in Opposition to the Petitioners' Motion to Stay Arbitration**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JOSEPH Di MARTINO and EUGENE B. SHANKS, Jr.,

                          Petitioners,                          08 Civ. 4606

                - against -                                   Judge Chin

MARGARET DOOLEY,

                          Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**AFFIDAVIT OF GUY R. FAIRSTEIN IN SUPPORT OF
THE MOTION OF MARGARET DOOLEY, THE
RESPONDENT, TO COMPEL ARBITRATION AND IN
<u>OPPOSITION TO THE PETITION TO STAY ARBITRATION</u>**

STATE OF NEW YORK            )
                                  ss:
COUNTY OF WESTCHESTER   )

       I, GUY R. FAIRSTEIN, having been sworn, state:

       1.       I am an attorney-at-law and the attorney representing Margaret Dooley

("Margaret"), the arbitration-claimant in the underlying arbitration, and the respondent in this

proceeding.  I make this affidavit in support of Margaret's motion to compel arbitration and in

opposition to the petition by which Joseph Di Martino and Eugene B. Shanks, Jr., two of the

four arbitration-respondents, seek to stay the arbitration.

       2.       Margaret sets forth in her accompanying affidavit a brief statement of the

facts upon which her claims in the underlying arbitration are based.  Margaret's legal arguments

1

are set forth in her accompanying memorandum.

       3.     Exhibit A hereto is a copy of the notice of removal by which Margaret removed to this Court the special proceeding commenced by Joseph Di Martino and Eugene B. Shanks, Jr., in the Supreme Court of the State of New York, County of New York (without the papers of Messrs Di Martino and Shanks filed in the Supreme Court, which papers are separately before the Court).

       4.     Exhibit G to Margaret's affidavit is a copy of the Performance Unit Plan as restated effective as of January 1, 2006. Messrs Di Martino and Shanks did not submit this plan document as an exhibit to their papers filed in the Supreme Court. However, arbitration-respondent Natixis Capital Markets, Inc., did submit this plan document to the mediator in the mediation which preceded Margaret's filing of her underlying arbitration. This plan document is signed by the three arbitration-respondents, including Mr. Shanks.

                                                         Guy R. Fairstein

Sworn to before me

on June 6, 2008

Notary Public

JOHN PELOSE
Notary Public, State of New York
No. 04PE6147380
Qualified in Westchester County
Commission Expires June 5, 2010

**Exhibit A to the
Affidavit of Guy R. Fairstein,
sworn to on June 6, 2008**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JOSEPH Di MARTINO and EUGENE B. SHANKS, Jr.,

                               Petitioners,

                 - against -

MARGARET DOOLEY,

                               Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**FILED**
MAY 1 9 2008
**USDC WP SDNY**

Civ. 2008

**JUDGE CHIN**
**08 CIV. 4606**

## <u>NOTICE OF REMOVAL</u>

      MARGARET DOOLEY ("Margaret"), by her attorney, Guy R. Fairstein, for her notice of removal, states:

      1.      Margaret removes to this Court a special proceeding under CPLR Article 75 commenced against her in the Supreme Court of the State of New York, County of New York (Index No. 601436/2008) (the "NYS Proceeding"), by Joseph Di Martino ("DiMartino") and Eugene B. Shanks, Jr. ("Shanks"), as petitioners.  In the NYS Proceeding, Di Martino and Shanks seek an order staying an arbitration commenced by Margaret, whose demand for arbitration was filed with the American Arbitration Association (the "AAA") on April 28, 2008.  By an order to show cause, dated May 13, 2008, the petition of Di Martino and Shanks was made returnable in the Supreme Court, New York County, on May 21, 2008.  The order to show cause, the petition, and the supporting papers of Di Martino and Shanks are under this notice of removal.  A copy of Margaret's demand for arbitration, without the exhibits thereto as filed with

1

the AAA, is Exhibit B to the supporting affirmation of Howard J. Rubin.

2.      Removal is effected pursuant to 28 U.S.C. § 1441(b) and 9 U.S.C. § 205, on the ground that the subject matter of the NYS Proceeding relates to an arbitration agreement falling under The Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "New York Convention").

3.      Under 9 U.S.C. § 203, the NYS Proceeding is deemed to arise under the laws and treaties of the United States, and this Court has original jurisdiction over it.

4.      Under 9 U.S.C. § 204, venue is proper in New York County, the place designated in the arbitration agreement as the place of arbitration.

5.      Under 9 U.S.C. § 202, the arbitration agreement falls under the New York Convention because: it arises out of a legal relationship considered as commercial; it is not entirely between citizens of the United States; it envisages both performance and enforcement abroad; and it has some other reasonable relation with one or more foreign states which are signatories to the Convention.

A.      The arbitration agreement is contained in an employer-promulgated long-term incentive plan, the Performance Unit Plan (the "LTIP") for CDC North America Inc. and its subsidiaries (now Natixis Capital Markets, Inc.), adopted by the CDC Advisory Board on September 1, 1997, and restated at least once thereafter. Margaret demanded arbitration under the LTIP Document and the New York Convention (Rubin Affirmation, Exhibit B):

> 1.      Margaret demands the arbitration, in New York,
> New York, of her claims under: (a) an employer-promulgated plan, the
> Performance Unit Plan (the "LTIP") for CDC North America Inc. and its
> subsidiaries, adopted by the CDC Advisory Board on September 1, 1997,
> for "Performance Periods" beginning on or after January 1, 1997, and

2

effective as to all Performance Periods begun prior to January 1, 2006; and (b) 9 U.S.C. §§ 201, et seq., the enabling legislation for the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention").

