UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEPH Di MARTINO AND EUGENE B.
SHANKS, Jr.,

                  Petitioners,

      -against-

MARGARET DOOLEY,

                  Respondent.

Case No. 08 Civ. 4606 (DC)

## MEMORANDUM OF LAW IN FURTHER SUPPORT OF PETITIONERS' MOTION TO STAY ARBITRATION AND IN OPPOSITION TO RESPONDENT'S MOTION TO COMPEL ARBITRATION

DAVIS & GILBERT LLP

*Attorneys for Petitioners Joseph Di Martino
and Eugene B. Shanks, Jr.*
Howard J. Rubin (hrubin@dglaw.com)
Jennifer Tafet Klausner (jklausner@dglaw.com)
Heath J. Rosenthal (hrosenthal@dglaw.com)
1740 Broadway
New York, NY 10019
(212) 468-4800

TABLE OF CONTENTS

PRELIMINARY STATEMENT.....................................................................................................1

ARGUMENT............................................................................................................................5

    I.     RESPONDENT'S MOTION TO COMPEL MUST BE DECIDED
           UNDER A SUMMARY JUDGMENT STANDARD............................................5

    II.    THE COURT – NOT AN ARBITRATOR – MUST DECIDE
           WHETHER AN ARBITRATION AGREEMENT EXISTS
           BETWEEN PETITIONERS AND RESPONDENT................................................5

    III.   THE ARBITRATION SHOULD BE STAYED AS AGAINST
           PETITIONERS BECAUSE NO VALID ARBITRATION
           AGREEMENT EXISTS BETWEEN RESPONDENT AND
           PETITIONERS ......................................................................................................11

          A.     THE ARBITRATION PROVISION SHOULD BE
                 ANALYZED UNDER NEW YORK LAW, WHICH
                 HOLDS THAT AN INTENTION TO ARBITRATE MUST
                 BE CLEAR AND UNEQUIVOCAL........................................................ 11

          B.     THE ARBITRATION CLAUSE'S PLAIN LANGUAGE
                 PROVIDES THAT ONLY NATIXIS AND THE LTIP
                 PARTICIPANTS MUST ARBITRATE CLAIMS
                 ARISING OUT OF OR RELATING TO THE LTIP
                 DOCUMENT........................................................................................... 13

          C.     THE LTIP DOCUMENT'S PROVISIONS
                 DEMONSTRATE THAT RESPONDENT COULD NOT
                 HAVE REASONABLY EXPECTED TO ARBITRATE
                 HER CLAIMS AGAINST PETITIONERS.............................................. 15

          D.     RESPONDENT'S FAILURE TO MEDIATE HER
                 CLAIMS AGAINST PETITIONERS PROVIDES
                 COMPELLING EVIDENCE THAT PETITIONERS ARE
                 NOT BOUND BY THE ARBITRATION CLAUSE................................. 21

CONCLUSION.....................................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Barrack, Rodos & Bacine v. Ballon Stoll Bader & Nadler, P.C.*,
　　No. 08 Civ. 02152 (PKL), 2008 U.S. Dist. LEXIS 22026
　　(S.D.N.Y Mar. 20, 2008) ................................................................7, 19, 20

*Bensadoun v. Jobe-Riat*,
　　316 F.3d 171 (2d Cir. 2003)........................................................................5

*Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel*,
　　346 F.3d 360 (2d Cir. 2003)
　　*aff'd*, 2004 U.S. App. LEXIS 10464 (2d Cir. 2004) .................................7, 12

*Contec Corp. v. Remote Solution Co., Ltd.*,
　　398 F.3d 205 (2d Cir. 2005)...................................................................7, 8, 9

*Corrigan v. Breen*,
　　241 A.D.2d 861, 660 N.Y.S.2d 503 (3d Dep't 1997)............................12, 13

*First Options of Chicago, Inc. v. Kaplan*,
　　514 U.S. 938 (1995)........................................................................... *passim*

*Gulf Underwriters Ins. Co. v. Verizon Commc'ns, Inc.*,
　　32 *A.D.3d 709, 710*, 822 N.Y.S.2d 8 (1st Dep't 2006) .................................12

*Hall St. Assocs. L.L.C. v. Mattel, Inc.*,
　　128 S. Ct. 1396 (2007)................................................................................9

*Hartford Accident & Indem. Co. v. Equitas Reinsurance Ltd.*,
　　200 F. Supp. 2d 102 (D. Conn. 2002)..........................................................5

*Jackson Heights Care Ctr, LLC v. Bloch*,
　　39 *A.D.3d 477, 479*, 833 N.Y.S.2d 581 (2d Dep't 2007) .............................12

*Lerner v. Amalgamated Clothing and Textile Workers*,
　　938 F.2d 2 (2d Cir. 1991)..........................................................................18

*Limonium Maritime, S.A. v. Mizushima Marinera*,No.
　　96 Civ. 1888 (DC), 1999 U.S. Dist. LEXIS 20010 (S.D.N.Y. Jan. 28, 1999),
　　*aff'd*, Nos. 99-7219(L) 99-7249, 1999 U.S. App. LEXIS 30447
　　(2d Cir. Nov. 18, 1999)..........................................................10, 11, 15, 16

*Local 205, Cmty. and Soc. Agency Employees' Union, Dist. Council 1707
AFSCME, AFL-CIO v. Day Care Council of New York, Inc.*,
   992 F. Supp. 388 (S.D.N.Y. 1998) .................................................................... *passim*

*Mason Tenders Dist. Council Welfare Fund v. Thomsen Constr. Co.*,
   301 F.3d 50 (2d Cir. 2002) ............................................................................ 18

*Monisoff v. Am. Eagle Invs., Inc.*,
   927 F. Supp. 137 (S.D.N.Y.), *aff'd*, No. 96-7798, 1996 U.S. App. LEXIS
   31865 (2d Cir. Dec. 9, 1996) .......................................................................6, 7

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
   460 U.S. 1 (1983) ............................................................................................ 6

*Nichols v. Wash. Mut. Bank*,
   No. 07 Civ. 3216 (JG), 2007 U.S. Dist. LEXIS 85936
   (E.D.N.Y. Nov. 21, 2007) .............................................................................. 9, 10

*Omni Quartz, LTD v. CVS Corp.*,
   287 F.3d 61 (2d Cir. 2002) ...........................................................................7, 8

*Preston v. Ferrer*,
   128 S. Ct. 978 (2008) .................................................................................8, 9, 24

*Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela*,
   991 F.2d 42 (2d Cir. 1993) .............................................................................. 15

*Salzman Sign Co., Inc. v. Beck*,
   10 N.Y.2d 63, 217 N.Y.S.2d 55 (1961) ...................................................... 17

*Sarhank Group v. Oracle Corp.*,
   404 F.3d 657 (2d Cir. 2005) ........................................................................ *passim*

*TNS Holdings, Inc. v. MKI Secs. Corp.*,
   92 N.Y.2d 335, 680 N.Y.S.2d 891 (1998) ................................................ 12

*Telenor East Invest AS v. Altimo Holdings & Invs. Ltd.*,
   No. 07 Civ. 4829 (DC) 2008 U.S. Dist. LEXIS 23458
   (S.D.N.Y. Mar. 25, 2008) .............................................................................. 7