The purposes of the LTIP are set forth in the LTIP Document (Exhibit B to the supporting affidavit of Joseph Di Martino):

> 1. **Purposes**.    The purposes of this Performance Unit Plan (the "Plan") are to assist CDC North America Inc. and its subsidiaries (collectively referred to herein as the "Company") in attracting, retaining, motivating and rewarding employees and whose performance can impact the long term success of the Company by providing competitive compensation opportunities that reward outstanding performance.

The LTIP is a legal relationship considered as commercial, within 9 U.S.C. § 202.

B.    The LTIP is not entirely between citizens of the United States. Margaret is a citizen of the United Kingdom(demand for arbitration, at ¶ 3). Other participants in the LTIP are citizens of countries other than the United States, including at least : Philippe Kieffer, a citizen of France residing in the United Kingdom; Kristine Jensen, a citizen of Denmark residing in the United Kingdom; and others who are, upon information and belief, citizens of France residing in the United States (id., at ¶ 10). One of the members of the LTIP Advisory Board is required to be a representative of Natixis's parent company in France, and is designated the "French Representative" (see Exhibit A to the supporting affidavit of Joseph DiMartino, at ¶ 2), the position filled by Arbitration-Respondent Anthony Orsatelli, who is, upon information and belief, a citizen and resident of France (demand for arbitration., at ¶¶ 5.A, 10).

C.    The LTIP envisages performance and enforcement abroad, as its participants include employees of Natixis residing outside the United States, and as an arbitration

3

award against Arbitration-Respondent Anthony Orsatelli would be enforced in France.

D.    The United States, Denmark, France and The United Kingdom are parties to the New York Convention (id., at ¶ 12) . See:

http://www.uncitral.org/uncitral/en/uncitral_texts/arbitration/NYConvention_status.html

6.    Pursuant to 28 U.S.C. 1441(b), Margaret submits these papers filed in the Supreme Court of the State of New York, County of New York: (a) order to show cause, dated May 13, 2008; (b) petition, dated May 13, 2008; (c) affirmation of Howard J. Rubin, dated May 13, 2008, and Exhibits A and B thereto; (d) affidavit of Eugene B. Shanks, Jr., sworn to on May 12, 2008; (e) affidavit of Joseph Di Martino, sworn to on May 13, 2008, and Exhibits A, B and C thereto; and (f) memorandum of law, dated May 13, 2008.

7.    Margaret intends to move to compel arbitration.

Dated: May 19, 2008

Guy R. Fairstein - GF-1721

15 Stewart Place - No. 11-J
White Plains, NY 10603
914-328-0923

To:

Davis & Gilbert LLP
Attorneys for the Petitioners
1740 Broadway
New York, NY 10019

The Clerk
Supreme Court, New York County
Supreme Court Building
60 Centre Street
New York, NY 10007

4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JOSEPH Di MARTINO and EUGENE B. SHANKS, Jr.,

                                    Petitioners,                    4606 Civ. 2008

                    - against -
                                                                    Judge Chin
MARGARET DOOLEY,

                                    Respondent.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### AFFIRMATION OF SERVICE

I, GUY R. FAIRSTEIN, an attorney-at-law duly admitted to practice law in the

State of New York, affirm under the penalty of perjury that:

1.    I am the attorney representing Margaret Dooley, the respondent.

2.    On June 7, 2008, I delivered to Federal Express, for delivery on Monday,

June 9, 2008, to Howard J. Rubin, of Davis & Gilbert LLP, the petitioners' attorneys, at 1740

Broadway, New York, NY 10019, a sealed envelope in a Federal Express mailer containing a

copy of each of the following papers:

          - - the Motion of Margaret Dooley to compel arbitration, and notice thereof;

          - - the affidavit of Margaret Dooley, sworn to in June 6, 2008, with the exhibits
thereto; and

          - - the affidavit of Guy F. Fairstein, sworn to on June 6, 2008, with the exhibits
thereto.

Dated: June 7, 2008

                                        _____
                                        Guy R. Fairstein  (GF - 1721)
                                        Attorney for the Respondent
                                        15 Stewart Place  -  No. 11-J
                                        White Plains, NY 10603
                                        914-328-0923

# Affirmation of Service

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JOSEPH Di MARTINO and EUGENE B. SHANKS, Jr.,

                                             Petitioners,                     4606 Civ. 2008

                - against -

                                                                   Judge Chin

MARGARET DOOLEY,

                                         Respondent.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## **AFFIRMATION OF SERVICE**

         I, GUY R. FAIRSTEIN, an attorney-at-law duly admitted to practice law in the

State of New York, affirm under the penalty of perjury that:

         1.        I am the attorney representing Margaret Dooley, the respondent.

         2.        On June 7, 2008, I delivered to Federal Express, for delivery on Monday,

June 9, 2008, to Howard J. Rubin, of Davis & Gilbert LLP, the petitioners' attorneys, at 1740

Broadway, New York, NY 10019, a sealed envelope in a Federal Express mailer containing a

copy of each of the following papers:

         - - the Motion of Margaret Dooley to compel arbitration, and notice thereof;

         - - the affidavit of Margaret Dooley, sworn to in June 6, 2008, with the exhibits
thereto; and

         - - the affidavit of Guy F. Fairstein, sworn to on June 6, 2008, with the exhibits
thereto.

Dated: June 7, 2008

                                          _____

                                          Guy R. Fairstein  (GF - 1721)
                                          Attorney for the Respondent
                                          15 Stewart Place  -  No. 11-J
                                          White Plains, NY 10603
                                          914-328-0923