*Thompson-CSF, S.A. v. Am. Arbitration Ass'n*,
   64 F.3d 773 (2d Cir. 1995) ........................................................................10, 11, 20

*V.C. Vitanza Sons, Inc. v. New York City Hous. Auth.*,
   7 *A.D.3d 398, 398*, 776 N.Y.S.2d 472 (1st Dep't 2004) .........................12, 13

## STATUTES

9 U.S.C. § 4   ............................................................................................................5, 7, 8, 9

9 U.S.C. § 206............................................................................................................5

9 U.S.C. § 208 ............................................................................................................5

## MISCELLANEOUS

AAA, Commercial Arbitration Rules and Mediation, Rule R.39(2007)
    www.adr.org ............................................................................................................2

Petitioners Joseph Di Martino ("Di Martino") and Eugene B. Shanks, Jr. ("Shanks") (together, "Petitioners") respectfully submit this memorandum of law in further support of their motion to stay the arbitration proceeding (the "Arbitration") that Respondent Margaret Dooley ("Dooley" or "Respondent") commenced against them, Natixis Capital Markets, Inc. ("Natixis")[1] and Anthony Orsatelli ("Orsatelli") by a Demand for Arbitration (the "Demand") with the American Arbitration Association ("AAA") and in opposition to Respondent's motion to compel the Arbitration as to Petitioners.

## PRELIMINARY STATEMENT

Respondent purported to commence an AAA Arbitration against Di Martino and Shanks under the authority of the Long-Term Incentive Plan ("LTIP") of her former employer Natixis, as administered pursuant to a Performance Unit Plan Agreement adopted in 1997 (the "LTIP Document") that contains an arbitration clause (the "Arbitration Clause"). As Respondent has admitted, Natixis paid her $571,215.97 in February 2008, which represented the amount of money Natixis calculated that she was owed for the portion of the LTIP units that had vested pursuant to the terms of the LTIP Document. (This was in addition to more than four million dollars in cash and additional compensation Natixis paid Respondent during her employment of approximately four years.) Pursuant to the LTIP Document, the units Natixis granted to her which had not vested at the time of her termination were forfeited.

Although Natixis paid Respondent in a manner consistent with its LTIP and in the exact same manner as all of the other LTIP participants, (Affidavit of Lawrence Laier, sworn to June 19, 2008 ("Laier Aff."), ¶6), Dooley claims in the Arbitration that she is entitled to more money.

---

[1] Petitioners refer the Court to footnote 2 of the Memorandum of Law in Support of Petitioners' Motion to Stay Arbitration ("Stay Brief") for a detailed description of the various corporate changes that resulted in Natixis.

Critically, Natixis, Respondent's employer and the only entity that has an agreement to arbitrate with Respondent, is not seeking to stay the Arbitration. Natixis is a large international bank with sufficient assets to pay any award in the Arbitration. Thus, Respondent's claims will be heard on the merits because Natixis stands ready to proceed with the Arbitration and to satisfy any award, should one ever be entered in Respondent's favor.

Respondent, however, insists on dragging into the Arbitration three individuals – Di Martino, Shanks and Orsatelli[2] – who merely served on an advisory board (the "Advisory Board"). *Id.* ¶ 3. Respondent claims that Petitioners are somehow parties to the long term incentive plan document and are bound by the Arbitration Clause, and, in any event, the question of whether they are bound thereto is to be decided by an arbitrator, not the Court. Respondent is incorrect on both counts.

First, it is up to the Court, not an arbitrator, to determine the threshold question of whether Respondent even has an agreement to arbitrate with Petitioners. Although parties to an arbitration clause can agree, through "clear" and "unmistakable" language, to have all issues of arbitrability decided by an arbitrator, a *court* must *first determine whether an arbitration agreement even exists between the parties*. As the Second Circuit recently stated in *Sarhank*

---

[2]      On or around April 23, 2008, Respondent purported to have served Orsatelli with the Demand by sending it to Natixis' Paris Office (Affirm. of Howard J. Rubin, Esq., dated May 13, 2008, Ex. B ("Demand") at p. 28.). Petitioners filed their petition (the "Petition") to stay the Arbitration on May 13, 2008. On June 2, 2008, after Petitioners filed the Petition, Dooley sent the Demand to Orsatelli "at an address in Paris believed to be his last known address." (Respondent's Mem. of Law ("Dooley Brief") at p. 2 n.2.)

On or around Rule 39 of the AAA Commercial Arbitration Rules ("AAA Rules") states that "[a]ny papers, notices or process necessary or proper for the initiation ... of an arbitration under these rules ... may be served on a party by mail addressed to the party, or its representative at the last known address or by personal service, in or outside the state where the arbitration is to be held, provided that reasonable opportunity to be heard with regard to the dispute is or has been granted to the party." Orsatelli was not affiliated with Natixis on April 23, 2008. (Laier Aff. ¶ 3.) Thus, Dooley's sending of the Demand to Natixis' Paris Office or to an address "believed" to be his last known address does not constitute proper service on Orsatelli under the AAA Rules. However, should the Court deem Orsatelli properly served with the Demand, Petitioners respectfully request that the Court declare that Orsatelli cannot be compelled to arbitrate against Respondent in the Arbitration and stay the Arbitration as against Orsatelli for the same reasons that such relief is being requested on Petitioners' behalf, as discussed more fully below.

*Group v. Oracle Corp.,* "arbitrability is not arbitrable in the absence of the parties' agreement" to arbitrate. 404 F.3d 657, 661 (2d Cir. 2005). Compelling Petitioners to arbitrate when they do not have any agreement to do so flies in the face of the bedrock principal that arbitration is a matter of contract, and a party cannot be required to arbitrate any dispute he has not agreed to arbitrate.

The unambiguous language of the Arbitration Clause demonstrates that Petitioners and Respondent do *not* have an agreement to arbitrate. Rather, the Arbitration Clause specifically limits arbitration to disputes between Natixis and its officers – the LTIP participants – neither of which include either Di Martino or Shanks. In addition, it is clear from a reading of all of the LTIP Document's provisions together that Di Martino, who signed the LTIP Document only in his capacity as a Natixis Advisory Board Member, and Shanks, who did not sign the LTIP Document at all, are not parties to or otherwise bound by the LTIP Document, including its Arbitration Clause.

Finally, Respondent's actions prior to bringing the instant motion provide "compelling evidence" of her knowledge that Petitioners are not bound by the Arbitration Clause. The Arbitration Clause provides that the Company (Natixis) and the LTIP participants must submit to mandatory mediation prior to arbitrating their claims. Although Respondent brought the required mediation (the "Mediation") against Natixis, she did not name Shanks, Di Martino or any other Advisory Board Member in her Request for Mediation.

Respondent makes two contradictory arguments in an attempt to save her case, both of which are wholly lacking merit. First, she contends that Petitioners indeed did participate in the mandatory Mediation even though she does not dispute that she did not name them in the Request for Mediation and they were not present at the Mediation. But Petitioners had no

3

involvement whatsoever with the prerequisite Mediation, which makes sense because Respondent asserted claims against them for the very first time in the Demand for Arbitration months after the Mediation. Indeed, Davis & Gilbert, LLP ("Davis & Gilbert"), the firm that represented Natixis in the Mediation, had no contact whatsoever with, and did not begin representing, Petitioners until they were named in the Arbitration after the Mediation failed.

Second, Respondent claims that she did *not* mediate against Petitioners, asserting that somehow the mediation portion of the Arbitration Clause was limited to Natixis and the LTIP participants, whereas the arbitration provision had no such limitation. This is contrary to the plain language of the Arbitration Clause and is also nonsensical. The purpose of the mediation prerequisite is an attempt to avoid the need for arbitration. This goal would be thwarted if claims brought against all other entities except for Natixis and the LTIP participants could skip the mediation stage and go directly to arbitration. Indeed, Respondent's critical admission on this issue is fatal to her entire argument on her motion to compel.

Finally, as shown below, Respondent not only lacks the right to arbitrate her claims against Petitioners because they are not bound by the Arbitration Clause, but it is also unnecessary that Petitioners be involved in the Arbitration. With the exception of damages arising out of Petitioners' alleged breach of their fiduciary duties, Dooley is seeking the same damages from Petitioners and Natixis – namely the value of her LTIP units that she claims have vested. In addition, because Petitioners are only personally liable under the LTIP Document for actions they did not take in good faith, and Natixis believes all of the actions alleged by Respondent against Petitioners were taken in good faith, Natixis will indemnify Petitioners for any judgment that is made against them in the Arbitration. Thus, Respondent does not need to have Petitioners as parties to the Arbitration to get all the relief, if any, to which she is entitled.

4

For all these reasons, the Court should stay the Arbitration against Petitioners and allow it to proceed efficiently against the real and appropriate party, Respondent's employer, Natixis.

## ARGUMENT

### I.    RESPONDENT'S MOTION TO COMPEL MUST BE DECIDED UNDER A SUMMARY JUDGMENT STANDARD

"In the context of motions to compel arbitration brought under [Section 4 of] the Federal Arbitration Act ("FAA"), . . . the court applies a standard similar to that applicable for a motion for summary judgment. . . . If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003) (citing 9 U.S.C. § 4) (internal citations omitted).  This standard also applies to motions to compel arbitration brought under Section 206 of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. § 206, to the extent that Section 4 is not in conflict with Section 206.  *See Hartford Accident & Indem. Co. v. Equitas Reinsurance Ltd.*, 200 F. Supp. 2d 102, 107, n.7 (D. Conn. 2002) (citing 9 U.S.C. § 208).

### II.    THE COURT – NOT AN ARBITRATOR – MUST DECIDE WHETHER AN ARBITRATION AGREMEENT EXISTS BETWEEN PETITIONERS AND RESPONDENT.

Respondent incorrectly argues that an arbitrator, not the Court, should decide whether an agreement exists between her and Petitioners to arbitrate the claims she brought in the Arbitration.  To the contrary, that determination must be made by the Court.[3]

---

[3] Respondent spends a significant amount of time in her brief arguing that the LTIP Document is a unilateral, not a bilateral agreement (Dooley Brief at pp. 4-5.)  She does not, however, explain why this distinction makes a difference to her case, and she does not cite any authority on the issue.  Indeed, not only is the distinction between bilateral and unilateral agreements completely irrelevant to Respondent's case, such a distinction *might* only be relevant if *Respondent* were trying to *avoid* arbitration.  Here, however, Respondent is the party seeking to compel arbitration, and therefore the distinction between unilateral and bilateral agreements is immaterial.

Respondent confuses the question of who decides arbitrability issues when it has *already been established that an arbitration agreement exists* with the threshold question of who decides *whether an arbitration agreement exists in the first instance.* Respondent's reliance on the Supreme Court's decision in *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.* exemplifies her confusion. 460 U.S. 1, 24-25 (1983) (Dooley Brief at p. 13.)

In Respondent's brief, she quotes the Supreme Court in *Moses H. Cone* as stating that "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration" to support her argument that an arbitrator should decide whether an arbitration agreement exists between her and Petitioners. *Id.* at 460 U.S. at 24-25. Respondent's reliance on *Moses H. Cone* is completely misplaced. As Judge Cedarbaum explained, "[t]he Supreme Court's statement in *Moses H. Cone*, quoted above, 'applies on its face only to the scope of the issues subject to arbitration, not to the threshold issue of whether there exists any agreement to arbitrate between the parties.'" *Local 205, Cmty. and Soc. Agency Employees' Union, Dist. Council 1707 AFSCME, AFL-CIO v. Day Care Council of New York, Inc.*, 992 F. Supp. 388, 393 (S.D.N.Y. 1998) (quoting *Monisoff v. Am. Eagle Invs., Inc.*, 927 F. Supp. 137, 138 (S.D.N.Y.), *aff'd*, No. 96-7798, 1996 U.S. App. LEXIS 31865 (2d Cir. Dec. 9, 1996)). Thus, the presumption in favor of arbitration "is not intended to force an interpretation requiring parties to arbitrate if they did not agree to submit any disputes to arbitration." *Id.* In other words, "a *court* first must conclude that the parties intended to arbitrate in the first instance before the scope of arbitration may be defined." *Monisoff*, 1996 U.S. App. LEXIS 31865, at \*\*2-3 (emphasis added).

Moreover, the general presumption under the FAA is that the issue of arbitrability should be resolved by a court, not an arbitrator. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S.

938, 944-45 (1995); *Telenor East Invest AS v. Altimo Holdings & Invs. Ltd.,* No. 07 Civ. 4829 (DC); 2008 U.S. Dist. LEXIS 23458, at *12 (S.D.N.Y. Mar. 25, 2008). Thus, the issue of arbitrability may only be referred to an arbitrator when there is "*clear* and *unmistakable* evidence from the arbitration agreement, as construed by the relevant state law, that the parties intended the question of arbitrability shall be decided by the arbitrator." *Contec Corp. v. Remote Solution Co., Ltd.,* 398 F.3d 205, 208 (2d Cir. 2005) (internal citations omitted) (emphasis in original). Significantly, however, the Second Circuit has explained that even where the arbitration clause at issue evidences a "clear and unmistakable" intent to refer the issue of arbitrability to an arbitrator, "before proceeding to determine the scope of the arbitration agreement, the *court* must first confirm that the agreement is valid and enforceable." *Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel*, 346 F.3d 360, 366 (2d Cir. 2003) (emphasis added) *aff'd*, 2004 U.S. App. LEXIS 10464 (2d Cir. 2004). Logically, the Second Circuit has reasoned that "arbitrability is not arbitrable in the absence of the parties' agreement" to arbitrate. *Sarhank Group*, 404 F.3d at 661.

Furthermore, Section 4 of the FAA states that "the *court* shall hear the parties*, and upon being satisfied that the making of the agreement for arbitration* or the failure to comply therewith *is not in issue*, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. . . . If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C.§ 4 (emphasis added). [4] Thus, a plain reading of Section 4 shows that it is up to a court, not an arbitrator, to decide whether an agreement to arbitrate exists.

---

[4] As discussed below, Petitioners assert that the LTIP Document and its Arbitration Clause are unambiguous and therefore the Court may decide as a matter of law whether Petitioners are bound to arbitrate with Respondent pursuant to the Arbitration Clause. *See Omni Quartz, LTD v. CVS Corp.*, 287 F.3d 61, 64 (2d Cir. 2002) ("The proper interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue

Respondent argues that because the Arbitration Clause incorporates the AAA Rules, Petitioners "remitted all questions of arbitrability to the arbitrator." (Dooley Brief at p.14.) Respondent relies on *Preston v. Ferrer*, 128 S. Ct. 978 (2008) and *Contec Corp. v. Remote Solution Co., Ltd.*, 398 F.3d 205 (2d Cir. 2005), both of which are distinguishable. (Dooley Brief at pp. 13-14.)

In *Preston,* the Supreme Court reversed the California Court of Appeal's holding that an arbitrator lacked jurisdiction to hear the respondent's challenge to the validity of a contract to which it was a party. The *Preston* court reasoned that the contract's arbitration clause, to which the respondent was also a *party*, incorporated the AAA Rules. 128 S. Ct. at 987-89. Thus, the Supreme Court held that an arbitrator had jurisdiction to adjudicate the contract's validity because AAA Rule 7(b) states that the "arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part." *Id.* at 989. (citation omitted).

Similarly, in *Contec*, the Second Circuit held that a *party* to an arbitration clause that incorporated the AAA Rules was compelled to arbitrate against a non-party to the underlying contract. 398 F.3d at 211. The Second Circuit stated that an arbitration clause incorporating the AAA Rules constituted "clear and unmistakable" evidence that the *parties* to the arbitration clause agreed that issues of arbitrability are for an arbitrator to decide because AAA Rule 7(a) states that an arbitrator has the power to rule on his or her own jurisdiction. *Id.* at 208. The *Contec* court itself *first* determined that the entity which was seeking to avoid arbitration was bound by the arbitration clause *prior* to holding that the arbitration clause provided that issues of

---

(continued . . . )

may properly be resolved by summary judgment.")  However, should the Court believe otherwise, a hearing is required to determine whether an arbitration agreement exists between Petitioners and Respondent. 9 U.S.C. § 4.

arbitrability were for an arbitrator to decide.  *Id.* at 208, 211 ("There can be no doubt that the 1999 Agreement bound its signatory . . . to arbitrate any disputes with the Agreement's other signatory"; Because respondent "*agreed to be bound* by provisions that clearly and unmistakably allow the arbitrator to determine her own jurisdiction    . . . it is the province of the arbitrator to decide whether a valid arbitration agreement exists." (emphasis added)).

There is a critical distinction between *Preston* and *Contec* and the case at bar.  Petitioners unequivocally dispute that they are parties to the Arbitration Clause and therefore challenge the existence of any agreement between them and Respondent to arbitrate the claims Respondent brought in the Arbitration, including issues of arbitrability.   To the contrary, the parties attempting to avoid arbitration in both *Preston* and *Contec* did *not* deny that they were parties to the arbitration clauses at issue. [5]  Indeed, two months *after* the Second Circuit decided *Contec*, it held in *Sarhank Group* that a *court* is first required to determine whether a party even agreed to arbitrate before reaching the question of whether the arbitration agreement confers on an arbitrator the power to decide issues of arbitrability.  404 F.3d at 661.[6]

The Eastern District case *Nichols v. Wash. Mut. Bank* is instructive.  Nichols brought claims against a number of defendants, including National Foreclosure Relief, Inc.  ("National Foreclosure"), under the Fair Debt Collection Practices Act and various New York laws.  *Nichols v. Wash. Mut. Bank*, No. 07 Civ. 3216 (JG), 2007 U.S. Dist. LEXIS 85936 (E.D.N.Y. Nov. 21, 2007).  National Foreclosure moved to stay the proceeding pending arbitration.  *Id.* at **1-2.

[5] Respondent also cites *In Hall St. Assocs. L.L.C. v. Mattel, Inc.*, 128 S. Ct 1396 (2007) to support her argument that an arbitrator should decide whether she has an agreement to arbitrate with Petitioners.  The issue in that case was "whether statutory grounds for prompt vacatur and modification may be supplemented by contract." *Id.* at 1400. Because it did not involve the question of under what circumstances an arbitrator may decide issues of arbitrability, it does not support Respondent's position at all.

[6] Notably, although Respondent cited *Contec* at length in her brief, she failed to cite *Sarhank Group*, a more recent and relevant Second Circuit case.

9

Nichols argued that she did not have an arbitration agreement with National Foreclosure because she was unaware of the arbitration clause in her contract with National Foreclosure. *Id.* at \*24. Although the arbitration clause incorporated the AAA Rules, the Court held that it, not an arbitrator, had to decide whether an arbitration agreement existed between Nichols and National Foreclosure. *Id.* at \*\*4, 23. The Court explained that "[w]hen a party challenges not the validity of the entire contract . . . or the application of a valid arbitration clause to the particular dispute at issue, . . . but rather the existence or validity of the arbitration clause itself, *courts* must determine whether the arbitration clause itself exists, and whether it is valid." *Id.* at \*\*22-23. (emphasis added) (internal citations omitted).[7]

Here, Petitioners allege that they are not parties to the Arbitration Clause and therefore no arbitration agreement exists between them and Respondent. Thus, the Arbitration Clause's incorporation of the AAA Rules is wholly irrelevant to the *threshold* question of whether the Court or an arbitrator should decide if Petitioners are even a party to the Arbitration Clause. As explained above, it is clear that such a determination must be made by the Court. To hold otherwise would run contrary to the oft-cited policy that arbitration is a matter of contract, and generally "a party cannot be required to submit to arbitration any dispute to which he has not agreed so to submit." *Limonium Maritime, S.A. v. Mizushima Marinera,* No. 96 Civ. 1888 (DC), 1999 U.S. Dist. LEXIS 20010, at \*13 (S.D.N.Y. Jan. 28, 1999), *aff'd,* Nos. 99-7219(L), 99-7249, 1999 U.S. App. LEXIS 30447 (2d Cir. Nov. 18, 1999) (quoting *Thompson-CSF, S.A. v. Am. Arbitration Ass'n,* 64 F.3d 773, 776 (2d Cir. 1995)). Since "the question 'who has the primary

---

[7] Although the *Nichols* court ultimately held that a valid arbitration agreement existed between Nichols and National Foreclosure, that case is distinguishable from the case at bar. Nichols argued that she could not be compelled to arbitrate because she was unaware of the arbitration provision in the contract she sought to enforce. Here, Petitioners, who are not seeking to enforce the LTIP Document, argue that they are not parties to an arbitration clause.

power to decide arbitrability' turns upon what the parties *agreed* about that matter," *First Options,* 514 U.S. at 943 (emphasis added and deleted in original), and Petitioners allege that they did not agree to arbitrate *anything* with Respondent, including arbitrability, the question of whether Petitioners and Respondent entered into an arbitration agreement cannot be put in front of an arbitrator.  *See Sarhank Group*, 404 F.3d at 661-62 (An agreement "which does not mention Oracle does not evidence a 'clear and unmistakable' . . . intent by Oracle to arbitrate *or* permit the arbitrator to decide the issue of arbitrability.") (citation omitted).  Thus, the Court, not an arbitrator, should determine whether Petitioners and Respondent agreed to arbitrate Respondent's claims in the Arbitration.

## III.   THE ARBITRATION SHOULD BE STAYED AS AGAINST PETITIONERS BECAUSE NO VALID ARBITRATION AGREEMENT EXISTS BETWEEN RESPONDENT AND PETITIONERS.

Di Martino and Shanks are not subject to the Arbitration Clause, and they therefore do not have an agreement with Respondent to arbitrate the claims she brought against them. Consequently, the Court should grant Petitioners' motion to stay the Arbitration as against them and deny Respondent's motion to compel them to arbitrate.

### A.   THE ARBITRATION PROVISION SHOULD BE ANALYZED UNDER NEW YORK LAW, WHICH HOLDS THAT AN INTENTION TO ARBITRATE MUST BE CLEAR AND UNEQUIVOCAL.

"[W]hile the FAA creates a 'body of federal substantive law of arbitrability, applicable to any arbitration agreement within coverage of the Act,' . . . in evaluating whether the parties have entered into a valid arbitration agreement, the court must look to state law [contract] principles." *Cap Gemini Ernst & Young*, 346 F.3d at 364 (internal citation omitted); *See also First Options*, 514 U.S. at 944.  Respondent worked for Natixis in New York and the events at issue occurred in

11

New York. Indeed, Respondent made her Demand for Arbitration in New York. Therefore, New York law applies to the question of whether Petitioners and Respondent have an agreement to arbitrate.

New York law holds that parties must clearly and unequivocally manifest an intention to arbitrate before relinquishing their rights to have their case heard in a court of law. *TNS Holdings, Inc. v. MKI Secs. Corp.*, 92 N.Y.2d 335, 339, 680 N.Y.S.2d 891, 893 (1998) (courts are mindful "to avoid the unintentional waiver of the benefits and safeguards which a court of law may provide in resolving disputes … unless the parties have subscribed to an arbitration agreement" and shown a "clear indication of intent" to be bound by the agreement); *Gulf Underwriters Ins. Co. v. Verizon Commc'ns, Inc.*, 32 A.D.3d 709, 710, 822 N.Y.S.2d 8, 9 (1st Dep't 2006) (same).

When interpreting the Arbitration Clause under New York law, the Court should determine "the intent of the parties from within the four corners of the [LTIP Document], giving full effect to the plain meaning of the language used and the parties' reasonable expectations." *See Jackson Heights Care Ctr, LLC v. Bloch*, 39 A.D.3d 477, 479, 833 N.Y.S.2d 581, 584 (2d Dep't 2007); *See also Corrigan v. Breen*, 241 A.D.2d 861, 863, 660 N.Y.S.2d 503, 505 (3d Dep't 1997) ("[t]he cardinal rule of contract interpretation is that, where the language of the contract is clear and unambiguous, the parties' intent is to be gleaned from the language of the agreement and *whatever may be reasonably implied therefrom.*") (emphasis in original) (internal citation omitted). The language of the Arbitration Clause should be construed "so as to give full meaning and effect to all provisions of the agreement." *See V.C. Vitanza Sons, Inc. v. New York City Hous. Auth.*, 7 A.D.3d 398, 398, 776 N.Y.S.2d 472, 472 (1st Dep't 2004). "In addition, 'the parties' practical interpretation of their contract prior to litigation provides compelling evidence

12

of the parties' intent, including their intent with respect to arbitration." *Day Care Council of*

*New York, Inc.*, 992 F. Supp. at 392.

### B.   THE ARBITRATION CLAUSE'S PLAIN LANGUAGE PROVIDES THAT ONLY NATIXIS AND THE LTIP PARTICIPANTS MUST ARBITRATE CLAIMS ARISING OUT OF OR RELATING TO THE LTIP DOCUMENT.

The Arbitration Clause's plain language provides clear evidence that Natixis and the

LTIP participants are the only parties to the Arbitration Clause.  The Arbitration Clause states:

> In the event there is any claim or dispute arising out of or relating to this Plan, or the breach thereof, and the Company and the Plan participants shall not have resolved such claim or dispute within 90 days after written notice from one party to the other setting forth the nature of such claim or dispute, then such claim or dispute shall attempt to be settled by mediation through a mediator agreed upon by the parties for nonbinding, confidential mediation.  If this is not successful, the dispute will be submitted to binding arbitration in New York, New York, in accordance with the Commercial Arbitration Association by an arbitrator(s) selected according to such Rules.    Judgment upon the award rendered by such arbitrator(s) shall be entered in any Court having jurisdiction thereof upon the application of either party.

(Aff. of Joseph Di Martino, sworn to May 13, 2008 ("Di Martino Aff."), Ex. B (LTIP Document)
¶ 6(h) (emphasis added).)

Thus, the Arbitration Clause provides that *only* "the Company" and the "Plan

participants" must arbitrate disputes arising out of or relating to the LTIP Document.  The

"Company" is defined in the LTIP Document as "CDC North America Inc. and its subsidiaries"

(now Natixis North America, Inc., including Natixis).  (LTIP Document ¶ 1.)  "Participant" is

defined in the LTIP Document as "an eligible employee who has been designated by the

Committee to receive Units for a specified Performance Period which have not yet been settled."

(*Id.* ¶ 2(g).)  Only officers of Natixis are "eligible employees" for participation in the LTIP, a

point admitted by Respondent.  (Di Martino Aff. Ex. C (Preamble) at p. 1; Dooley Brief at p.10

("The LTIP Document . . . sets forth terms governing one form of incentive compensation for officers of Natixis.")).

The Advisory Board members, including Shanks and Di Martino, do not fall into either the LTIP Document's definition of "Company" or "Participant." Instead, the Advisory Board is provided with its own defined term, "Board." Thus, under the well-known maxim "*expressio unius est exclusio alterius,*" the inclusion of the defined terms "Company" and "Participant" in the Arbitration Clause leads to the conclusion that the Advisory Board, including Petitioners, are not covered by the Arbitration Clause. In fact, Petitioners were *never* Natixis officers, and therefore were never even eligible to participate in the LTIP, (Di Martino Aff. ¶ 7; Aff. of Eugene B. Shanks, Jr., sworn to May 12, 2008, ¶ 8), a fact Respondent cannot dispute.

Further evidence that the Arbitration Clause only applied to Natixis and the LTIP participants is found in the last sentence of the Arbitration Clause, which refers to "either party." The inclusion of the phrase "either party" clearly evidences that the Arbitration Clause applies only to the two entities referred to therein – Natixis and the LTIP participants. Thus, contrary to Respondent's assertion that the Arbitration Clause is broad enough to encompass any and all claims brought relating to the LTIP Document, the plain language of the Arbitration Clause is narrowly tailored to only include claims brought between the Company and the LTIP participants. *See Day Care Council of New York, Inc.*, 992 F. Supp. at 392 (finding that the term "either party" in an arbitration clause "indicat[ed] that the arbitration clause was intended to apply to only [to the] two parties referred to" in the arbitration clause).

Notably, in the section of Respondent's memorandum of law in which she asserts that the Arbitration Clause is broad enough to remit "all claims and disputes under the LTIP," she disingenuously cites only a *portion* of the Arbitration Clause, purposefully leaving out the

14

sentences that refer to "the Company," "the Plan Participants" and "either party" and which thereby limit the Arbitration Clause's purview as discussed above.   (Dooley Brief at p.12.) Moreover, the only case she cites to support her position that the Arbitration Clause is broad enough to cover disputes between Petitioners and Respondent is completely distinguishable. (*Id.* at p. 24.)  In *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela*, the Second Circuit held that the arbitration clause at issue was all-encompassing because it was "not restrictively worded by referring to the parties to that contract by name," but rather merely provided for "arbitration of disputes between 'the contracting parties.'" 991 F.2d 42, 48 (2d Cir. 1993).   To the contrary, the plain language of the Arbitration Clause unambiguously limits arbitration to disputes between the Company and the LTIP participants, and for this reason alone Respondent's motion to compel should be denied. *See Limonium Maritime, S.A.*, 1999 U.S. Dist. LEXIS 20010, at *16 ("[C]ourts have held that clauses requiring arbitration of disputes 'between the disponent owner and the charterers' or 'between the contracting parties' are too narrow to encompass disputes involving nonsignatories and thus have been held to apply only to disputes between the particular parties identified in the arbitration clause.").[8]

### C.   THE LTIP DOCUMENT'S PROVISIONS DEMONSTRATE THAT RESPONDENT COULD NOT HAVE REASONABLY EXPECTED TO ARBITRATE HER CLAIMS AGAINST PETITIONERS.

Aside from the fact that the plain language of the Arbitration Clause limits arbitration to disputes between Natixis and the LTIP participants, Respondent also could not have reasonably thought she could bring an arbitration against Petitioners based upon a reading of the LTIP

---

[8]   In *Limonium Maritime,* the Court found, among other things, that the arbitration clause at issue was broad enough to bind non-signatories, stating that the arbitration clause did "not contain restrictive language and therefore its application was *clearly* not intended to be limited to the signatories of the Charter Agreement." *Id.* at **17-18 (emphasis added).  The Court's decision in *Limonium Maritime* is distinguishable because here, the Arbitration Clause does contain language restricting arbitral disputes to those between Natixis and the LTIP participants.

Document as a whole.  Because Shanks did not sign the LTIP Document[9] at all and Di Martino only signed it in his representative capacity as an Advisory Board Member, Petitioners are not bound by any of the LTIP Document's provisions, including the Arbitration Clause.

Respondent incorrectly contends that Di Martino signed the LTIP Document in his individual capacity.  As explained in Petitioners' Stay Brief, the LTIP Document's stated purposes, to assist Natixis in attracting employees whose performance can impact its long-term success and rewarding those employees for outstanding performance, demonstrate that the LTIP

---

[9]    Respondent brought the Arbitration *only* pursuant to the 1997 LTIP Document.  (Demand ¶ 1.)  Thus, it is irrelevant that Shanks signed the restated LTIP Document in 2006, (Aff. of Margaret Dooley, sworn to June 6, 2008, Ex. G ("2006 LTIP Document")), because Respondent has not brought the Arbitration claiming any breach of *that* document.  In addition, no other LTIP Documents were adopted in between the 1997 and 2006 LTIP Documents.  (Laier Aff. ¶ 2.)  The 2006 LTIP Document is the same as the 1997 LTIP Document in all relevant respects and contains the exact Arbitration Clause as the 1997 LTIP Document.  Thus, Respondent could not compel Shanks to arbitration even if the 2006 LTIP Document was at issue for all of the reasons set forth herein.

As Respondent's attorney points out, Petitioners submitted the 2006 LTIP Document at the Mediation, but they did not submit it to the state court in conjunction with their motion to stay the Arbitration. (Aff. of Guy R. Fairstein, Esq., sworn to June 6, 2008, ¶ 4.)  This is because Respondent's theory of her case in the Arbitration miraculously changed from the theory of her case at the Mediation, which had concluded only less than two months earlier.  In her Request for Mediation and at the Mediation, Respondent contended that her LTIP units vested upon the termination of her employment by Natixis on May 17, 2007.  However, she now has a completely new theory by which she claims in the Demand that her LTIP units vested on December 31, 2004 and December 31, 2005. (Demand ¶ 35; Dooley Brief at p. 3.)

In order for Respondent's new theory to work, she can only rely on the 1997 LTIP Document because the 2006 LTIP Document states that it "shall become effective as of January 1, 2006." (2006 LTIP Document ¶ 6(i).) Respondent's units obviously could not have vested pursuant to an agreement that became effective *after* she claims they vested.  Thus, Respondent specifically brought her claims at the Arbitration only under the 1997 LTIP Document, despite being in possession of a copy of the 2006 LTIP Document as submitted by Petitioners at the Mediation.  Consequently, Petitioners did not submit the 2006 LTIP Document to the state court in conjunction with their petition to stay the Arbitration.  Respondent's reliance on the 2006 LTIP Document in her motion to compel arbitration undermines the theory of her case that her LTIP units vested *prior* to 2006. (*See* Dooley Brief at p. 3.)

To further demonstrate the disingenuousness of Respondent's claims, it is worth noting the following facts: (1) Respondent claims that the LTIP units granted to her for the Performance Period of January 1, 2005 to December 31, 2005 vested on December 31, 2005, but she admits Natixis did not actually grant those units to her until May 2006, four months *after* she claims they vested.  (*Id*.); and (2) Although Respondent claims that her LTIP units vested in 2004 and 2005, and she was entitled to get paid hundreds of thousands of dollars at that time, she *never* complained to Natixis about her alleged entitlement to that money or the fact that it had not been paid until she contacted Natixis' *years* later – after her termination in May 2007. (Laier Aff. ¶ 6.)  Of course that makes sense since her original theory as articulated in the Mediation was that the LTIP units vested and she was entitled to get paid after she was terminated in May 2007.  She had not yet had the benefit of having Natixis demonstrate that her original argument had absolutely no merit, so she had not yet invented her new theory that somehow her LTIP units vested retroactively before they were ever issued.

Document is an agreement purely between Natixis and the LTIP participants, not the Advisory Board Members. In addition, Respondent, knowing that an enormous amount of money is paid out to the LTIP participants, could not have reasonably expected Di Martino and Shanks to be on the hook for all possible claims made under the LTIP Document. Indeed, at the time the LTIP was paid out in February 2008 (when Respondent was paid $571,215.97), there were more than 200 LTIP participants holding LTIP units totaling a face value of over 100 million ($100,000,000.00) dollars. (Laier Aff. ¶ 2.)

Moreover, the fact that Di Martino's name does not appear in the body of the LTIP Document and that he signed it under the phrase "As adopted by the Board" provides further evidence that he signed it only in his representative capacity. *See Salzman Sign Co., Inc. v. Beck*, 10 N.Y.2d 63, 66, 217 N.Y.S.2d 55, 57 (1961) (officer not individually bound where individual "was neither named in the contract as a party thereto nor did he sign as such").

In addition, the LTIP Document contains an indemnity provision entitled "Limitation of Liability" which states that no Advisory Board member "shall be personally liable for any action, determination, or interpretation taken or made in good faith with respect to the [LTIP], and each such person shall, to the extent permitted by law, be fully indemnified and protected by the Company with respect to any such action, determination or interpretation." (LTIP Document ¶ 3(c).) Respondent claims that the Limitation on Liability provision is in fact a personal liability provision because it does not protect Advisory Board Members from actions not taken in good faith.[10]  (Dooley Brief at pp. 20-21.)   However, a plain reading of the indemnity provision

---

[10] Respondent makes a blatant mischaracterization of the indemnity provision, stating that it provides the Advisory Board Members with "only a limited exculpation from personal liability." (Dooley Brief at p. 8.) Quite the contrary, the indemnity provision protects the Advisory Board Members from *all* claims arising out of or relating to the LTIP Document except those related to actions taken by the Board Members not in good faith. (LTIP Document ¶ 3(c).)

demonstrates that it provides protection to the Advisory Board members for *all* claims against them arising out of or relating to the LTIP Document, with the limited exception of those not taken in good faith.

In any event, even if the indemnity provision is actually a personal liability provision, it is still the fact that Di Martino signed the LTIP Document solely in his representative capacity as an Advisory Board Member. In *Mason Tenders Dist. Council Welfare Fund v. Thomsen Constr. Co.*, the Second Circuit found that a signatory to a contract was not individually liable for a breach of the contract even though the contract contained a personal liability clause. 301 F.3d 50, 54 (2d Cir. 2002). The Second Circuit explained that the high degree of intention needed to be shown in order to impart personal liability on a signatory to a contract "goes beyond the mere presence of a personal liability clause in the signed agreement". Here, the totality of the circumstances as described above must lead to the conclusion that there is not "overwhelming evidence" that Di Martino "clear[ly] and explicit[ly]" signed the LTIP Document in his individual capacity. *See Lerner v. Amalgamated Clothing and Textile Workers*, 938 F.2d 2, 6-7 (2d Cir. 1991) ("an agent who signs an agreement on behalf of a disclosed principal will not be individually bound to the terms of the agreement 'unless there is clear and explicit evidence of the agent's intention to substitute or superadd his personal liability for, or to, that of his principal.'") (citations omitted).

Respondent puts forth a number of theories as to why Shanks should be bound to the LTIP Document even though he did not sign it. (Dooley Brief at p. 20.) However, even if it were determined that Petitioners were bound to the *LTIP Document* (which they are not), they *still* would not be bound by the terms of its *Arbitration Provision*. In any event, while it is true

18

that a non-signatory can be bound to an agreement under certain circumstances, as described below, the theories espoused by Respondent lack merit.

In *Local 205, Cmty. and Soc. Agency Employees' Union, Dist. Council 1707 AFSCME, AFL-CIO v. Day Care Council of New York, Inc.*, Judge Cedarbaum denied a petition for enforcement of an arbitration award as against the defendant because although the defendant was a party and signatory to an agreement containing an arbitration clause it was not a party to the arbitration clause itself. 992 F. Supp. 388, 393 (S.D.N.Y. 1998). The arbitration clause at issue did not refer either directly or indirectly to the defendant. *Id.* at 392-93. Rather, it specifically called for the arbitration of disputes only between the plaintiff union and its member employees. *Id.* Consequently, Judge Cedarbaum held that no valid arbitration agreement existed between the plaintiff and the defendant. *Id.* at 393. Thus, even if it were determined that Petitioners were bound by the LTIP Document (which they are not), there still is no valid arbitration agreement between Respondents and Petitioners since Petitioners are not parties to the Arbitration Clause.[11]

In any event, Respondent's argument that Shanks is bound to the LTIP Document despite him not being a party thereto lacks merit. First, Respondent claims that Shanks is estopped from avoiding arbitration because he exploited the LTIP Document. (Dooley Brief at p. 20.) In order for a court to hold that a non-signatory is estopped from avoiding arbitration, it must be demonstrated that the non-signatory received a "direct benefit" from the underlying agreement. *Thompson-CSF*, 64 F.3d at 779; *Barrack, Rodos & Bacine v. Ballon Stoll Bader & Nadler, P.C.*, No. 08 Civ. 02152 (PKL), 2008 U.S. Dist. LEXIS 22026, at **15-16 (S.D.N.Y Mar. 20, 2008).

---

[11] Respondent's assertion that Petitioners are "pick[ing] and choos[ing] among the provisions of the LTIP document, taking those they like and rejecting others" deserves little comment. (*See* Dooley Brief at p. 7.) Obviously an entity can be bound by one provision of a contract but not bound by another provision that specifically excludes them, which is the case here. *See Day Care Council of New York, Inc.*, 992 F. Supp. at 393.

Respondent has attacked the "candor" of Petitioners by completely fabricating a baseless accusation that they did not submit their consulting contracts to the state court because the consulting contracts are advantageous to Respondent's case. (*See* Dooley Brief at p. 6.) Unfortunately for Respondent, the consulting contracts, now submitted by Petitioners to the Court, only hurt her position. (*See* Laier Aff. Ex. A.) (Petitioners did not submit them on their Motion to Stay because, as is obvious from the face of them, they do not contain anything relevant to this case.) Under Shanks' agreement with Natixis, Natixis agreed to pay Shanks a compensation of "$3,000 per meeting" not to "total less than US $45,000" for his initial term of service of April 1, 1998 through June 30, 1999. Natixis also agreed to pay him "[s]pecial payments . . . by the end of the quarter in which services are rendered." (*Id.*) Shanks' compensation program has not changed since he entered into the consulting agreement, and he never received any "special payment" pursuant to the consulting agreement or otherwise. (*Id.* ¶ 4.)

Shanks (and Di Martino) did not receive *any* direct benefit from the LTIP Document. Rather, they are paid a salary for administering a plan. Indeed, since the LTIP Document provides that the Advisory Board's purpose is to administer, construe and interpret the LTIP, it would be a clear conflict of interest if Advisory Board Members could receive direct benefits from the LTIP Document. (*See* LTIP Document ¶ 3(a).) Thus, because Shanks did not receive a "direct benefit" from the LTIP Document, Respondent's estoppel theory must fail. *See Barrack, Rodos & Bacine*, 2008 U.S. Dist. LEXIS 22026, at **15-16 (no estoppel where non-signatory only exploited the contractual relation of the parties to the agreement, which was a benefit arising from the agreement but was not a direct benefit of the agreement).

20

Respondent also claims that Shanks must arbitrate because he either incorporated or assumed the LTIP Document, and she bases this argument on his pure speculation that his consulting contract will reveal either such incorporation or assumption. (Dooley Brief at p. 20.) However, it is clear from the face of the Shanks' consulting contract that he neither incorporated nor assumed the LTIP Document. (*See* Laier Aff. Ex. A.) Even if Shanks did incorporate the LTIP Document – which he did not – he is not a party to its Arbitration Clause as explained herein. Similarly, even if Shanks did assume the *LTIP Document* – which he did not – he has not assumed its *Arbitration Clause* because he has not taken any action evidencing an agreement to arbitrate, and Respondent sets forth no facts to the contrary.

## C.    RESPONDENT'S FAILURE TO MEDIATE HER CLAIMS AGAINST PETITIONERS PROVIDES COMPELLING EVIDENCE THAT PETITIONERS ARE NOT BOUND BY THE ARBITRATION CLAUSE.

Respondent's interpretation of the Arbitration Clause prior to bringing this lawsuit provides "compelling evidence" that she did not believe Petitioners to be bound by the Arbitration Clause. *See Day Care Council of New York, Inc.*, 992 F. Supp. at 392. Specifically, the Arbitration Clause clearly provides that mediation is a prerequisite to arbitration. Although Respondent brought the Mediation against Natixis prior to filing her Arbitration Demand, she never brought a mediation against either Di Martino or Shanks or asserted any of the claims she now makes in the Demand against them. Indeed, by failing to meet this condition precedent Respondent cannot now proceed with the Arbitration against Petitioners.

Realizing her error, Respondent now attempts to backpedal by making two conflicting arguments, both of which are wholly lacking in merit. Respondent first argues that the Advisory Board Members were involved in negotiating a settlement with her during the mediation process. (Dooley Brief at p. 4.) She then argues that she did not mediate against Petitioners because

21

Advisory Board Members are excluded from the mediation process required by the Arbitration Clause. (*Id.* at pp. 8, 23.)

First, Respondent, referring to settlement discussions occurring during the Mediation, states that "the Advisory Board members were negotiating with Margaret, through their or their delegatee's agent, terms of settlement . . . .   Margaret refused to agree to this [settlement], and proceeded to arbitration." (*Id.* at 4; *See also* Demand ¶¶ 40, 46B.) This statement has absolutely no basis in fact. Howard J. Rubin ("Rubin"), the attorney from Davis & Gilbert who represented Natixis in the Mediation with Respondent and who is now representing Petitioners in this action, was not asked to and did not represent Petitioners in the mandatory Mediation because Petitioners were not named by Respondent in the Mediation and they therefore had no role in it. (Decl. of Howard J. Rubin, Esq., ("Rubin Declaration") dated June 19, 2008, ¶ 3.) As the Rubin Declaration states, no lawyer involved in the mediation had any contact whatsoever with Di Martino or Shanks at any point until the Demand for Arbitration was served approximately two months *after* the Mediation was over. (*Id.* ¶ 4.) There was no reason for Mr. Rubin to be in contact with people who Respondent did not name in the Mediation, and, in any event, he did not negotiate at all with Respondent on behalf of Petitioners at any point in time. The settlement terms proposed by both parties contained no payments or actions on the part of Petitioners and their names were never mentioned. (*Id.* ¶ 5.) Respondent's assertion that Petitioners were negotiating with Respondent through Mr. Rubin during the Mediation is therefore a complete fabrication.

Next, despite having stated that the Petitioners took part in the Mediation, Respondent goes on to argue that she complied strictly with the Arbitration Clause by *not* including Petitioners in the Mediation. (Dooley Brief at pp. 8, 23.) Her claim that the Advisory Board

Members were exempt from the Arbitration Clause's mediation requirement yet somehow included in the arbitration part of the same clause is nonsensical and indeed, amounts to a fatal admission.[12]  Respondent asserts that under the Arbitration Clause, only the Company and the LTIP participants had to meet the mediation prerequisite prior to commencing arbitration, but any other individual or entity could go directly to arbitration without mediating first.  This argument defies both the Arbitration Clause's plain language and the clear purpose of the Arbitration Clause and arbitration in general.

First, Respondent's assertion that Advisory Board Members were exempt from the mediation requirement but are bound to arbitrate contradicts the plain, unambiguous language of the Arbitration Clause.  She somehow claims that the phrase "any claim or dispute arising out of or relating to this Plan, or breach thereof" in the Arbitration Clause's first sentence relates to the arbitration requirement, while the second phrase in the very same sentence, which refers to "the Company and the Plan participants," does not.  This is contrary to the Arbitration Clause's plain language.  The *entire* Arbitration Clause clearly tracks the grievance procedure for a typical dispute arising out of or relating to the LTIP Document.  The Arbitration Clause's first sentence states that in "the event there is any claim of dispute . . . and the Company and the Plan participants shall not have resolved *such claim or dispute* . . . then *such claim or dispute* shall attempt to be settled by mediation . . .."  (LTIP Document ¶ 6(h)) (emphasis added).  Respondent admits that this language limits mediation to the Company and the LTIP participants.  (Dooley Brief at 23-24.)  The Arbitration Clause's second sentence states, "if this is not successful, *the dispute* will be submitted to binding arbitration . . . ."  (LTIP Document ¶ 6(h)) (emphasis

---

[12] Petitioners make this argument solely to demonstrate that Respondent did not believe them to be bound by the Arbitration Clause.  Petitioners are not arguing that the mediation requirement actually applies to them because, as discussed herein, they are not parties to any portion of the Arbitration Clause, including its mediation requirement.

added).  It would make no sense to read the second sentence as incorporating the first sentence's

first phrase but not its second phrase.  A simple reading of the Arbitration Clause holds that it

limits *both* the mediation and arbitration to grievances between the Company and the LITP

participants and thus, Respondent's admission on this point is fatal to her entire argument.

Respondent attempts to bolster her argument that the Arbitration Clause's restrictive

language – "the Company and the Plan participants" – applies only to the first sentence by calling

the Arbitration Clause the "mediation/arbitration clause."  (Dooley Brief at p.7.)  However, the

*entire* provision is called the "Arbitration Clause," *not* the "mediation/arbitration clause," clearly

indicating that the restriction to disputes between Natixis and the LTIP participants applies to

both the mediation and the arbitration process. (LTIP Document ¶ 6(h).)    There is nothing

ambiguous about the Arbitration Clause, and Respondent's desperate attempt to create ambiguity

in the Arbitration Clause where none exists must fail.

Second, Respondent's assertion that Advisory Board Members were exempt from the

mediation prerequisite but can be compelled to arbitrate is contrary to the clear purpose of the

Arbitration Clause and arbitration in general.  The Arbitration Clause actually contains two

prerequisites to arbitration.  First, it requires that the Company and the LTIP participants attempt

to settle their dispute on their own.  (*Id*.)  If that fails, they then must go to mediation.  (*Id*.)  If

mediation is unsuccessful, then they can go to arbitration.  (*Id*.)  Clearly, these two steps were

included as measures to assist in the *avoidance* of having to spend time and money arbitrating.

As stated by the Supreme Court in *Preston,* a case cited by Respondent herself, "[a] prime

objective of an agreement to arbitrate is to achieve 'streamlined proceedings and expeditious

results.'"  *Preston*, 128 S. Ct. at 928.  It would make no sense to read the Arbitration Clause as

requiring only the Company and the LTIP participants to settle their differences on their own and

through mediation in an attempt to foster a cheaper, more efficient result, while at the same time permitting others to skip straight to arbitration.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Court deny Respondent's motion to compel them to participate in the Arbitration and grant their motion to stay the Arbitration, along with such other and further relief as the Court deems just and proper.

Dated:    June 20, 2008
          New York, New York

DAVIS & GILBERT LLP

By:_____

    Howard J. Rubin hrubin@dglaw.com
    Jennifer Tafet Klausner jklausner@dglaw.com
    Heath J. Rosenthal hrosenthal@dglaw.com
1740 Broadway
New York, NY 10019
(212) 468-4800
*Attorneys for Petitioners Joseph Di Martino and Eugene B. Shanks, Jr.*